# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARTIN LUJAN,

          Petitioner/Plaintiff,

vs.                                                                          No. CIV 13-0438 JB/SMV

CITY OF SANTA FE,

          Defendant/Respondent.

## AMENDED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Petitioner Martin Lujan's Appeal Brief, filed September 18, 2013 (Doc. 29)("Appeal Brief"). The Court held a hearing on October 22, 2013. The primary issues are: (i) whether Administrative Hearing Officer Paula G. Maynes acted fraudulently, arbitrarily, or capriciously when she failed to recuse herself from Plaintiff/Petitioner Martin Lujan's post-termination administrative hearing, or disclose her prior representation of the Defendant/Respondent City of Santa Fe with City Attorney Mark Allen; (ii) whether Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses by authorizing the payment of two submitted invoices is fraudulent, arbitrary, or capricious, and supported by substantial evidence; (iii) whether Ms. Maynes' decision that M. Lujan carelessly, negligently, or improperly used City of Santa Fe funds is fraudulent, arbitrary, or capricious, and supported by substantial evidence; (iv) whether Ms. Maynes' decision that M. Lujan intentionally

---

[1]The Memorandum Opinion and Order, filed February 24, 2015 (Doc. 62)("MOO"), denied in part and granted in part the requests in Petitioner Martin Lujan's Appeal Brief, filed September 18, 2013 (Doc. 29), had words missing on multiple pages. Although the Court meticulously reviewed the MOO before filing it, a technical glitch occurred when the MOO was converted from a Word file to a PDF file. This Amended Memorandum Opinion and Order fixes those errors while leaving the substance of the MOO -- i.e., the MOO's factual findings, legal conclusions, analysis, and holdings -- intact and unchanged.

falsified or mishandled City of Santa Fe records is fraudulent, arbitrary, or capricious, and supported by substantial evidence; (v) whether Ms. Maynes' decision that M. Lujan stole City of Santa Fe funds is fraudulent, arbitrary, or capricious, and supported by substantial evidence; (vi) whether just cause existed for the City of Santa Fe to terminate M. Lujan's employment; and (vii) whether Ms. Maynes' decision was in accord with the law.

The Court will deny M. Lujan's requests in the Appeal Brief in part and grant them in part. First, Ms. Maynes did not act fraudulently, arbitrarily, or capriciously when she failed to recuse herself from M. Lujan's post-termination administrative hearing, or disclose her prior representation of the City of Santa Fe. Second, Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses by authorizing payment of two submitted invoices is not fraudulent, arbitrary, or capricious, and substantial evidence supports the decision. Third, Ms. Maynes' decision that M. Lujan carelessly, negligently, or improperly used City of Santa Fe funds is arbitrary and capricious and substantial evidence does not support the decision. Fourth, M. Lujan waived the issue whether Ms. Maynes decision that he intentionally falsified or mishandled City of Santa Fe records was fraudulent, arbitrary, and capricious, and substantial evidence did not support it; if M. Lujan did not waive the issue, however, the Court finds that Ms. Maynes' decision that he intentionally falsified or mishandled City of Santa Fe funds was arbitrary and capricious and substantial evidence did not support it. Fifth, Ms. Maynes' decision that M. Lujan stole City of Santa Fe funds is arbitrary and capricious, and substantial evidence does not support the decision. Sixth, just cause existed for M. Lujan's termination from employment. Seventh, Ms. Maynes' decision was in accord with the law. Consequently, the Court will grant M. Lujan's request in the Appeal Brief regarding Ms. Maynes' conclusions that M. Lujan stole City of Santa Fe funds and carelessly, negligently, or improperly used City of Santa Fe funds, but deny the

requests in the Appeal Brief on the remainder of the issues, and leave Ms. Maynes' determination that just cause existed for M. Lujan's termination intact.

**FACTUAL BACKGROUND**

This case arises out of the City of Santa Fe's termination of M. Lujan's employment after he allegedly attempted to embezzle City of Santa Fe funds. The Court takes its facts from M. Lujan's post-termination administrative hearing that Ms. Maynes conducted. See Reporter's Transcript of Proceedings (Nov. 6, 2012), filed May 23, 2013 (Doc. 8-21); Reporter's Transcript of Proceedings (Nov. 6, 2012), filed May 23, 2013 (Doc. 8-22); Reporter's Transcript of Proceedings (Nov. 6, 2012), filed May 23, 2013 (Doc. 8-23)(collectively "Nov. 6, 2012, Hearing Tr."); Reporter's Transcript of Proceedings (Nov. 7, 2012), filed May 23, 2013 (Doc. 8-24); Reporter's Transcript of Proceedings (Nov. 7, 2012), filed May 23, 2013 (Doc. 8-25); Reporter's Transcript of Proceedings (Nov. 7, 2012), filed May 23, 2013 (Doc. 8-26); Reporter's Transcript of Proceedings (Nov. 7, 2012), filed May 23, 2013 (Doc. 8-27)(collectively "Nov. 7, 2012, Hearing Tr."); Reporter's Transcript of Proceedings (Nov. 8, 2012), filed May 23, 2013 (Doc. 8-28); Reporter's Transcript of Proceedings (Nov. 8, 2012), filed May 23, 2013 (Doc. 8-29); Reporter's Transcript of Proceedings (Nov. 8, 2012), filed May 23, 2013 (Doc. 8-30); Reporter's Transcript of Proceedings (Nov. 8, 2012), filed May 23, 2013 (Doc. 8-31)(collectively "Nov. 8, 2012, Hearing Tr."); Reporter's Transcript of Proceedings (Dec. 3, 2012), filed May 23, 2013 (Doc. 8-32); Reporter's Transcript of Proceedings (Dec. 3, 2012), filed May 23, 2013 (Doc. 8-33); Reporter's Transcript of Proceedings (Dec. 3, 2012), filed May 23, 2013 (Doc. 8-34)(collectively "Dec. 3, 2012, Hearing Tr.").[2]

---

[2]Because the copies of the post-determination hearing transcripts are provided with four transcript pages on each CM/ECF page, the Court will use the original transcripts' pagination rather than CM/ECF's

1.      <u>M. Lujan's Background with the City of Santa Fe.</u>

M. Lujan was the Municipal Recreation Complex Administrative Manager from approximately January, 2010, until the City of Santa Fe terminated his employment on August 14, 2012. <u>See</u> Nov. 6, 2012, Hearing Tr. at 49:16-20 (Pino, Allen); Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins). M. Lujan also held the position of Interim Division Director for the City of Santa Fe's Recreation Division from October 9, 2010, through August 14, 2012. <u>See</u> Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins). In those capacities, M. Lujan was responsible for helping to create and to manage a multimillion-dollar budget. <u>See</u> Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1029:4-10 (M. Lujan, Allen). M. Lujan was also responsible for reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those purchases. <u>See</u> Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); <u>id.</u> at 69:25-70:3 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1027:9-14 (M. Lujan, Allen). M. Lujan authorized the payments for most of the City of Santa Fe's purchases by signing them. <u>See</u> Nov. 6, 2012, Hearing Tr. at 50:21-24 (Pino, Allen).[3] M. Lujan worked for the City of Santa Fe in

_____

[3]The City of Santa Fe asserts that M. Lujan "was in charge of making sure that the goods and services the City procured were actually received and the City was not overcharged for those goods or services." Response at 5 (citing Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen)). M. Lujan argues that the record does not support this fact. <u>See</u> Petitioner Martin Lujan's Reply Brief, filed November 4, 2013 (Doc. 50)("Reply"). M. Lujan points to Pino's testimony that M. Lujan's "responsibilities, as will all division directors, was to help create a budget and held [sic] manage a budget, and oversee significant purchases and payments . . . ." Reply at 9. M. Lujan argues that the City of Santa Fe's statement is misleading and is contrary to the fact that the City of Santa Fe has a purchasing department and purchasing agents who are responsible for approving purchases like the one at issue in this case. <u>See</u> Reply at 9-10. M. Lujan points out that the record contains the purchase order for the City of Santa Fe's sponsorship of the 2012 Grand Nationals Tournament, which Robert Rodarte -- the City's Purchasing Officer -- signed and approved <u>See</u> Reply at 10 (citing Purchase Order (June 6, 2012) at 15, filed May 23, 2013 (Doc. 8-13)("June 6, 2012, PO"). M. Lujan asserts that further evidence that the City of Santa Fe's argument is misleading is Rodarte's June 29, 2012, electronic-mail transmission, in which he writes: "After

---

reviewing the Purchase Order issued for the month of June, I noticed that the PO listed above for Santa Fe Junior Wrestling was missing a contract.  Somehow this one got past me during the approval process."   Reply at 10 (quoting Rodarte's June 29, 2012, electronic-mail transmission)(internal quotation marks omitted)(emphases in Reply omitted).   M. Lujan concludes: "Lujan's submission of the agreement with the Santa Fe Junior Wrestling Association was not subject to Lujan's approval but it required both the blessing of the City Manager and approval of the City's Purchasing Agent . . . ."  Reply at 10.

Both parties mischaracterize this passage of Pino's testimony:

Q.      It's my understanding that you were Mr. Lujan's direct supervisor.

A.      Yes.

Q.      And what was Mr. Lujan's job title?

A.      He was the director of the Municipal Recreation Complex -- or the manager of the Municipal Recreation Complex, MRC; and he was interim director of recreations division.

Q.      Okay.  And what were his responsibilities with regard to financial matters?

A.      His responsibilities, as with all division directors, was to help create a budget and help manage a budget, and to oversee significant purchases and payments, and the obtaining of goods and services and payment for those goods and services.

Q.      And specifically with regard to overseeing purchases, what does that involve?

A.      Generally, it would involve reviewing the goods and services to be purchased, the price that has been quoted for that purpose, and the amount paid for that service or good.

Q.      When an invoice comes in to the City under a contract, what is the division director's responsibilities?

A.      It depends on the level of the invoice.  Generally, small invoices for small goods, small services, are handled administratively through a process, through a purchasing and payment process.   Division directors will, generally, spend a little bit more time with things of greater significance and higher costs, and review, along with the administrators who make the payments, and process the invoices, the payment -- the delivery of those services and the payment for those services.

Q.      Okay.  So the division director is responsible for authorizing payment?

recreation-related positions for eighteen years.  See Nov. 8, 2012, Hearing Tr. at 909:5-8 (M. Lujan, Thompkins).  During that time, M. Lujan was not demoted, written up, or disciplined in any way.  See Nov. 8, 2012, Hearing Tr. at 910:18-21 (M. Lujan, Thompkins).

      **2.**      **The Events Which Led to M. Lujan's Termination.**

The incident that led to M. Lujan's termination involved the City of Santa Fe's sponsorship of the Amateur Athletic Union's 2012 Grand National Wrestling Tournament that took place in Santa Fe from June 6, 2012, to June 9, 2012.  See Nov. 8, 2012, Hearing Tr. at 790:6-23 (L. Lujan, Thompkins).  The Santa Fe Junior Wrestling Association ("SFJWA") sponsored the tournament.  See Nov. 8, 2012, Hearing Tr. at 771:1-773:25 (L. Lujan, Thompkins).  M. Lujan's older brother -- Larry Lujan[4] -- is an SFJWA Board member and is the Director of the AAU Grand National Wrestling Tournament.  See Nov. 8, 2012, Hearing Tr. at 741:9-21 (L. Lujan, Thompkins).

_____

      A.      For most of the purchases, there is a signature line for the division director.

Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen).
      Pino's testimony demonstrates that M. Lujan was not "in charge of" -- i.e., had the final say in -- making sure that the City of Santa Fe received the goods and services that it bought and was not overcharged.  Response at 5.  Instead, the testimony shows that M. Lujan often worked with the administrators who make payments on behalf of the City of Santa Fe to determine whether the City of Santa Fe received the goods and services that it bought and was not overcharged.  See Nov. 6, 2012, Hearing Tr. at 50:5-19 (Pino, Allen).  Similarly, Pino's testimony demonstrates that M. Lujan's statement that "Lujan's submission of the agreement with the Santa Fe Junior Wrestling Association was not subject to Lujan's approval" is incorrect.  Reply at 10.  Pino testified that M. Lujan was responsible for "oversee[ing] significant purchases and payments" and authorizing "most of" those payments by signing them.  Nov. 6, 2012, Hearing Tr. at 49:23-50:24 (Pino, Allen).  The Court thus concludes that the most accurate way to describe Pino's testimony is with the following three facts: (i) M. Lujan was responsible for helping create and manage a multimillion-dollar budget; (ii) M. Lujan was also responsible for reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those purchases; and (iii) M. Lujan authorized the payments for most of the City of Santa Fe's purchases by signing them.

      [4]L. Lujan worked as the Municipal Recreation Complex Administrative Manager -- the position that M. Lujan held when he was fired -- before he retired in 2010.  See Nov. 8, 2012,

In 2011, the City of Santa Fe sponsored the Grand National Wrestling Tournament by providing in-kind service contributions and purchasing advertisements in the Tournament's program.  See Electronic-Mail Transmission from Martin Lujan to Robert P. Romero at 29 (Feb. 3, 2012), filed May 23, 2013 (Doc. 8-8)("M. Lujan's Feb. 3, 2012, E-mail").  At all relevant times, the City has a fraud-prevention policy, which states:

> An employee should not be involved in the procurement of any goods or services for the City with a business in which a family member . . . has a direct financial interest in (owner, partner, officer, director or board member).  If the business is one which may be advantageous to the department or City to do business with, the procurement can be handled by the next level up in the chain of command or can be handled by the Purchasing Office.  Procurement includes writing and evaluating bids, writing and evaluation of requests for proposals, the acquisition of quotes, and the entering or approval of subsequent purchase requisitions.

City Fraud Prevention Policy Rule 6.3.4, filed May 23, 2013 (Doc. 8-17)("Anti-Fraud Policy"). Despite R. Romero's knowledge of the Anti-Fraud Policy, and his knowledge of M. Lujan and L. Lujan's familial relationship and their respective positions, R. Romero assigned the brothers to work together on the City of Santa Fe's sponsorship of the 2011 and 2012 Grand National Tournaments.  See Nov. 6, 2012, Hearing Tr. at 291:11-18 (Romero, Allen).  R. Romero "did not think"[5] about the Anti-Fraud policy when he tasked M. Lujan with evaluating the sponsorship

---

Hearing Tr. at 741:12-14 (L. Lujan, Thompkins); id. at 922:12-24 (M. Lujan, Thompkins).  L. Lujan worked for the City of Santa Fe for twenty-six years and eight months.  See Nov. 8, 2012, Hearing Tr. at 786:22-25 (L. Lujan, Thompkins).

[5]M. Lujan takes umbrage with this fact, arguing that the facts and R. Romero's testimony contradict it.  See Reply at 13.  M. Lujan points out that: (i) R. Romero was a close friend of the Lujan brothers before the events that led to this case; (ii) R. Romero knew that the Lujans were brothers; (iii) R. Romero knew about the Anti-Fraud Policy; (iv) he did not think anything would happen; and (v) R. Romero assigned the Lujan brothers to work together again on the 2012 tournament in violation of the Anti-Fraud Policy.  See Reply at 13.  M. Lujan asserts that it is clear that R. Romero was aware of the policy, but alleges that he did not think about it "to make Lujan's appear as the perpetrators."  Reply at 13.  M. Lujan says that R. Romero's "alleged belief is eliminated" when R. Romero admitted that the Anti-Fraud Policy "does not have an exception." Reply at 14 (quoting Nov. 7, 2012, Hearing Tr. at 386:1-23 (R. Romero, Thompkins))(internal

requests that L. Lujan had submitted, and "didn't expect there to be any fraud."  Nov. 6, 2012, Hearing Tr. at 291:11-292:2 (R. Romero, Allen).

L. Lujan had concerns about working with his brother on the sponsorship requests, because he and his brother "wanted the whole program to go without any problems" and "wanted to show transparency."  Nov. 8, 2012, Hearing Tr. at 867:21-23 (L. Lujan, Allen).  L. Lujan did not want people looking at him and his brother, "and pointing fingers, saying that [L. Lujan] was a former city employee."  Nov. 8, 2012, Hearing Tr. at 867:23-868:1 (L. Lujan, Allen).  L. Lujan brought the issue to R. Romero's attention, because "Robert's always preached transparency."  Nov. 8, 2012, Hearing Tr. at 868:1-3 (L. Lujan, Allen).

On January 16, 2012, L. Lujan sent an electronic-mail transmission to City Councilor Carmichael Dominguez[6] seeking the City's financial assistance in hosting the 2012 AAU Grand Nationals Tournament.  See Electronic-Mail Transmission from Robert P. Romero to Martin Lujan at 25 (Jan. 24, 2012), filed May 23, 2013 (Doc. 8-8)("Jan. 24, 2012, E-mail").  Specifically, L. Lujan asked Dominguez for "$5000 and/or $11,000 which would allow all Santa Fe wrestlers to participate at no cost."  Letter from the SFJW Board to Councilor Carmichael Dominguez at 27-28 (Jan. 16, 2012), filed May 23, 2013 (Doc. 8-8)("Jan. 16, 2012, Letter").  The Jan. 16, 2012, Letter did not ask the City of Santa Fe to purchase advertising.  See Jan. 16, 2012, Letter at 26-27.

---

quotation marks omitted).  According to M. Lujan, R. Romero's testimony indicates that "there is no exception for not thinking about the policy."  Reply at 14.

M. Lujan's arguments do not contradict R. Romero's statement, but instead provide additional information that the Court has incorporated into the Factual Background.  Consequently, the Court can consider this fact in its analysis.

[6]Dominguez and M. Lujan have been friends since high school.  See Nov. 8, 2012, Hearing Tr. at 659:11-5 (Dominguez, Thompkins).  L. Lujan and Dominquez were also friends; L. Lujan worked on Dominguez' campaign, they golfed together, and they traveled together.  See Nov. 8, 2012, Hearing Tr. at 743:6-12 (L. Lujan, Thompkins).

Dominguez forwarded the Jan. 16, 2012, Letter to R. Romero, asking if there were "[a]ny options." Jan. 24, 2012, E-mail at 25. R. Romero, in turn, forwarded the request to M. Lujan and copied M. Lujan's supervisor, City Public Works Director Isaac Pino. See Jan. 24, 2012, E-mail at 25. On February 3, 2012, R. Romero asked M. Lujan to: (i) evaluate what the City of Santa Fe had done regarding sponsoring the 2011 Grand Nationals Tournament; and (ii) determine what the City of Santa Fe could afford to do for the 2012 tournament. See Electronic-Mail Transmission from Robert Romero to Martin Lujan at 29 (Feb. 3, 2012), filed May 23, 2013 (Doc. 8-8)("R. Romero's Feb. 3, 2012, E-mail").

That same day, M. Lujan told R. Romero that the City of Santa Fe had supported the 2011 Grand Nationals Tournament by providing in-kind service contributions and purchasing advertisements in the tournament's program. See M. Lujan's Feb. 3, 2012, E-mail at 29. M. Lujan told R. Romero that he would follow up with L. Lujan and try to get specifics as to what SFJWA was seeking from the City for the 2012 tournament. See M. Lujan's Feb. 3, 2012, E-mail at 29. On May 9, 2012, M. Lujan told R. Romero that SFJWA was asking "$950 for the back cover and $700 . . . for inside front cover and inside back cover." Electronic-Mail Transmission from Martin Lujan to Robert Romero (May 9, 2012) at 32, filed May 23, 2013 (Doc. 8-8)("M. Lujan's May 9, 2012, E-mail"). On May 14, 2012, M. Lujan said: "I think if we are able to swing the bid fee of 5K plus some advertising like you suggested, our amount will offer strong support." Electronic-Mail Transmission from Martin Lujan to Robert Romero (May 14, 2012) at 2, filed May 23, 2013 (Doc. 8-9)("M. Lujan's May 14, 2012, E-mail"). M. Lujan said that the advertising would bring the City of Santa Fe's support amount "to slightly over 6K depending on ad costs." M. Lujan's May 14, 2012, E-mail at 2. M. Lujan further stated that the event should have a positive impact on the City of Santa Fe's tax revenue, because the wrestlers and their families would spend approximately

$500,000.00 during their stay in Santa Fe.  See M. Lujan's May 14, 2012, E-mail at 2.  Based on these communications, R. Romero believed that the $5,000.00 hosting fee did not include any advertising.  See Nov. 6, 2012, Hearing Tr. at 296:14-20 (M. Lujan, Allen).

R. Romero authorized the City of Santa Fe to give SFJWA $5,000.00 to cover the hosting fee, and $950.00 to purchase the back cover advertisement in the 2012 tournament program.  See Nov. 6, 2012, Hearing Tr. at 299:16-20 (R. Romero, Allen).  R. Romero therefore rounded the number up to $6,000.00.  See Nov. 6, 2012, Hearing Tr. at 300:1-10 (R. Romero, Allen); Dec. 3, 2012, Hearing Tr. at 1075:1-3 (M. Lujan, Allen).

At May 28, 2012, meeting with his brother, M. Lujan wrote down on a napkin his understanding what the SFJWA was seeking from the City of Santa Fe for the 2012 tournament.  See Proposal (undated) at 1, filed May 23, 2012 (Doc. 8-12)("Proposal").  M. Lujan wrote, in pertinent part:

```
Host fee            - 5,000
Inside Cover        - 900
Inside back cover - 750
                  -----------
                    $6,650
                  - 330 Less 20% for both ad's
                  -----------
                    6,320
          6K
```

Proposal at 1.  The Proposal indicates that M. Lujan and L. Lujan agreed that the City of Santa Fe's $6,000.00 sponsorship would include two advertisements and the hosting fee.  See Proposal at 1; Dec. 3, 2012, Hearing Tr. at 1107:9-14 (M. Lujan, Allen).

After R. Romero was presented with the proposal, he provided M. Lujan with a line-item source from where he could get the $6,000.00 in sponsorship funds.  See Excel Spreadsheet (undated) at 9-11, filed May 23, 2013 (Doc. 8-13).  Having received R. Romero's approval, M.

Lujan had L. Lujan sign the napkin confirming what the City of Santa Fe's $6,000.00 sponsorship

would cover.  See Proposal at 1.  The next day, May 29, 2012, M. Lujan's administrative assistant

-- Jennifer Romero -- sent an electronic-mail transmission to R. Romero, which stated:

> On behalf of Martin, Req. # 20132243 has been entered into the system for
> Santa Fe Jr. Wrestling, total: $6,000 for the AAU Wrestling Host Fees.  Please
> review the req. on E-1 to ensure that everything is correct.
>
> Let me know if you would like for us to make any changes before we send
> forward for approvals.

Electronic-Mail Transmission from Jennifer Romero to Robert Romero (May 29, 2012) at 1, filed

May 23, 2013 (Doc. 8-13).  Thirty-one minutes later, R. Romero responded: "Looks good.  Move

forward."  Electronic-Mail Transmission from Robert Romero to Jennifer Romero (May 29, 2012)

at 1, filed May 23, 2013 (Doc. 8-13).[7]

---

[7]M. Lujan states, without citing any evidence in the record, that "[a]t this point the City Manager Romero fully understood that the City was paying the $5,000 host fee and purchasing two (2) advertisements in the Tournaments' [sic] program."  Appeal Brief at 7.  In his Reply, M. Lujan expands upon this argument by pointing out that Pino testified: "The discussion between Mr. Romero and Mr. Lujan at the outset was $5,000 for the host fee and a thousand dollars for other advertising."  Reply at 10 (quoting Nov. 6, 2012, Hearing Tr. at 134:8-10 (Pino, Thompkins))(internal quotation marks omitted).  M. Lujan highlights that, in a May 14, 2012, electronic-mail transmission to R. Romero, M. Lujan mentioned "the bid fee of 5K plus some advertising like you suggested."  Reply at 10-11 (quoting M. Lujan's May 14, 2012, E-mail at 2)(internal quotation marks omitted).  M. Lujan says that the City of Santa Fe contradicts its own alleged fact by arguing that, in a May 9, 2012, electronic-mail transmission to R. Romero, M. Lujan advised that the SFJWA was asking "$950 for the back cover and $700 [ ] for inside front cover and inside back cover."  Reply at 11 (Response at 7)(modifications in Response)(internal quotation marks omitted).

M. Lujan correctly asserts that R. Romero knew that the City of Santa Fe's $6,000.00 sponsorship would cover both the tournament-hosting fee and some advertising.  There is no evidence, however, that: (i) R. Romero knew that the $6.000.00 sponsorship included two advertisements; (ii) R. Romero authorized M. Lujan to purchase two advertisements in the tournament program; or (iii) the City of Santa Fe would receive a discount on a second advertisement, bringing the total down to $6,000.00.  To the contrary, R. Romero testified that, after receiving M. Lujan's May 14, 2012, E-mail, he authorized "5K for the bid fee and 950 for the back -- back cover" for the sponsorship, which R. Romero rounded up to $6,000.00.  Nov. 6, 2012, Hearing Tr. at 299:19-300:8 (Allen, R. Romero).

On June 6, 2012, the City of Santa Fe issued a purchase order to the SFJWA for $6,000.00. See Purchase Order at 1 (June 6, 2012), filed May 23, 2013 (Doc. 8-9). After the tournament was held from June 6, 2012, to June 9, 2012, but before processing the $6,000.00 payment to the SFJWA, the City of Santa Fe discovered a string of electronic-mail transmissions between M. Lujan and L. Lujan. L. Lujan sent the first electronic-mail transmission on June 19, 2012. See Electronic-Mail Transmission from Larry Lujan to Martin Lujan (June 19, 2012) at 9, filed May 23, 2013 (Doc. 8-9)("L. Lujan's 1st June 19, 2012, e-mail"). It stated: "Martin, attached i[s] the Invoice for the 2012 AAU Grand Nationals." L. Lujan's 1st June 19, 2012, E-mail at 9. Attached to the electronic-mail transmission was an invoice to the City of Santa Fe - Recreation Division dated May 4, 2012, from the SFJWA for "6,320 for the 2012 AAU Grand National Wrestling Host Fee (Includes: Host Fee City logo on website, City Logo on Event program)." Invoice #2012-02 at 5 (May 4, 2012), filed May 23, 2013 (Doc. 8-9)("$6,320 Invoice").

M. Lujan responded, stating: "Yo . . . this looks like the old invoice. The PO is for 6k." Electronic-Mail Transmission from Martin Lujan to Larry Lujan at 8 (June 19, 2012), filed May 23, 2013 (Doc. 8-9)("M. Lujan's 1st June 19, 2012, E-mail"). L. Lujan replied: "Cost is the same in order to get u your full reimbursement." Electronic-Mail Transmission from Larry Lujan to Martin Lujan at 8 (June 19, 2012), filed May 23, 2013 (Doc. 8-9)("L. Lujan's 2nd June 19, 2012, E-mail"). M. Lujan responded: "Lol . . . I guess you forgot what was agreed and what you signed, when we meet [sic] in the restaurant. Can't submit for payment without invoice . . . last day friday for this FY." Electronic-Mail Transmission from Martin Lujan to Larry Lujan (June 19, 2012) at 8, filed May 23, 2013 (Doc. 8-9)("M. Lujan's 2nd June 19, 2012, E-mail")(ellipses in original).

L. Lujan replied:

Here is the break down in case you forgot:

| | |
|---|---|
| Ncaa ticket- | $450 |
| Room ½- 703- | $350 |
| Car rental 185- | $92.50 |
| your airline- | $450 |
| | |
| total- | $1342.50 |

I'm still paying my credit card on your and Robert and Carmicheal LV trip.  If I have to I can may be eat car rental but that all I can do.  unless we make up difference with clarissa paying difference?  let me know and I will chg invoice.

Electronic-Mail Transmission from Larry Lujan to Martin Lujan at 8 (June 19, 2012),[8] filed May 23, 2013 (Doc. 8-9)("L. Lujan's 3rd June 19, 2012, E-mail).  M. Lujan responded: "Your [sic] funny . . . we sat down and agreed.  You signed it.  I will show it to you if you need to see it.  Not sure why your [sic] forgetting . . . i am not marcos, kathy, bennet or roses family.  I will wait for corrected invoice to pay."  Electronic-Mail Transmission from Martin Lujan to Larry Lujan (June 19, 2012) at 7, filed May 23, 2013 (Doc. 8-9)("M. Lujan's 3rd June 19, 2012, E-mail")(ellipses in original).  L. Lujan replied: "U hope your [sic] just kidding, I will correct invoice so we can get paid.  But we have to talk about the Back cover page unless u can show me where that was in the

---

[8]For some reason, L. Lujan's electronic-mail account was set to Greenwich Mean Time ("GMT"), rather than Mountain Standard Time ("MST").  See Electronic-Mail Transmission from Larry Lujan to Martin Lujan at 8 (June 20, 2012), filed May 23, 2013 (Doc. 8-9)("L. Lujan's 3rd June 19, 2012, E-mail")("Sent: Wed, Jun 20, 2012 02:51:07 GMT +00:00").  M. Lujan's electronic-mail account was set to Mountain Standard Time.  See Electronic Mail Tranmission from Martin Lujan to Larry Lujan at 8 (June 19, 2012), filed May 23, 2012 (Doc. 8-9)("M. Lujan's 3rd June 19, 2012, E-mail")("Date: Tue 19 Jun 2012 21:07:11 -0600").  Consequently, the times on L. Lujan's electronic-mail transmissions are six hours ahead of the times on M. Lujan's transmissions.  See Mountain Time Zone, Wikipedia.org, http://en.wikipedia.org/wiki/Mountain_Time_Zone ("The Mountain Time Zone of North America keeps time by subtracting seven hours from Greenwich Mean Time, during the shortest days of autumn and winter . . . , and by subtracting six hours during daylight saving time in the spring, summer, and early autumn.").

This explains why L. Lujan's 3rd June 19, 2012, E-mail -- which is dated June 20, 2012 under GMT -- is in the electronic-mail transmission chain before M. Lujan's 3rd June 19, 2012, E-mail -- which is dated June 19, 2012 under MST.  For consistency and clarity, the Court will adjust the dates and times of L. Lujan's transmissions to MST, and label them accordingly.

deal."  Electronic-Mail Transmission from Martin Lujan to Larry Lujan (June 20, 2012) at 7, filed

May 23, 2013 (Doc. 8-9).

        M. Lujan responded:

> Always . . . !  We went from the 5k to 6k to cover the $450. reimbursement on ticket
> . . . Back cover was not included but you did mention that if we purchased it would
> cover air to Florida.  Doesn't look like that is happening soo I guess its not an issue.
> Just notice invoice came through . . . .

Electronic-Mail Transmission from Martin Lujan to Larry Lujan at 8 (June 20, 2012), filed May

23, 2013 (Doc. 8-9)("M. Lujan's 1st June 20, 2012, E-mail").  L. Lujan replied: "I think back cover

is an issue, I was going to add your FL ticket to cover your expense NOT just your ticket but the

cost of AD.  Lets meet and discuss this issue, we gave up this to AD space to help you out not lose

money."  Electronic-Mail Transmission from Larry Lujan to Martin Lujan at 7 (June 20, 2012),

filed May 23, 2013 (Doc. 8-9)("L. Lujan's 1st June 20, 2012, E-mail").

        On June 20, 2012, L. Lujan sent an electronic-mail transmission to his brother with two

SFJWA invoices attached.  See Electronic-Mail Transmission from Larry Lujan to Martin Lujan at

14 (June 20, 2012), filed May 23, 2013 (Doc. 8-9)("L. Lujan's 2nd June 20, 2012, E-mail").  The

electronic-mail transmission stated: "Attached are the two invoices on host fees for $6000 the

other for Back Cover of the program for $750."  L. Lujan's 2nd June 20, 2012, E-mail at 14.  The

first invoice, dated May 4, 2012, was to the City of Santa Fe - Recreation Division in the amount of

$6,000 for "2012 AAU Grand National Wrestling Host Fee (Includes: Host Fee, City logo on

Website, City Logo on Event program)."  Invoice #2012-02 at 15 (May 4, 2012), filed May 23,

2013 (Doc. 8-9)("$6,000 Invoice").  The second invoice, dated June 1, 2012, was also to the City

of Santa Fe - Recreation Division in the amount of $750.00 for "2012 AAU Grand National

Wrestling Host Fee (Includes: Back cover page of Event program)."  Invoice #2012-03 (June 1,

2012) at 16, filed May 23, 2013 (Doc. 8-9)("$750.00 Invoice").

M. Lujan testified that he did not read the body of L. Lujan's 2nd June 20, 2012, E-mail and could not open the file containing the $750.00 Invoice.  See Dec. 3, 2012, Hearing Tr. at 1072:20-1073:14 (M. Lujan, Allen).  Yet M. Lujan still forwarded both SFJWA invoices to J. Romero for processing and payment.  See Electronic-Mail Transmission from Martin Lujan to Jennifer Romero at 14 (June 20, 2012), filed May 23, 2013 (Doc. 8-9)("M. Lujan's 2nd June 20, 2012, E-mail").  M. Lujan testified that he saw L. Lujan's June 2nd 20, 2012, E-mail come in, but he "didn't even give it a second thought" and "forwarded it immediately over."  Dec. 3, 2012, Hearing Tr. at 1073:12-14 (M. Lujan, Allen).

J. Romero then forwarded the $750.00 Invoice to Clarissa Lovato, owner of Elevate Media, stating: "Invoice for ad placement sfjr. wrestling."  Electronic-Mail Transmission from Jennifer Romero to Clarissa Lovato at 14 (June 20, 2012), filed May 23, 2013 (Doc. 8-9)("J. Romero's June 20, 2012, E-mail").  Under a Professional Services Agreement with the City of Santa Fe, Elevate Media places advertisements to market the City of Santa Fe's recreational enterprises, in particular, the Marty Sanchez Links de Santa Fe Golf Course.  See City of Santa Fe Professional Services Agreement at 10-21, filed May 23, 2013 (Doc. 8-15)("Elevate PSA").  The City of Santa Fe reimburses Elevate Media for these expenses.  See Elevate PSA at 13.  Elevate Media is required to secure approval from M. Lujan before placing any advertisements on the City of Santa Fe's behalf.  See Elevate PSA at 13.  The Lujan brothers worked closely with Lovato for years. See Nov. 7, 2012, Hearing Tr. at 562:7-563:5 (Lovato, Allen).  At some point on Friday, June 29, 2012, Lovato sent to M. Lujan for approval by facsimile transmission a $750.00 invoice from Elevate Media for an advertisement in the 2012 Grand Nationals Tournament program.  See Nov. 7, 2012, Hearing Tr. at 559:5-8 (Lovato, Thompkins).

That same day, at 4:38 p.m., M. Lujan received an electronic-mail transmission from Rodarte, which states:

> After reviewing the Purchase Orders issued for the month of June, I noticed that the PO listed above for Santa Fe Junior Wrestling was missing a contract.  Somehow this one got past me during the approval process.  In order to comply with the Procurement rules, I will need for you to create a PSA [Professional Services Agreement] related to the services provided by this organization.  Based on the history between the City and the SFJW group you have always created a PO for $5000.  This year the total amount was for $6K which is above the threshold of 5K therefore requiring a PSA.  Breakdown the amount of money expended for each service.  The invoice submitted to Payables has no documentation as to what the City is paying for.  Have the vendor give you breakdown.  I have placed a hold on the check until the issue is resolved.

Electronic-Mail Transmission from Robert Rodarte to Martin Lujan and Jennifer Romero (June 29, 2012), filed May 23, 2013 (Doc. 8-9)("Rodarte's June 29, 2012, E-mail").  See Nov. 6, 2012, Hearing Tr. at 72:15-20 (Allen, Pino); Dec. 3, 2012, Hearing Tr. at 976:5-14 (Allen, M. Lujan).  Two minutes later, M. Lujan forwarded Rodarte's June 29, 2012, E-mail to City Councilor Dominguez, with the following message: "Check this bullshit out!!!"  Electronic-Mail Transmission from Martin Lujan to Carmichael Dominguez (June 29, 2012), filed May 23, 2013 (Doc. 8-9).

As Rodarte requested, J. Romero prepared the first draft of the PSA, itemizing the services that the City was to receive as follows:

    (1)      Host Sponsorship Fee

    (2)      2012 Grand Nationals Tournament Program

           (a)      Recreation Division Ad

           (b)      City Back Cover Ad

    (3)      Online

           (a)      City Logo on website

City of Santa Fe Professional Services Agreement at 6-7, filed May 23, 2013 (Doc. 8-10).  The version of the PSA that J. Romero ultimately submitted no longer had a detailed itemization of services, but instead stated: "Host Sponsorship Fee[.]  Santa Fe is the Host City for the 2012 AAU Grand Nationals.  The sponsorship fee shall be used to sponsor local youth participation in the sport of wrestling, in return, the City shall receive exposure via the Contractors website and event program."  City of Santa Fe Professional Services Agreement at 19, filed May 23, 2013 (Doc. 8-10).

The following Monday -- July 2, 2012 -- at 7:17 a.m., M. Lujan sent an electronic-mail transmission to J. Romero, stating: "Good Morning Jenn . . . lets hold on Clarissa june invoice until I get to office.  Hope it's not too late.  See you in a bit."  Electronic-Mail Transmission from Martin Lujan to Jennifer Romero at 27 (July 2, 2012), filed May 23, 2013 (Doc. 8-9)("M. Lujan's July 2, 2012, E-mail").  One minute later, at 7:18 a.m., Lovato sent an electronic-mail transmission to J. Romero concerning Elevate Media's $750.00 invoice, in which Lovato stated: "Just realized that the invoice I faxed on Friday is not correct.  Call me with questions."  Electronic-Mail Transmission from Clarissa Lovato to Jennifer Romero at 27 (July 2, 2012), filed May 23, 2013 (Doc. 8-9)("Lovato's July 2, 2012, E-mail").

Having become aware of the electronic-mail transmissions between M. Lujan and L. Lujan, between M. Lujan and J. Romero, and between J. Romero and Lovato, on July 11, 2012, R. Romero asked J. Romero for a copy of Elevate Media's $750.00 invoice.  See Nov. 7, 2012, Hearing Tr. at 372:13-373:6 (R. Romero, Allen).  J. Romero told R. Romero that she had deleted the invoice and that it was gone.  See Nov. 7, 2012, Hearing Tr. at 372:16-373:1 (R. Romero, Allen).  R. Romero then asked J. Romero to call Lovato to see if Lovato had a copy of the $750.00 invoice.  See Nov. 7, 2012, Hearing Tr. at 373:7-373:12 (R. Romero, Allen).  Lovato said that she

did not have a copy, and that she had lost it or thrown it away.  See Nov. 7, 2012, Hearing Tr. at

373:13-373:15 (R. Romero, Allen); id. at 374:20-23 (R. Romero, Allen).  R. Romero asked Lovato

what the mistake was in the $750.00 invoice, and Lovato responded that it was a spelling error.

See Nov. 7, 2012, Hearing Tr. at 374:15-17 (R. Romero, Allen).

       The final invoice that Elevate Media submitted did not include a $750.00 charge for the

SFJW advertisement.  At the post-termination hearing, Lovato maintained that she rescinded

Elevate Media's $750.00 invoice, because of a spelling error.  See Nov. 7, 2012, Hearing Tr. at

563:15-23 (Allen, Lovato).  Upon further questioning, however, she admitted that the invoice that

she resubmitted to the City of Santa Fe still had spelling errors.  See Nov. 7, 2012, Hearing Tr. at

563:24-567:31 (Allen, Lovato).  Lovato also acknowledged that many other invoices which

Elevate Media submitted to the City of Santa Fe in the past had spelling errors.  See Nov. 7, 2012,

Hearing Tr. at 583:25-584:7 (Allen, Lovato).

       **3.**        **M. Lujan's Other Acts of Misconduct.**

       In a March 23, 2011, electronic-mail transmission to R. Romero, M. Lujan said that he

would obtain advertising for the City of Sana Fe in the 2011 Grand Nationals Tournament program

if the City agreed to waive fifty percent of the rental cost for the convention center where the

tournament would be held.  See Purchase Order at 1 (July 11, 2011), filed May 23, 2013 (Doc.

8-14).  While preparing for the post-termination hearing, it was discovered that Elevate Media had

submitted a $500.00 invoice to the City of Santa Fe for a full-page color advertisement in the 2011

Grand Nationals Tournament program.  See Untitled Invoice at 2, filed May 23, 2013 (Doc. 8-14).

The City of Santa Fe also discovered that Wolfman Brothers -- another media firm that L. Lujan's

brother-in-law and sister-in-law owned -- submitted an invoice to the City of Santa Fe for $750.00,

purportedly for a full-page advertisement in the 2011 Grand Nationals Tournament program.  See

Purchase Order at 30 (June 7, 2011) , filed May 23, 2013 (Doc. 8-13); Invoice from Wolfman Brothers to the City of Santa Fe Recreation Division for AAU Grand Nationals - Full Page Ad in Tournament Program (June 21, 2011) at 31, filed May 23, 2013 (Doc. 8-13); Check from the City of Santa Fe to Wolfman Brothers for $750.00 (June 29, 2011), filed May 23, 2013 (Doc. 8-13).  At the post-termination hearing, however, L. Lujan's brother-in-law -- John Romero -- testified that the work that the Wolfman Brothers did for the 2011 Grand Nationals Tournament was donated.  See Nov. 7, 2012, Hearing Tr. at 629:5-630:12 (J. Romero, Thompkins).  Although the City of Santa Fe paid both invoices, neither should have been submitted for payment, because R. Romero did not authorize payment for any advertisements in the 2011 Grant Nationals Tournament program.  See Nov. 7, 2012, Hearing Tr. at 333:10-334:7 (R. Romero, Allen).

Having discovered that Elevate Media charged the City $500.00 for the advertisement in the 2011 Grand Nationals Tournament program, the City of Santa Fe asked Lovato for the invoice that the SFJWA sent to Elevate Media for that advertisement.  See Nov. 7, 2012, Hearing Tr. at 333:10-334:7 (R. Romero, Allen).  Lovato admitted that the invoice did not exist, because the SFJWA never billed Elevate Media for any advertisements for the 2011 Grand Nationals Tournament.  See Nov. 7, 2012, Hearing Tr. at 333:10-334:7 (R. Romero, Allen).  Lovato then wrote a $500.00 check to reimburse the City of Santa Fe.  See Nov. 7, 2012, Hearing Tr. at 333:10-334:7 (R. Romero, Allen).

The City of Santa Fe also discovered that, in 2011 and 2012, M. Lujan had used Elevate Media to make a $600 contribution to Santo De Nino Regional Catholic School.  See Dec. 3, 2012, Hearing Tr. at 1056:16-23 (Allen, M. Lujan); id. at 1058:3-13 (Allen, M. Lujan); id. at 1060:15-1061:1 (Allen, M. Lujan).  Elevate Media, in turn, billed the City for the amount of the contribution.  See Dec. 3, 2012, Hearing Tr. at 1056:16-23 (Allen, M. Lujan); id. at 1058:3-13

(Allen, M. Lujan); id. at 1060:15-1061:1 (Allen, M. Lujan).  The City of Santa Fe also learned that M. Lujan's son attended Santo De Nino Regional Catholic School, and that the school required each student's family to annually donate or fundraise a minimum of $400.00 for the school.  See Dec. 3, 2012, Hearing Tr. at 1054:18-1055:11 (Allen, M. Lujan).  On June 7, 2012, the school sent a thank you letter to "Elevate Media/Martin Lujan."  Letter from Lisa S. Vakharia, Director of Advancement, Santo Nino Regional Catholic School to Martin Lujan and Elevate Media at 22 (June 7, 2012), filed May 23, 2013 (Doc. 8-16).  The City of Santa Fe also discovered that, in October, 2008, L. Lujan -- who then held the position of Municipal Recreation Committee Administrative Manager -- approved an invoice that Lovato -- who was not a municipal employee -- submitted to the City of Santa Fe for a conference that she had attended.  See Nov. 8, 2012, Hearing Tr. at 828:18-830:8 (L. Lujan, Thompkins).

The City of Santa Fe uncovered that, in a June 2012 invoice from Elevate Media, there was a charge in the amount of $1,800.00 for "social media maintenance and staff training" for Marty Chavez Links de Santa Fe staff.  Invoice from Elevate Media to Marty Sanchez Links de Santa Fe (June 27, 2012) at 30, filed May 23, 2013 (Doc. 8-14).  During the post-termination hearing, however, Lovato testified that the charge was for expenses that would be incurred in the future.  See Nov. 7, 2012, Hearing Tr. at 601:1-19 (Lovato, Allen).  Lovato admitted that there was nothing in the invoice which would let an auditor know that the City of Santa Fe was paying for services that would be provided in the future.  See Nov. 7, 2012, Hearing Tr. at 605:5-9 (Lovato, Allen).

> 4.      **The Disciplinary Proceedings**.

After reviewing the electronic-mail transmissions between M. Lujan and L. Lujan, Romero concluded that M. Lujan was trying to steal money from the City of Santa Fe.  See Nov. 7, 2012,

Hearing Tr. at 343:14-25 (Allen, R. Romero).  R. Romero and Pino met with M. Lujan on July 5, 2012, to discuss the string of electronic-mail transmissions between M. Lujan and his brother and get M. Lujan's side of the story.  See Nov. 7, 2012, Hearing Tr. at 344:1-345:13 (Allen, R. Romero).  Because of their personal friendship, R. Romero had decided that he was going to give M. Lujan an opportunity to resign if he did not have a reasonable explanation for the electronic-mail transmissions between him and his brother.  See Nov. 7, 2012, Hearing Tr. at 344:1-345:13 (Allen, R. Romero).  When he saw the electronic-mail transmissions, M. Lujan got nervous, kept saying "I don't understand," and could not offer an explanation for them.  Nov. 7, 2012, Hearing Tr. at 345:14-25 (Allen, R. Romero).  M. Lujan asked R. Romero to give him until the end of the next day -- Friday, July 6, 2012 -- to decide whether to resign and also said that he was going to look through the electronic-mail transmissions between him and his brother.  See Nov. 7, 2012, Hearing Tr. at 346:1-20 (Allen, R. Romero).  The next day, M. Lujan asked R. Romero if he could have until Monday, July 9, 2012, to decide whether to resign.  See Nov. 7, 2012, Hearing Tr. at 347:3-7 (Allen, R. Romero).

On Monday, July 9, 2012, R. Romero and Interim Human Resources Director Vicki Gage met with M. Lujan.  See Nov. 7, 2012, Hearing Tr. at 347:3-7 (Allen, R. Romero).  At the meeting, M. Lujan said that the electronic-mail transmissions were his brother's fault, that his brother was trying to get more money out of the City of Santa Fe, and that his brother was relentless.  See Nov. 6, 2012, Hearing Tr. at 231:12-19 (Allen, Gage).  M. Lujan said that he sent his brother an electronic-mail transmission telling him to stop.  See Nov. 6, 2012, Hearing Tr. at 231:20-24 (Allen, Gage).  M. Lujan then handed R. Romero what M. Lujan said was an electronic-mail transmission dated June 21, 2012, which states:

> Whats this email now?  Dude enough already . . . larry what were all the emails about the other night/morning . . . one to many wines.  Lol.  as I mentioned to you

> when we talked if you have issue with Robert or Carmike take it up with them.  I owe you nada and expect nada!  When you mentioned Robert owing for vegas ho's . . . I know nothing.  You were lucky to get 6k from RR.  It's done and were only paying the 6k for everything . . . Bid and ads!  I will keep you posted when I hear something . . . so stop w the emails!

Nov. 6, 2012, Hearing Tr. at 232:19-233:7 (Allen, Gage)(alterations in electronic-mail transmission)(internal quotation marks omitted).  When R. Romero read this electronic-mail transmission, he believed that M. Lujan was trying to scare him into not taking disciplinary action by making the "Vegas ho's" comment.  Nov. 7, 2012, Hearing Tr. at 352:3-11 (R. Romero, Allen).  R. Romero told M. Lujan that he thought the electronic-mail transmission was doctored and asked M. Lujan to bring in the computer on which he had written the transmission.  See Nov. 7, 2012, Hearing Tr. at 368:22-369:7 (R. Romero, Allen).  M. Lujan responded that he could not do so, because he wrote the transmission on his wife's work computer.  See Nov. 7, 2012, Hearing Tr. at 369:9-10 (R. Romero, Allen).  R. Romero asked if M. Lujan could bring in L. Lujan's computer so that R. Romero could retrieve the transmission.  See Nov. 7, 2012, Hearing Tr. at 369:11-12 (R. Romero, Allen).  M. Lujan said: "I'll try, but you know Larry."  Nov. 7, 2012, Hearing Tr. at 369:14 (R. Romero, Allen).  M. Lujan never brought his brother's computer to R. Romero.  See Nov. 7, 2012, Hearing Tr. at 369:14-17 (R. Romero, Allen).

The meeting ended with R. Romero telling M. Lujan that he was still on administrative leave and that they would meet again on Wednesday, July 11, 2012.  See Nov. 6, 2012, Hearing Tr. at 234:22-25 (Gage, Allen).  After the meeting ended, R. Romero and Gage began examining the electronic-mail transmission that M. Lujan had provided them.  See Nov. 6, 2012, Hearing Tr. at 235:2-3 (Gage, Allen).  After running experiments on their own Yahoo electronic-mail accounts, they came to the conclusion that the electronic-mail transmission that M. Lujan had provided was fake.  See Nov. 6, 2012, Hearing Tr. at 235:4-239:25 (Gage, Allen).

M. Lujan received a Notice of Contemplated Action on July 13, 2012.  See Notice of Contemplated Action (July 13, 2012) at 1-4, filed May 23, 2013 (Doc. 8-11)("Notice of Contemplated Action").  The Notice of Contemplated Action stated:

> It has been discovered that Larry Lujan, the AAU Grand National Tournament Director and the Santa Fe Junior Wrestling Treasurer, and you conspired to defraud the City of Santa Fe of at least $900.  Specifically, you conspired to include the cost of a personal airline ticket for $450 and an NCAA ticket for $450 in invoices to be paid by the City of Santa Fe for hosting the 2012 AAU Grand National Wrestling tournament on June 6 to June 9, 2012.

Notice of Contemplated Action at 1.

A pre-determination hearing took place on July 23, 2012, at which M. Lujan was present and represented by counsel.  See Minutes of Pre-determination Meeting of July 23, 2012, filed May 23, 2013 (Doc. 8-11)("Minutes").  During the pre-determination meeting, M. Lujan's attorney said that the City of Santa Fe's agreement with L. Lujan was for two advertisements in the amount of $1,650.00 with a twenty-percent discount, which was still higher than the $1,000.00 that the City allocated.  See Minutes at 13.  M. Lujan's attorney further stated that M. Lujan negotiated with L. Lujan to get the back-cover advertisement for free.  See Minutes at 13.  M. Lujan said that he felt uncomfortable being involved in the requisition process with his brother, so he had J. Romero prepare the requisition.  See Minutes at 14.  On July 30, 2012, M. Lujan received the Notice of Proposed Disciplinary Action-Termination of Employment, in which Pino recommended that M. Lujan be terminated "based on [his] attempt to steal taxpayer funds from the City."  Notice of Proposed Disciplinary Action - Termination of Employment (July 30, 2012), filed May 23, 2013 (Doc. 8-12).  On August 7, 2012, M. Lujan received the Notice of Final Decision from R. Romero, which terminated his employment on August 14, 2012.  See Notice of Final Decision (August 7, 2012), filed May 23, 2013 (Doc. 8-13).

There were a number of flaws in the City of Santa Fe's investigation into M. Lujan's alleged misconduct.  Gage never asked L. Lujan what he meant by the itemized expenses in the electronic-mail transmissions between him and his brother.  See Nov. 6, 2012, Hearing Tr. at 250:16-24 (Gage, Thompkins).  Gage also never spoke to anyone at the SFJWA or the AAU Grand Nationals Tournament to determine what L. Lujan meant in his electronic-mail transmissions.  See Nov. 6, 2012, Hearing Tr. at 250:25-251:7 (Gage, Thompkins).  Pino's investigation consisted only of reviewing the electronic-mail transmissions between M. Lujan and his brother.  See Nov. 6, 2012, Hearing Tr. at 108:12-18 (Pino, Thompkins).  Pino did not talk to L. Lujan, J. Romero, or Lovato during his investigation.  See Nov. 6, 2012, Hearing Tr. at 108:16-24 (Pino, Thompkins).

On August 13, 2012, M. Lujan appealed his termination to an outside hearing officer.  See Appeal at 3.  A public hearing was held before Ms. Maynes on November 6, 2012, November 7, 2012, November 8, 2012, and December 3, 2012.  See Decision at 3.  Ms. Maynes issued her decision in March, 2013.  See Decision at 1.  Ms. Maynes made the following Findings of Fact in her decision:

1.      Martin G. Lujan was an 18 year employee of the City of Santa Fe in permanent full-time classified status.  In 2012, he held the position of Interim Recreation Division Director and Administrative Director of the Municipal Recreation Center.

2.      There is no prior instance (occurring before 2012) of substantial discipline in Martin Lujan's personnel record at the City.

3.      In a letter dated January 16, 2012, from Larry Lujan, Treasurer of the SFJWA, to Councilor Carmichael Dominguez, the SFJWA requested the City pay the Five Thousand Dollar ($5,000) bid/host fee to the National AAU Organization for the purpose of hosting the 2012 AAU Grant Nationals Wrestling Tournament on June 6 to 9, 2012.

4.      In Larry Lujan's letter, SFJWA solicited one of two sponsorship options: "a financial contribution of a bid fee of $5,000 and/or $11,000 which would allow all Santa Fe Wrestlers to participate at no cost . . . ."

5.      Larry Lujan, the author of the letter seeking support, is Martin Lujan's brother and held the position of Recreation Division Director before Martin Lujan until Larry's retirement.

6.      Larry Lujan is the treasurer for the SFJWA and was also the 2012 Grand Nationals Tournament Director.

7.      City Councilor Carmichael Dominguez forwarded Larry Lujan's solicitation letter to the City Manager Robert Romero asking for his consideration and expressing his support.

8.      Robert Romero forwarded Larry Lujan's solicitation letter to Isaac Pino, Public Works Director, and to Martin G. Lujan, requesting that both evaluate what the City had done in the past to sponsor the tournament and to tell him (Romero) what the City could afford to do in 2012.

9.      Martin Lujan told City Manager Romero that he would follow up with his brother, Larry Lujan, to obtain specifics as to what was sought in sponsorship, whether actual money or an in-kind donation.

10.     Martin Lujan informed City Manager Robert Romero that the City's contribution for 2011 AAU Grand Nationals was primarily as in-kind services, partial rental forgiveness for use of the Santa Fe Community Convention Center and the purchase of two ads which were placed in the Wrestling Tournament Program.

11.     In his response to the City Manager, Martin Lujan indicated that these types of support were possible for 2012.

12.     In his communications with the City Manager, Martin Lujan provided him with information regarding the cost for advertising in the tournament program and confirmed that the hosting fee was $5,000, which had already been paid by the SFJWA.

13.     Martin Lujan personally recommended to the City Manager that the City pay the $5,000 bid/hosting fee, plus purchase a couple of ads in the tournament program, which would bring City support to . . . $6,320, depending upon the cost of the specific ads.

14.     In that communication, Martin Lujan also advised the City Manager that he could find the funds to purchase the ads and that the tournament would have a positive impact on gross receipts tax and lodgers tax revenue, stating that wrestlers and their families could spend as much as $500,000 during their stay in Santa Fe.

15.    Based on these recommendations, City Manager Romero believed that the $5,000 bid/hosting fee did not include any advertising and that Martin Lujan was recommending that the City purchase some.

16.    Based upon the recommendation from Martin Lujan, City Manager Romero authorized an expenditure of $6,320 to be used in supporting SFJW in hosting the tournament.  He believed that this sum included the bid/hosting fee of $5,000 and an additional $1,320 towards the purchase of non-specified ads in the tournament program.

17.    The AAU Grand Nationals Tournament was held in Santa Fe on June 6 to 9, 2012.  At the time that it was held, the City had not yet paid any portion of its authorized sponsorship monies to Santa Fe Junior Wrestling.

18.    Sometime later, a string of email was discovered on Martin Lujan's City e-mail account, beginning on June 19, 2012, between him and his brother Larry Lujan relating to payment of the sponsorship monies.

19.    The City of Santa Fe's fiscal year runs from July 1 thru July 30 of each calendar year.  Thus, the end of the fiscal year for 2012 concluded on June 30, 2012.

20.    The actual text of the e-message exchange is set forth here: [Ms. Maynes then included photocopies of the electronic-mail transmissions between M. Lujan and L. Lujan]

21.    Attached to the first e-mail on June 19, 2012 was an invoice dated May 4, 2012 for "$6,000 for the 2012 AAU Grand National Wrestling Host Fee (includes host fee, City logo on website, City logo on event program)."  This invoice represents on its face that the City was obtaining both the Host Fee and some advertising.

22.    In his message to Larry Lujan on June 20, 2012, Martin Lujan responded to his brother, "We went from $5k to $6k to cover the $450. [sic] reimbursement on ticket.  Back cover was not included but you did mention if we purchased it would cover air to Florida.  Doesn't look like that is happening soo I guess its not an issue.  Just noticed invoice came through . . ."

23.    There was never authorization by City Manager Robert Romero for a $450 reimbursement for a ticket, whether an airline ticket or an event admission ticket for Martin Lujan.

24.    In addition to the invoice for the $6,000 host fee, Larry Lujan attached a second invoice to his June 20, 2012 e-mail message.  The invoice is dated

June 1, 2012 in the amount of $750 for "2012 AAU Grand National Wrestling host fee (includes: Back Cover page of event program)."

25.     There was never authorization by City Manager Robert Romero for an additional expenditure of $750 for a back cover of the event program advertisement.

26.     On June 20, 2012, at 8:15 a.m., Martin Lujan forwarded both invoices to his Administrative Assistant Jennifer Romero for processing and payment.

27.     Jennifer Romero then forwarded the $750 invoice to Clarissa Lovato, owner of Elevate Media, for payment with the messages, 'Invoice for ad placement sfjr.wrestling.  Jennifer Romero routed the invoice for $6,000 to the City's Finance Department for payment.

28.     The City of Santa Fe maintains a Professional Services Agreement with Elevate Media to reimburse it for actual expenses incurred placing advertising and seeking media exposure for the City of Santa Fe's recreational enterprises, in particular, for the "Marty Sanchez Links de Santa Fe Golf Course."

29.     Elevate Media's Professional Services Agreement was awarded via competitive bids pursuant to a request for proposal procurement.

30.     As the MRC Administrator, Martin Lujan is the individual who authorizes placement of advertising for the Marty Sanchez Links de Santa Fe Golf Course and he has regular contact with Clarissa Lovato for that purpose.

31.     In October, 2008, Larry Lujan had authorized payment for Clarissa Lovato to attend a National Parks and Recreation Conference in Baltimore with all expenses paid by invoicing the City under Elevate Media's professional services agreement.

32.     There is a close professional relationship between Marin Lujan and Clarissa Lovato as a result of his approval of expenditures for advertising for the Marty Sanchez Links de Santa Fe Golf Course.

33.     On Friday, June 29, 2012, Martin Lujan received an e-mail from Robert Rodarte, the City of Santa Fe Purchasing Officer, regarding Purchase Order No. 1130768, the purchase order seeking a voucher for the $6,000 payable to Santa Fe Junior Wrestling for the City sponsorship of the Grand Tournament.

34.     In his message to Martin Lujan, Rodarte stated:

"After reviewing the Purchase Orders issued for the month of June. I noticed that the PO listed above for the Santa Fe Junior Wrestling was missing a contract. Somehow this one got past me in the approval process. In order to comply with the Procurement Rules, I will need for you to create a PSA [Professional Services Agreement] related to the services provided by this organization. Based on the history between the City and the SFJW group, we have always created a PO for $5,000. This year, the total amount was for $6K, which is above the threshold of $5K, therefore requiring a PSA. Break down the amount of money expended for each service. The invoice submitted to Payables has no documentation as to what the City is paying for. Have the vendor give you a breakdown. I have placed a hold on the check until the issue is resolved."

35.    At that point, Martin Lujan directed his Administrative Assistant Jennifer Romero, to prepare a PSA draft to cover the $6,000 host fee and advertising.

36.    The message from Rodarte, set forth in Finding 34, was sent at 4:38 p.m. on a Friday. On Monday, July 2, 2012 at 7:17 a.m., Martin Lujan sent an e-message to Jennifer Romero stating, "Good morning Jenn . . . Let's hold on Clarissa June invoice until I get to office. Hope it's not too late. See you in a bit." One minute after that email to Jennifer Romero, Clarissa Lovato of Elevate Media sent an e-message to Jennifer Romero at [7:18 a.m.] concerning Elevate Media's June invoice to the City. In that e-mail, Lovato stated, "Just realized that the invoice I faxed on Friday is not correct. Call me with questions."

37.    Mysteriously, the Elevate Media original June invoice faxed from Lovato to Romero at the City disappeared and no longer exists. Clarissa Lovato said that she destroyed it electronically.

38.    One week later, July 9, 2012, City Manager Romero asked Jennifer Romero [no relation] for a copy of the fax referred to by Clarissa Lovato. Jennifer Romero, too, stated that she lost the fax and could not produce it.

39.    On July 9, 2012, City Manager Robert Romero requested a copy of the fax from Clarissa Lovato, who responded that she could not find it.

40.    When City Manager Robert Romero asked Lovato to explain what mistakes were on the June invoice, she told him there were spelling errors.

41.    In fact, almost every invoice submitted by Elevate Media to the City for payment under its contract was replete with spelling errors: a spelling error

on an Elevate Media invoice would not have been remarkable or out of the ordinary.

42.     The final June 2012 invoice resubmitted by Elevate Media did not include the $750 charge for the Santa Fe Junior Wrestling back cover if the event program advertising.

43.     Martin Lujan contacted Clarissa Lovato sometime early on July 2, 2012 and asked her to destroy the June invoice she had submitted to Jennifer Romero for payment which had included the $750 charge.

44.     Martin Lujan contacted Clarissa Lovato sometime early on July 2, 2012 and asked her to destroy the June invoice she had submitted to Jennifer Romero for payment which had included the $750 charge.

45.     Martin Lujan's statements to his brother Larry Lujan in the e-mail chain beginning on June 19, 2012, and continuing through July 2, 2012, [Finding 20] were made for the purpose of authorizing City funds to reimburse Larry Lujan for Martin Lujan's personal expenses.  And as incentive for Larry Lujan to use his influence with AAU officials to obtain complimentary admission to athletic tournaments or reimbursement to attend those events for Martin Lujan.

46.     Martin Lujan's communications to Jennifer Romero and Clarissa Lovato on or around July 2, 2012 to "hold off on" the original Elevate Media June 2012 invoice were for the purpose of concealing his attempt to obtain additional City funds in excess of the authorized $6,320 to reimburse his brother Larry Lujan for personal expenses.

47.     Martin Lujan received a Notice of Contemplated Action on July 13, 2012, which he refused to sign on July 13, 2012.  City Exhibit 4.

48.     A predetermination meeting occurred with Martin Lujan on July 23, 2012 and minutes were maintained of that meeting.

49.     Martin Lujan appeared with his attorney at the predetermination meeting on July 23, 2012 at 9:30 a.m. City Exhibit 7.

50.     Martin Lujan received the Notice of Proposed Disciplinary Action-Termination of Employment, dated July 30, 2012.  City Exhibit 10.

51.     The Notice of Final Decision was issued to Martin Lujan on August 7, 2012, terminating his employment effective August 14, 2012.  City's Exhibit 12.

52.     Nathaniel Thompkins, Attorney for Martin Lujan, requested appointment of an outside hearing officer by letter dated August 13, 2012.  City's Exhibit 14.

53.     A formal hearing was held in this matter on November 6 - 8, 2012 and continued until completion on December 3, 2012.

54.     The parties both agreed to waive the requirement for issuance of this decision within 30 days of the close of the hearing.

Decision ¶¶ 1-54, 15-28, filed September 13, 2013 (Doc. 30)("Decision")(modifications in

Decision).

Ms. Maynes upheld M. Lujan's termination and made the following conclusions of law:

1.     The Hearing Officer has subject matter jurisdiction over this appeal and over the Appellant Martin Lujan, pursuant to Rule 7.51, and 7.52 of the City of Santa Fe Personnel Rules/Regulations and Policies (Rev. 11/30/05).

2.     Martin G. Lujan was a classified employee subject to the City of Santa Fe Personnel Rules on August 11, 2012 and for the entire period of the calendar year 2012.

3.     Martin Lujan received all process due to him under the Personnel Rules/Regulations and Policies of the City of Santa Fe (November 2005), for imposing formal discipline upon him.

4.     The parties agreed to the designation of Paula G. Maynes as Hearing Officer pursuant to Rule 7.51(3).

5.     The hearing date and time were determined by agreement of the parties, including the date upon which the hearing was continued and concluded, December 3, 2012.

6.     Martin Lujan appeared at the hearing on November 6, 7 and 8 and December 3, 2012, and was represented by Nathaniel Thompkins of the New Mexico Law Firm through the course of the hearing.

7.     The hearing was tape-recorded by the Hearing Officer and recorded by certified shorthand reporting performed by Maureen Costello, New Mexico Certified Shorthand Reporter.

8.     The City of Santa Fe met its burden of proof to show by a preponderance of the evidence that Martin Lujan attempted to obtain City funds under false pretenses, specifically, by authorizing payment of two submitted invoices,

the first for $6,000 and a second invoice for $750, to reimburse or pay Martin Lujan's personal expenses through the Santa Fe Junior Wrestling Association, via its Treasurer, Martin Lujan's brother Larry Lujan.

9. There was "just cause" for Martin Lujan's dismissal in the record to conclude that Martin Lujan's acts, statements and intent violated subsections of Section 7.50(E):

(2) Careless, negligent or improper use of City property, equipment or funds;

(7) Stealing from the City or from other employees;

(10) Intentional falsification or mishandling of City records; . . . and

(13) action which reflects poorly upon the integrity of the City Santa Fe [sic].

Rule 7.50(E) Personnel Rules/Regulations and Policies [11/2005].

10. If it is determined in any subsequent review of this decision that § (7) of Section 7.50(E), "Stealing from the City", does not include statements showing an intent to steal, then there was sufficient evidence to support Martin Lujan's termination for just cause based on §§ (2) "Careless, negligent or improper use of City funds", (10) "Intentional falsification or mishandling of City records" and (13) action which reflects poorly upon the integrity of the City of Santa Fe.

11. Martin Lujan's acts and statements made in furtherance of the attempt to obtain and commit City funds to his personal use or expenses constitutes "just cause" for his dismissal under the City of Santa Fe's Personnel Rules.

12. Martin Lujan's dismissal from classified employment was for just cause under the standards enunciated in Rule 7.50.

Decision ¶¶ 1-12, at 29-31.

## PROCEDURAL BACKGROUND

On April 18, 2013, M. Lujan filed a Petition for Writ of Certiorari and a Complaint in the First Judicial District Court for the State of New Mexico, County of Santa Fe. See First Amended Petition for Writ of Certiorari and Complaint for Violation of First Amendment Rights, Retaliatory

Discharge and the Whistle Blower Act, filed May 9, 2013 (Doc. 1-2).  On May 9, 2013, the Defendants removed the case to the United States District Court for the District of New Mexico, asserting that the District of New Mexico has federal-question jurisdiction over the case.  <u>See</u> Civil Cover Sheet, filed May 9, 2013 (Doc. 1-1).  On October 11, 2013, M. Lujan filed a second Petition for Writ of Certiorari and a Complaint.  <u>See</u> Second Amended Petition for Writ of Certiorari and Complaint for Violation of First Amendment Rights, Retaliatory Discharge and the Whistle Blower Act, filed October 11, 2013 (Doc. 39)("Complaint and Petition").

M. Lujan asks the Court to issue a Writ of Certiorari, pursuant to Constitution of the State of New Mexico, and reverse Ms. Maynes' decision for three reasons.  <u>See</u> Complaint and Petition at 8-9.  First, M. Lujan contends that there is no substantial evidence that he committed theft, attempted theft, or was careless or negligent in the use of City of Santa Fe funds as defined under the City of Santa Fe's Personnel Rules and Regulations.  <u>See</u> Complaint and Petition at 8.  M. Lujan points out that Ms. Maynes questioned her own finding on the issue of theft and stated that the evidence only demonstrated "statements showing an intent to steal."  Complaint and Petition at 8 (citation omitted)(internal quotation marks omitted).  M. Lujan notes that R. Romero testified at the post-termination hearing that the City of Santa Fe never paid the SFJWA or any other entity that it agreed to pay under the purchase order that it issued to the SFJWA.  <u>See</u> Complaint and Petition at 8.

Second, M. Lujan asserts that Ms. Maynes "misinterpreted and/or misapplied the law or rules which govern[ed]" his alleged conduct.  Complaint and Petition at 8.  M. Lujan points out that the City has not presented any evidence that it paid money either to the SFJWA or to AAU because of M. Lujan's actions.  <u>See</u> Complaint and Petition at 8-9.  M. Lujan says: "Therefore it is inconsistent as a matter of law for Martin to have been careless, negligent or improper with City

funds."  Complaint and Petition at 8.  M. Lujan also argues that the electronic-mail transmissions between him and his brother on which Ms. Maynes relied "do not demonstrate that Martin handled any City funds."  Complaint and Petition at 9.  M. Lujan states that there is no evidence that he incurred any personal expenses, purchased an airline ticket, or received reimbursement for any expenses.  See Complaint and Petition at 9.

Third, M. Lujan asserts that the City of Santa Fe acted fraudulently, arbitrarily, and capriciously.  See Complaint and Petition at 9.  M. Lujan argues that R. Romero was his friend until M. Lujan began investigating concerns about R. Romero's girlfriend violating "time clock" policies.  Complaint and Petition at 9.  M. Lujan explains that he "instituted measures to control the abuses that were being carried out regarding employees clocking in for other employees," and that R. Romero's "subordinates and cronies" granted R. Romero's girlfriend an exemption from those measures.  Complaint and Petition at 9.  M. Lujan concludes:

> When Robert Romero became aware that Martin was investigating the legal requirements concerning the exemption of Robert Romero's girlfriend from the time clock policy and the nepotism of Robert Romero to a relative of his girlfriend, Robert Romero retaliated against Martin and violated his First Amendment Rights to Free Speech and Liberty, Violated the City's Anti-Fraud Policy, and retaliated against Martin for being a Whistle Blower.

Complaint and Petition at 9.

M. Lujan also alleges that the Defendants: (i) violated his rights under the First Amendment to the Constitution of the United States of America when they retaliated against him for exercising his right to free speech, see Complaint and Petition ¶¶ 1-14, at 11-12 (Count I); (ii) unlawfully discharged him for raising issues of public concern, see Complaint and Petition ¶¶ 15-24, at 12-13 (Count II); and (iii) violated the New Mexico Whistleblower Protection Act, N.M. Stat. Ann. §§ 10-16C-2(1) and 10-16C-2(4)("WPA"), when they terminated him after he raised concerns that City of Santa Fe officials had violated the City of Santa Fe's Personnel Rules,

Regulations, and Policies, Complaint and Petition ¶¶ 25-45, at 14-17 (Count III).   This Memorandum Opinion and Order does not address M. Lujan's claims, but only resolves his appeal.

      1.    **<u>The Appeal Brief</u>**.

M. Lujan filed the Appeal Brief on September 18, 2013.  <u>See</u> Appeal Brief at 1.[9]  In the Appeal Brief, M. Lujan asks the Court to overturn Ms. Maynes' decision for five reasons.  <u>See</u> Appeal Brief *passim*.   First, M. Lujan argues that Ms. Maynes' failure to disclose that she represented the City of Santa Fe with City Attorney Mark Allen -- who represents the City of Santa Fe in this case -- was arbitrary and capricious.  <u>See</u> Appeal Brief at 13-27.  M. Lujan asserts that, contrary to Ms. Maynes' statement in the Decision that both parties agreed to her serving as the hearing officer for the case, the City of Santa Fe's Human Resources Director appointed her to serve in that position.  <u>See</u> Appeal Brief at 13.  M. Lujan also argues that the City of Santa Fe violated rule 7.51(B)(2), which, according to M. Lujan, states that "the hearing officer shall not participate in any adjudicatory proceeding if, for any reason, the hearing officer cannot afford a fair and impartial hearing to either party."  Appeal Brief at 13-14 (citation omitted).  M. Lujan says that the City of Santa Fe violated this rule when neither Mr. Allen nor Ms. Maynes disclosed that Ms. Maynes represented the City of Santa Fe in its appeal to the Supreme Court of New Mexico in <u>Archuleta v. Santa Fe Police Department</u>, 2005-NMSC-006, 108 P.3d 1019.  M. Lujan argues that, at a minimum, Mr. Allen and Ms. Maynes should have disclosed that Ms. Maynes had been paid to represent the City of Santa Fe in a prior case.  <u>See</u> Appeal Brief at 14.  In M. Lujan's view, this disclosure would have allowed him to object to Ms. Maynes serving as the hearing officer for his case.  <u>See</u> Appeal Brief at 14.

---

      [9]The Court will use M. Lujan's pagination -- i.e., those found at the bottom of each page of the Appeal Brief -- rather than CM/ECF's.

M. Lujan explains that the Court of Appeals of New Mexico considered what constitutes impermissible bias for a hearing officer in City of Albuquerque v. Chavez, 1997-NMCA-054, 941 P.2d 509.  See Appeal Brief at 16.  M. Lujan asserts that, in that case, the Court of Appeals of New Mexico said that a party does not need to show actual bias to disqualify a hearing officer.  See Appeal Brief at 16 (citing City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16).  According to M. Lujan, the Court of Appeals of New Mexico said that a hearing officer should disqualify himself or herself for bias whenever "a reasonable person would have serious doubts about whether the hearing officer could be fair."  Appeal Brief at 16 (quoting City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16).  M. Lujan argues, without further explanation, that the Court of Appeals of New Mexico's impermissible-bias standard is met in this case.  See Appeal Brief at 17. M. Lujan asserts that, consequently, Ms. Maynes should have either disclosed her prior representation of the City of Santa Fe or disqualified herself from presiding over the hearing.  See Appeal Brief at 17.

Second, M. Lujan addresses together three of Ms. Maynes' conclusions of law -- that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses; that M. Lujan carelessly, negligently, or improperly used City of Santa Fe funds; and that M. Lujan intentionally falsified or mishandled City of Santa Fe records -- arguing that all three conclusions were arbitrary and capricious, and that substantial evidence did not support them.  See Appeal Brief at 17-20.  M. Lujan says that Ms. Maynes found that M. Lujan's submission of two invoices for payment was fraudulent.  See Appeal Brief at 17.  M. Lujan asserts that, under New Mexico law, fraud consists of "the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representation."  Appeal Brief at 17 (citing N.M. Stat. Ann. § 30-16-6).  M. Lujan states that, because it is difficult to determine to what invoices Ms.

Maynes is referring in her finding, he will instead demonstrate how substantial evidence does not support her finding.  See Appeal Brief at 17-18.

M. Lujan points out that the electronic-mail transmissions on which Ms. Maynes relied were created after R. Romero authorized the payment of $6,000.00 to the SFJWA and after Rodarte authorized the purchase order.  See Appeal Brief at 18.  M. Lujan states that there is no evidence that he submitted any reimbursement requests to the City of Santa Fe.  See Appeal Brief at 18.  M. Lujan notes that both he and his brother testified that the electronic-mail transmissions -- in which L. Lujan listed a ticket, car rental, and hotel expenses -- had nothing to do with the 2012 Grand Nationals Tournament.  See Appeal Brief at 18 (citation omitted).  M. Lujan argues that the only invoice that was submitted to the City of Santa Fe for payment was the $6,000.00 invoice from the SFJWA -- which R. Romero agreed to pay and Rodarte approved.  See Appeal Brief at 18.  M. Lujan says that, because the alleged $750.00 Invoice sent to Elevate Media was never submitted to the City of Santa Fe for payment, it cannot be considered a fraudulent submission on which Ms. Maynes could base her decision.  See Appeal Brief at 18-19.

M. Lujan asserts that Ms. Maynes' finding that he negligently used City of Santa Fe funds is "inconsistent with the fact that the City never paid SFJWA or the AAU Grand National Tournament any funds for the 2012 event."  Appeal Brief at 19.  M. Lujan argues that, more importantly, the City of Santa Fe never presented evidence that he submitted any of the expenses listed in his brother's electronic-mail transmission -- i.e., a $450.00 event ticket, a $450.00 airline ticket, or hotel or car expenses -- for reimbursement.  See Appeal Brief at 19-20.  M. Lujan states that, in fact, R. Romero testified that the event in Florida never happened and that, therefore, the expenses listed in L. Lujan's transmission "could not have been actually expensed."  Appeal Brief

at 20 (citing Nov. 6, 2012, Hearing Tr. at 145:2-19 (Thompkins, Pino)[10]).  M. Lujan concludes:
"Given that **NO** City funds were ever paid to the SFJWA or to Lujan coupled with the City's
agreement to pay SFJWA $6,000, the decision is arbitrary and capricious in finding that Lujan
'negligently used City funds.'"  Appeal Brief at 20 (bold in original).

Third, M. Lujan argues that Ms. Maynes' finding that M. Lujan stole City funds is arbitrary
and capricious, and substantial evidence does not support the finding.  See Appeal Brief at 20-22.
M. Lujan asserts that, under New Mexico law, theft requires both a mental state and an actual
"taking out of possession of owner without his consent."  Appeal Brief at 20 (quoting State v.
Lopez, 1980-NMCA-016, ¶ 13, 610 P.2d 753, 756)(internal quotation marks omitted).  M. Lujan
argues that the Decision does not establish the elements of theft.  See Appeal Brief at 20.
According to M. Lujan, the Decision found that the "'City had not yet paid any portion of its
authorized sponsorship monies to the SFJWA.'"  Appeal Brief at 20 (quoting Decision ¶ 17, at 18).

M. Lujan points out that the payment of funds to the SFJWA would require some sort of
proof that M. Lujan was being reimbursed or that the payment included the expenses that the City
of Santa Fe alleged were outlined in L. Lujan's June 3rd 19, 2012, electronic-mail transmission.
See Appeal Brief at 20.  M. Lujan reiterated that R. Romero's testimony established that the
expenses itemized in L. Lujan's 3rd June 19, 2012, electronic-mail transmission could not have
been charged to the City of Santa Fe, because the alleged Florida event never happened.  See
Appeal Brief at 20 (citing Nov. 6, 2012, Hearing Tr. at 145:2-19 (Thompkins, Pino)).  M. Lujan
asserts that Pino's testimony reflects that he understood that, because the Florida trip never

---

[10]It is unclear why M. Lujan cited Pino's testimony rather than R. Romero's testimony in support of this assertion, but Pino's testimony supports the assertion.  See Nov. 6, 2012, Hearing Tr. at 145:16-19 (Thompkins, Pino)("Q.  And you've already testified that the one in Florida couldn't have happened because there was no tournament in March; is that correct?  A.  It turns out that way.").

happened, L. Lujan never incurred and, therefore, never submitted any expenses to the City of Santa Fe for reimbursement.  See Appeal Brief at 21.  M. Lujan argues that, in light of Pino's uncontroverted testimony, Ms. Maynes' finding that M. Lujan stole City of Santa Fe funds is "plainly unreasonable," arbitrary and capricious, and substantial evidence does not support the finding.  Appeal Brief at 21-22.

Fourth, M. Lujan argues that there was no just cause for his termination under the City of Santa Fe's Personnel Rules.  See Appeal Brief at 22-23.  M. Lujan asserts that all of the notices he received -- i.e., the Notice of Contemplated Action, the Notice of Proposed Disciplinary Action, and the Notice of Final Decision -- concern the electronic-mail transmissions between him and his brother about the 2012 Grand Nationals Tournament.  See Appeal Brief at 22.  M. Lujan states: "As demonstrated above, by examining the e-mails and considering the testimony of the City's own witnesses, there is no evidence of a conspiracy, theft or negligence."  Appeal Brief at 22.  M. Lujan argues that the evidence that the City of Santa Fe submitted is also insufficient to prove fraud or that he stole funds from the City of Santa Fe.  See Appeal Brief at 22.

M. Lujan points out that the last part of the Decision concludes that M. Lujan attempted to steal City of Santa Fe funds.  See Appeal Brief at 23.  M. Lujan explains that, with respect to a finding of attempt, New Mexico law requires an "'overt act in furtherance of and with intent to commit a felony.'"  Appeal Brief at 23 (quoting N.M. Stat. Ann. § 30-28-1).  M. Lujan argues that the City did not present substantial evidence that he committed an overt act that would satisfy N.M. Stat. Ann. § 30-28-1.  See Appeal Brief at 23.  M. Lujan states that, "[a]s established in this brief, regarding the e-mail exchanges, the City admits that there was no conspiracy and that Lujan never went on any alleged Florida trip and he did not incur or submit any expenses for reimbursement to the City."  Appeal Brief at 23.  M. Lujan notes that any alleged events outside of

the 2012 Grand Nationals Tournament were not relevant to the City of Santa Fe's decision to terminate M. Lujan and are, therefore, irrelevant to this appeal.  <u>See</u> Appeal Brief at 23.

Fifth, and finally, M. Lujan argues that the Decision was not in accord with the law.  <u>See</u> Appeal Brief at 23-24.  M. Lujan reiterates that Ms. Maynes was impermissibly biased and should have disclosed her conflict of interest to either M. Lujan or his attorney.  <u>See</u> Appeal Brief at 24.  M. Lujan asserts:

> [T]he decisions' holding on the issue of "stealing", "attempt to steal", "fraud" and "negligence" are not consistent with New Mexico's legal requirements for these alleged findings.  The evidence from the City's own witnesses who made the allegations stands in direct contradiction of the decision's findings.  The only relevant evidence consisted of the e-mail exchanges and when testified to by the City's witnesses, the testimony and e-mails failed to support the Hearing Officer's decision.

Appeal Brief at 24.

### 2.    <u>The Response</u>.

The City of Santa Fe responded to the Appeal Brief on October 17, 2013.  <u>See</u> City of Santa Fe's Response to Petitioner's Appeal Brief, filed October 17, 2013 (Doc. 41)("Response").  In the Response, the City of Santa Fe addresses the five issues from the Appeal Brief.  <u>See</u> Response *passim*.  First, the City of Santa argues that Ms. Maynes' representation of the City of Santa Fe in a previous, unrelated matter does not warrant her disqualification.  <u>See</u> Response at 25.  The City of Santa Fe directs the Court to the City of Santa Fe's Motion to Strike, filed Oct. 15, 2013 (Doc. 40)("Motion to Strike"), in which it argued that the Court should strike this issue from the Appeal Brief, because M. Lujan did not raise it at the post-termination hearing and the information was readily available.  <u>See</u> Response at 25.  The City of Santa Fe argues, without further explanation, that Ms. Maynes' prior representation of the City of Santa Fe did not require her to recuse herself. <u>See</u> Response at 25.

Second, the City of Santa Fe asserts that there was substantial evidence that M. Lujan: (i) attempted to obtain municipal funds under false pretenses by authorizing the payment of two submitted invoices; (ii) carelessly, negligently, and improperly used municipal funds; and (iii) intentionally falsified or mishandled municipal records. See Response at 25-29. In response to M. Lujan's assertion that "[i]t's difficult to discern what two invoices that the Hearing Officer is referring to in relation to her specific finding," Response at 25 (citing Appeal Brief at 17-18), the City points out that the Decision states:

> Martin Lujan, through the assistance of his brother Larry, intended to submit an invoice for $6,000 plus payment, as well as an additional invoice of $750 to be paid through the Professional Services Agreement between the City and Elevate Media, in excess of the sums and the purpose for which the monies had been authorized by the City Manager Robert Romero.

Response at 25 (quoting the Decision at 21)(internal quotation marks omitted). The City of Santa Fe argues that, consequently, it is clear that Ms. Maynes was referring to the $6,000.00 Invoice and $750.00 Invoice which L. Lujan sent by electronic-mail transmission to M. Lujan for processing. See Response at 25.

The City of Santa Fe highlights that Ms. Maynes concluded that it had "'met its burden of proof to show by a preponderance of the evidence that Martin Lujan attempted to obtain City funds under false pretenses.'" Response at 26 (quoting Decision ¶ 8, at 29)(emphasis in Response but not in Decision). The City of Santa Fe argues that substantial evidence supports this finding, because M. Lujan misrepresented the cost of the 2012 Grand Nationals Tournament advertisements and was in the process of submitting an unauthorized invoice from Elevate Media for payment despite the fact that Elevate Media had not provided the City of Santa Fe any services. See Response at 26.

The City of Santa Fe asserts that it is irrelevant that the electronic-mail transmission between the Lujan brothers occurred after the City of Santa Fe issued the $6,000.00 purchase order for the advertisement in the 2012 Grand Nationals Tournament program.  See Response at 26.  The City of Santa Fe points out that, in M. Lujan's 1st June 20, 2012, E-mail, he admitted to inflating the tournament advertisement's price to pay for a personal expense.  See Response at 26 (citing M. Lujan's 1st June 20, 2012, E-mail at 8 ("We went from 5k to 6k to cover $450. reimbursement on ticket."))  The City of Santa Fe asserts that there was also substantial evidence presented at the post-termination hearing that the SFJWA's listed prices for advertisements were negotiable.  See Response at 26 (citing Nov. 8, 2012, Hearing Tr. at 852:12-852:11 (L. Lujan, Allen)).  The City of Santa Fe argues that, consequently, there was substantial evidence that M. Lujan -- with his brother's help -- inflated the advertisement's price to steal City of Santa Fe funds for his personal gain.  See Response at 26.

The City of Santa Fe challenges M. Lujan's assertion that it failed to present any evidence of the amounts that he submitted for reimbursement, by stating: "That again is incorrect." Response at 27.  The City points out that, in M. Lujan's 1st June 20, 2012, E-mail, he indicated that he would be using $450 for a personal expense.  See Response at 27.  The City of Santa Fe argues that it is also reasonable to assume that M. Lujan would use all of the $750.00 from the invoice sent to Elevate Media for personal expenses, because the back-page advertisement was supposed to be free.  See Response at 27.  The City of Santa Fe asserts that, nonetheless, "it does not make a difference whether Lujan was attempting to steal $20 or $1000," as both constitute theft from the City of Santa Fe.  Response at 27.

3.      **The October 22, 2013, Hearing**.

The Court held a hearing on the Appeal Brief on October 22, 2013.  See Transcript of Hearing (taken Oct. 22, 2013)("Oct. 22, 2013, Tr.").[11]  At the hearing, the parties largely reiterated their arguments from the briefing.  See Oct. 22, 2013, Tr. at 5:2-87:9 (Robles, Thompkins, Court). Regarding the first issue in the Appeal Brief -- whether Ms. Maynes was impermissibly biased -- the Court asked M. Lujan whether the Court would have to disclose that it worked with a particular attorney almost thirty years ago if that attorney were before the Court.  See Oct. 22, 2013, Tr. at 9:25-10:8 (Court).  M. Lujan responded that disclosing the information gives the affected parties the opportunity to make further inquiries to determine if there is more than meets the eye to the Court's relationship with that attorney.  See Oct. 22, 2013, Tr. at 10:9-22 (Thompkins).  The Court asked whether M. Lujan was arguing that Ms. Maynes was actually biased, and M. Lujan responded that he did not have to meet that standard and, in any case, did not have enough information to make that determination.  See Oct. 22, 2013, Tr. at 12:3-8 (Thompkins).  The Court asked M. Lujan whether he was arguing that there was a procedural problem with the fact that she did not disclose her prior representation of the City of Santa Fe.  See Oct. 22, 2013, Tr. at 12:9-13 (Court).  M. Lujan responded that, from a procedural standpoint, and in terms of fairness, Ms. Maynes should have made a complete disclosure.  See Oct. 22, 2013, Tr. at 12:14-25 (Thompkins).

In response, the City of Santa Fe asserted that the problem with M. Lujan's argument is that "simple proximity does not equate to bias."  Oct. 22, 2013, Tr. at 14:11 (Robles).  The City of Santa Fe contended that it would be one thing if M. Lujan showed that there was a pipeline between the City of Santa Fe and Ms. Maynes' law firm -- Miller Stratvert, P.A. -- through which Miller Stratvert receives a steady stream of cases, but that is not the case here.  See Oct. 22, 2013,

---

[11]The Court's citations to the transcript refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

Tr. at 14:13-18 (Robles).  The City of Santa Fe argues that a Westlaw search and New Mexico courts search revealed that Ms. Maynes had represented the City of Santa Fe in two cases over thirty years.  See Oct. 22, 2013, Tr. at 14:19-23 (Robles).  The City of Santa Fe points out that, in the Archuleta v. Santa Fe Police Department case, Ms. Maynes worked on the appellate brief for the Supreme Court of New Mexico on behalf of the Grievance Review Board -- which is comprised of three private citizens and not of City of Santa Fe employees.  See Oct. 22, 2013, Tr. at 15:5-10 (Robles).  The City of Santa Fe also acknowledged that Mr. Allen represented the City of Santa Fe in that case.  See Oct. 22, 2013, Tr. at 15:10-11 (Robles).  The City said that, in 2008, Ms. Maynes represented the City of Santa Fe in an employment case and her firm currently has a lawsuit against the City of Santa Fe.  See Oct. 22, 2013, Tr. at 15:19-22 (Robles).  In the City of Santa Fe's view, the record does not demonstrate any evidence that Ms. Maynes was biased in serving as the hearing officer.  See Oct. 22, 2013, Tr. at 1-5 (Robles).  The City of Santa Fe asserted that, it would be one thing if Ms. Maynes represented the City of Santa Fe at the same time as when she served as the hearing officer, but to have five years between her most recent case in which she represented the City of Santa Fe and the hearing does not establish even the appearance of bias.  See Oct. 22, 2013, Tr. at 17:5-19 (Robles).  The City of Santa Fe added that, for a litigator, two cases in thirty years is "nothing" and would have no impact on her impartiality.  Oct. 22, 2013, Tr. at 17:7-12 (Robles).

The Court asked the City of Santa Fe what it thought of M. Lujan's disclosure argument -- i.e., that there is a procedural problem with Ms. Maynes failure to disclose, because it meant that he did not have an opportunity to ask questions, gather information, and make a challenge within the hearing's context.  See Oct. 22, 2013, Tr. at 18:20-19:1 (Court).  The City of Santa Fe responded that it was struck by how unique the Court's disclosure practice was and noted that he

had never seen another judge be as careful to include all potential conflicts.  See Oct. 22, 2013, Tr. at 19:2-9 (Robles).  The City of Santa Fe said that every judge has a different practice and some disclose more information than others.  See Oct. 22, 2013, Tr. at 19:7-12 (Robles).  The City of Santa Fe asserted that Ms. Maynes likely did not even think about those cases, because they were insignificant in her thirty-year career.  See Oct. 22, 2013, Tr. at 19:18-21 (Robles).  The City of Santa Fe maintained that, to show the appearance of bias, M. Lujan would need to offer evidence of a more significant connection between Ms. Maynes and the City of Santa Fe -- such as an ongoing financial link, personal link, or relationship -- from which an average person could conclude that Ms. Maynes would not act impartially.  See Oct. 22, 2013, Tr. at 20:16-24 (Robles).

M. Lujan said that he doubted that Ms. Maynes simply forgot about the cases in which she represented the City of Santa Fe, because the City of Santa Fe is not a minor client, but instead is the city in which she lives.  See Oct. 22, 2013, Tr. at 21:7-21 (Thompkins).  M. Lujan reiterated that he did not need to show actual bias, but must only show that "in the natural course of events there is an indication of a passable temptation to an affirm man or woman sitting as the justice for the case with bias for any issue presented to him or her."  Oct. 22, 2013, Tr. at 22:2-5 (Thompkins).  M. Lujan argued that this standard is met here and that he does not need to show that Ms. Maynes received finances from the City of Santa Fe to demonstrate that she should have recused herself.  See Oct. 22, 2013, Tr. at 22:1-25 (Thompkins).

The Court asked M. Lujan whether the appropriate remedy would be to vacate the Decision and remand the case for a new hearing.  See Oct. 22, 2013, Tr. at 23:15-17 (Court).  M. Lujan responded that the Court's proposal was a possible remedy, but argued that, if the Court remands the case, it should also award costs and attorneys' fees.  See Oct. 22, 2013, Tr. at 23:18-24:8 (Thompkins).  The Court said that it would take the matter under advisement, but that it was

inclined to find that Ms. Maynes was not impermissibly biased, and was not required to recuse herself or disclose her prior representation of the City of Santa Fe.  See Oct. 22, 2013, Tr. at 24:9-17 (Court).  The Court stated that the issue is whether a reasonable person would feel that there is an appearance of bias, and, in the Court's view, that "fairly high" standard likely was not met here.  Oct. 22, 2013, Tr. at 24:17-25:12 (Court).

Addressing the remainder of the Appeal Brief, M. Lujan reiterated his arguments that: (i) he never submitted the $750.00 Invoice to the City of Santa Fe; (ii) there is no evidence that he incurred any of the personal expenses detailed in his L. Lujan's 3rd June 19, 2012, E-mail; and (iii) there is no evidence that he submitted any personal expenses for reimbursement from the City of Santa Fe.  See Oct. 22, 2013, Tr. at 25:22-31:7 (Thompkins).  M. Lujan argues that, in the electronic-mail transmissions, he denied every request from his brother to give the SFJWA additional money from the City of Santa Fe -- to the point that L. Lujan eventually started talking about matters that had nothing to do with the 2012 Grand Nationals Tournament to try and push his brother to follow through with their sponsorship.  See Oct. 22, 2013, Tr. at 34:1-17 (Thompkins).

The Court asked the City of Santa Fe whether any invoice was submitted above the $6,000.00 amount that R. Romero originally authorized.  See Oct. 22, 2013, Tr. at 39:14-15 (Court).  The City of Santa Fe responded that, after the string of electronic-mail transmissions between M. Lujan and his brother, M. Lujan forwarded both the $6,000.00 Invoice and the $750.00 Invoice to J. Romero and asked her to process them.  See Oct. 22, 2013, Tr. at 39:20-23 (Robles).  The City of Santa Fe said that the $6,000.00 Invoice was supposed to go to the City of Santa Fe for payment and the other was supposed to go to Elevate Media so that they could bill the City of Santa Fe for an advertisement in the 2012 Grand Nationals Tournament program for which Elevate Media did not pay.  See Oct. 22, 2013, Tr. at 39:20-40:5 (Robles).  The City of Santa Fe

said that Rodarte discovered that the $6,000.00 payment required an itemized professional services agreement and placed a hold on the purchase order. See Oct. 22, 2013, Tr. at 40:9-16 (Robles). The City of Santa Fe asserted that, at that point, M. Lujan "realized that he had been caught with his hand in the cookie jar." Oct. 22, 2013, Tr. at 40:18-19 (Robles). The City of Santa argued that, consequently, on Monday morning, M. Lujan stopped Elevate Media from submitting the $750.00 Invoice and had it deleted. See Oct. 22, 2013, Tr. at 41:2-13 (Robles).

The Court asked the City of Santa Fe whether both the $6,000.00 Invoice and the $750.00 Invoice included the back-cover advertisement, and the City of Santa Fe responded that they did. See Oct. 22, 2013, Tr. at 41:19-42:1 (Court, Robles). The City of Santa Fe said that the Lujan brothers were essentially double-billing the City of Santa Fe for that advertisement. See Oct. 22, 2013, Tr. at 42:4-43:3 (Robles). The City of Santa then walked the Court through the electronic-mail transmissions between M. Lujan and his brother, and the Court noted that it appears that M. Lujan was resisting his brother's requests until the transmission when M. Lujan says: "We went from the 5k to 6k to cover the $450. reimbursement on ticket. Back cover was not included but you did mention that if we purchased it would cover air to Florida." Oct. 22, 2013, Tr. at 48:3-55:4 (Court, Robles)(citation omitted)(internal quotation marks omitted). The City of Santa Fe added that Ms. Maynes considered the Lujans' explanations for the transmissions and concluded that they were not credible. See Oct. 22, 2013, Tr. at 63:3-66:11 (Court, Robles).

Upon the Court's questioning, the City of Santa Fe asserted that the Court can uphold the Decision as long as it finds that substantial evidence supported any one of Ms. Maynes' findings of misconduct -- e.g., theft or false pretenses -- and that the finding was not arbitrary or capricious. See Oct. 22, 2013, Tr. at 70:10-21 (Robles, Court). In response, M. Lujan argued that Ms. Maynes' findings of misconduct all rest on her finding that the electronic-mail transmissions

between M. Lujan and his brother demonstrated an attempt to steal City of Santa Fe funds.  See Oct. 22, 2013, Tr. at 73:1-11 (Thompkins).  M. Lujan asserts that, if the Court does not accept that interpretation, there is not substantial evidence to support any of Ms. Maynes' findings of misconduct.  See Oct. 22, 2013, Tr. at 73:1-11 (Thompkins).  Turning to the electronic-mail transmissions, M. Lujan argued that he resisted every one of his brother's requests for more money from the City of Santa Fe, and that, even in the transmission in which M. Lujan said that "we went from 5K to 6K to cover the 450 reimbursement for the ticket," he also said that it "doesn't look like this is happening.  So I guess it's not an issue."  Oct. 22, 2013 Tr. at 75:22-76:8 (Thompkins)(citation omitted)(internal quotation marks omitted).  In M. Lujan's view, the transmissions do not include any confirmation or agreement between the brothers that any personal expenses would be added to the $6,000.00 Invoice that was submitted to the City of Santa Fe.  See Oct. 22, 2013, Tr. at 77:25-78:4 (Thompkins).  M. Lujan also reiterated that, before this incident, he was not disciplined in the seventeen to eighteen years that he worked for the City of Santa Fe, and that, if he and his brother were engaged in the widespread misconduct that the City of Santa Fe alleges, it would have been discovered long before this case.  See Oct. 22, 2013, Tr. at 80:5-81:18 (Thompkins).  At the end of the hearing, the Court said that it would take the matter under advisement.  See Oct. 22, 2013, Tr. at 87:6-9 (Court).

        4.    **The Reply.**

        M. Lujan replied to the Response on November 4, 2013.  See Petitioner Martin Lujan's Reply Brief, filed November 4, 2013 (Doc. 50)("Reply").  In addition to reiterating the arguments from his Appeal Brief, M. Lujan addresses six new issues in the Reply.  See Reply *passim*.  First, M. Lujan argues that his due-process right to a fair and impartial hearing officer cannot be waived because he failed to raise the issue at the hearing.  See Reply at 6-7.  M. Lujan asserts that "[r]ights

conferred by statute may not ordinarily be waived."  Reply at 7 (citing MAPCO Alaska Petro., Inc., v. United States, 27 Fed. Cl. 405 (1992)("MAPCO"), overruled on other grounds by Tesoro v. United States, 405 F.3d 1339 (Fed. Cir. 2005)).  M. Lujan contends that, in MAPCO, a business asserted that the use of a pricing index under its contract with the United States violated the Federal Acquisition Regulations.  See Reply at 7.  M. Lujan states: "The Government raised the defense of 'waiver and estoppel'.  The Court held that, '. . . when a contract clause drafted by the Government is inconsistent with law, whether the appellant inquired, protested, accepted or otherwise assumed any risks regarding the same is not controlling; the impropriety will not be allowed to stand.'"   Reply at 7 (quoting MAPCO, 27 Fed. Cl. at 416)(citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 51 (1974)("[W]e think it clear that there can be no prospective waiver of an employee's rights under Title VII."); Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704-05 (1945)(holding employees' written waiver of right to liquidated damages under Fair Labor Standards Act not enforceable)).  M. Lujan argues that, because he had a due-process right to a fair and impartial hearing officer, the right cannot be waived because he failed to raise it before the hearing officer.  See Reply at 7.

Second, M. Lujan reiterates the standard for whether a hearing officer is impermissibly biased:

> The inquiry is not whether the Board members are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.

Reply at 8 (quoting Santa Fe Exploration Co. v. Oil Conservation Comm'n of N.M., 1992-NMCA-044, 835 P.2d 819, 825)(emphases in Reply omitted)(internal quotation marks omitted).  M. Lujan argues that Ms. Maynes' prior representation of the City of Santa Fe satisfies

the "possible temptation" standard and, therefore, required her to recuse herself from M. Lujan's hearing.  Reply at 9.

Third, M. Lujan asserts that the City of Santa Fe's argument that he did not have a property right in the position of Interim Recreation Director was waived and, in the alternative, is incorrect. See Reply at 12-13.  M. Lujan points out that, in a footnote in the Response, the City of Santa Fe contends that M. Lujan had no property right in the position of Interim Recreation Division Director.  See Reply at 12.  M. Lujan argues that the City of Santa Fe never presented this issue to Ms. Maynes, but instead made the contention for the first time in the Response.  See Reply at 12. M. Lujan contends that, consequently, the City of Santa Fe waived this argument.  See Reply at 12-13.  M. Lujan asserts that, in the alternative, the City of Santa Fe's argument is incorrect, because "City Rules, 7.50(D) provides that 'Employees in temporary . . . status . . . (1) . . . must be advised in writing of the reasons for the dismissal . . . [and] (2) the Personnel Action request Form must be approved by the Human Resources Director and City Manager prior to the effective date of the dismissal.'"  Reply at 13 (modifications in Reply but not Rule 7.50(D))(citation omitted).  In M. Lujan's view, Rule 7.50(D) provided him a property right in the temporary position of Interim Recreation Division Director.  See Reply at 13.

Fourth, M. Lujan contends that the City's evidence of M. Lujan's other alleged acts of misconduct is not proper impeachment evidence.  See Reply at 14.  M. Lujan points out that he has never been disciplined or reprimanded for this alleged misconduct, nor has there been a finding that he did anything improper.  See Reply at 14.  M. Lujan asserts that, because he can only be disciplined for "just cause," it is improper for the City of Santa Fe to allege "that the evidence it discovered and presented for the first time to Lujan at the post-termination hearing could be used

to impeach him." Reply at 14. In M. Lujan's view, "the law on the subject of impeachment" does not support the City of Santa Fe's argument. Reply at 14.

M. Lujan explains that "'for more than two hundred years it has been the rule that evidence of other crimes is not admissible.'" Reply at 14 (quoting Coulston v. United States, 51 F.2d 178, 180 (10th Cir. 1931)). According to M. Lujan, in Coulston v. United States, the United States Court of Appeals for the Tenth Circuit found prejudicial error in the admission of testimony regarding a prior controversy between the defendant and federal narcotics agents. See Reply at 14-15 (citing Coulston v. United States, 51 F.2d at 180). M. Lujan states that the Tenth Circuit held that a remote and unrelated transaction had no evidentiary bearing on the issues before the trial court. See Reply at 15 (citing Coulston v. United States, 51 F.2d at 180). M. Lujan contends that, similarly, the City of Santa Fe's evidence of alleged misconduct has no bearing on this case, because Elevate Media acted alone in carrying out that misconduct and did not involve M. Lujan. See Reply at 15. M. Lujan asserts that, consequently, Ms. Maynes erred in considering that evidence as impeachment evidence. See Reply at 15.

Fifth, M. Lujan asserts that the City of Santa Fe's argument that M. Lujan attempted to steal municipal funds is unpersuasive, because the City of Santa Fe did not point to a personnel rule that defines either theft or attempted theft. See Reply at 15. M. Lujan reiterates that, under New Mexico law, attempted theft consists of an "'overt act in furtherance of and with intent.'" Reply at 15 (quoting N.M. Stat. Ann. § 30-28-1). M. Lujan argues that the Decision did not establish the elements of attempted theft:

> There was only one instance which the Hearing Officer found that Lujan sent an e-mail to his assistant Jennifer Romero who sent it to Elevate Media. It is admitted by Appellee that Elevate Media destroyed the alleged invoice and that it was never submitted to the City. Therefore, the required over[t] act in furtherance of the intent could not be proven. If an attempt is called off, i.e. the over[t] act has intentionally been stopped by the alleged perpetrator then the alleged perpetrator

> cannot be guilty of attempt to commit a crime as the prerequisite element of an
> "over[t] act" is missing.  It was arbitrary and capricious for the hearing officer to
> find Lujan had attempted to steal money without evidence of an over[t] act.

Reply at 16.

Sixth, M. Lujan contends that the City of Santa Fe's interpretation of the electronic-mail transmissions between him and his brother fails to consider the context of those transmissions.  See Reply at 16.  M. Lujan acknowledges that M. Lujan's 1st June 20, 2012, E-mail -- which states that "[w]e went from 5k to 6k to cover the $450" -- starts to create problems for him.  Reply at 16 (quoting M. Lujan's 1st June 20, 2012, E-mail)(internal quotation marks omitted).  M. Lujan asserts, however, that this statement must be considered in light of the sentence that follows it: "Doesn't look like that is happening soo I guess its not an issues."  Reply at 16 (quoting M. Lujan's June 20, 2012, E-mail)(internal quotation marks omitted).  M. Lujan contends that "the only interpretation which can be taken from that sentence is that Lujan is denying there is any attempted theft or actual theft of money from the City . . . ."  Reply at 16.  M. Lujan maintains that, consequently, there is no evidence that he entered into an agreement to steal City of Santa Fe funds.  See Reply at 17.

## STANDARD OF REVIEW

When reviewing hearing officers' decisions, courts "apply a whole-record standard of review."  Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 13, 129 P.3d 158.  Courts also review the hearing officers' decisions of law de novo.  See AMREP Sw. Inc. v. Sandoval Cnty. Assessor, 2012-NMCA-082, ¶ 7, 284 P.3d 1118 ("[W]e review de novo the legal question of whether the Board misinterpreted and misapplied its statutory and administrative governing provisions").  To succeed on appeal, a party must show that the hearing officer's decision was: (i) fraudulent, arbitrary, or capricious; (ii) not supported by substantial evidence; (iii) outside the

scope of the hearing officer's authority; or (iv) otherwise not in accordance with the law. See N.M.R.A. Rule 1-075(R) (setting forth the grounds upon which a party may obtain a reversal of a hearing officer's decision); Narvaez v. N.M. Dep't of Workforce Solutions, 2013-NMCA-079, ¶ 7, 306 P.3d 513, 515 (same).

### 1.    **Arbitrary and Capricious.**

The Supreme Court of New Mexico has explained that a hearing officer's decision is arbitrary and capricious only "if it is unreasonable or without a rational basis." Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n, 2003-NMSC-005, ¶ 17, 61 P.3d 806, 813 (2003).  "Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though another conclusion might have been reached." Perkins v. Dep't of Human Servs., 1987-NMCA-148, ¶ 20, 748 P.2d 24, 28.

### 2.    **Substantial Evidence.**

A reviewing court must "view the evidence in the light most favorable to the decision of the agency and must defer to the agency's factual determinations if supported by substantial evidence." N.M. State Bd. of Psychologist Exam'rs v. Land, 2003-NMCA-034, ¶ 5, 62 P.3d 1244, 1247. See Llena v. Montoya, 2013-NMCA-048, ¶ 9, 299 P.3d 456, 459 ("[A]lthough we engage in whole record review, we will not disturb any of an agency's factual findings that are supported by substantial evidence.").  "Substantial evidence is evidence that a reasonable mind would regard as adequate to support a conclusion."  Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers, 1998-NMSC-020, ¶ 17, 962 P.2d 1236, 242 (internal quotation marks omitted).  "The question is not whether substantial evidence would have supported an opposite result; it is whether such evidence supports the result reached."  Hernandez v. Mead Foods, Inc., 1986-NMCA-020, ¶ 16, 716 P.2d 645, 649.

## ANALYSIS

The Court will deny M. Lujan's requests in the Appeal Brief in part and grant them in part. First, Ms. Maynes did not act fraudulently, arbitrarily, or capriciously when she failed to recuse herself from M. Lujan's post-termination administrative hearing, or disclose her prior representation of the City of Santa Fe. Second, Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses by authorizing payment of two submitted invoices is not fraudulent, arbitrary, or capricious, and substantial evidence supports the decision. Third, Ms. Maynes' decision that M. Lujan carelessly, negligently, or improperly used City of Santa Fe funds is arbitrary and capricious and substantial evidence does not support the decision. Fourth, M. Lujan waived the issue whether Ms. Maynes decision that he intentionally falsified or mishandled City of Santa Fe records was fraudulent, arbitrary, and capricious, and substantial evidence did not support it; if M. Lujan did not waive the issue, however, the Court finds that Ms. Maynes' decision that he intentionally falsified or mishandled City of Santa Fe funds was arbitrary and capricious and substantial evidence did not support it. Fifth, Ms. Maynes' decision that M. Lujan stole City of Santa Fe funds is arbitrary and capricious, and substantial evidence does not support the decision. Sixth, just cause existed for M. Lujan's termination from employment. Seventh, Ms. Maynes' decision was in accord with the law. Consequently, the Court will grant M. Lujan's request in the Appeal Brief regarding Ms. Maynes' conclusions that M. Lujan stole City of Santa Fe funds and carelessly, negligently, or improperly used City of Santa Fe funds, but deny the requests in the Appeal Brief on the remainder of the issues, and leave Ms. Maynes' determination that just cause existed for M. Lujan's termination intact.

## I. MS. MAYNES DID NOT ACT ARBITRARILY OR CAPRICIOUSLY WHEN SHE FAILED TO RECUSE HERSELF, OR DISCLOSE HER PRIOR REPRESENTATION OF THE CITY OF SANTA FE.

Ms. Maynes did not act arbitrarily or capriciously when she failed to recuse herself or disclose her prior representation of the City of Santa Fe.  First, M. Lujan failed to raise his due-process claim either in his Complaint of in his petition for writ of certiorari.  Second, even if M. Lujan had included his due-process challenge to Ms. Maynes' impartiality in his Complaint or his Petition for writ of certiorari, he would not have a valid due-process claim.

### A.  M. LUJAN FAILED TO RAISE HIS DUE-PROCESS CLAIM EITHER IN HIS COMPLAINT OR IN HIS PETITION FOR WRIT OF CERTIORARI.

M. Lujan failed to raise his due-process claim in either his Complaint or his Petition for Writ of Certiorari.  M. Lujan asks the Court to overturn Ms. Maynes' decision, because she violated his due-process rights by failing to disclose that she represented the City of Santa Fe before the Supreme Court of New Mexico in Archuleta v. Santa Fe Police Department.  The City of Santa Fe contends that M. Lujan waived this argument, because he failed to raise it during his post-termination hearing.  See Response at 25; Motion to Strike at 4-6.  M. Lujan argues that it is irrelevant whether he raised the argument in the post-termination hearing, because a district court can consider due-process challenges under its original jurisdiction.  See Reply at 6.

M. Lujan correctly argues that due-process challenges "are appropriately addressed by the district court under its powers of original jurisdiction," rather than under its appellate jurisdiction. Los Chavez Cmty. Ass'n v. Valencia Cnty., 2012-NMCA-044, ¶ 10, 277 P.3d 475, 480.  See Maso v. N.M. Taxation & Revenue Dep't, Motor Vehicle Div., 2004-NMCA-025, ¶ 2, 85 P.2d 276, 278 ("We hold that [due-process] claims must be considered in the first instance by the district court pursuant to its original jurisdiction.").  Because due-process claims are not part of the administrative record, but instead function as freestanding claims, they do not need to be raised at an administrative hearing.  Cf. Maso v. N.M. Taxation & Revenue Dep't, Motor Vehicle Div., 2004-NMCA-025, ¶ 12 ("[E]ven if Driver had timely requested a hearing, MVD could not have

considered the issue he asked the district court, and now asks this Court, to determine -- whether failure to serve him with a Spanish-language notice constituted a denial of due process."). Consequently, M. Lujan did not waive his due-process challenge to Ms. Maynes' impartiality by failing to raise it during his post-termination hearing.

M. Lujan's due-process challenge suffers from a different malady: he failed to raise it in his Complaint or his Petition for Writ of Certiorari.  The Court of Appeals of New Mexico has liberally construed due-process challenges raised in appeals of administrative decisions as being brought under district courts' original jurisdiction.  See Los Chavez Cmty. Ass'n v. Valencia Cnty., 2012-NMCA-044, ¶ 11 ("The fact that Los Chavez's original appeal to the district court invoked only that court's appellate jurisdiction is not fatal to our analysis."); State v. Roybal, 2006-NMCA-043, ¶ 17, 132 P.3d 598, 605 ("It is the substance of the [pleading], and not its form or label, that controls.").  Where a party fails to mention an issue entirely in either its Complaint or Petition for Writ of Certiorari, however, New Mexico courts will not consider it.  See N.M.R.A Rule 12-505(D)(3) (stating that a petition for a writ of certiorari "shall contain a concise statement showing . . . the questions presented for review by the Court of Appeals; only the questions set forth in the petition will be considered by the Court"); San Pedro Neighborhood Ass'n v. S.F. Cnty. Bd. Cnty. Cmm'rs, 2009-NMCA-045, ¶ 29, 206 P.3d 1011, 1019 ("The issue now raised was not set forth by either the Board or Applicant in their petitions for certiorari.  We therefore do not consider it.").

Neither M. Lujan's Complaint nor his Writ of Certiorari mentions his due-process challenge to Ms. Maynes' impartiality.  Nor do they allege facts which, taken as true, would constitute a due-process challenge to Ms. Maynes' impartiality.  Instead, M. Lujan raised the issue

for the first time in the Appeal Brief.  See Appeal Brief at 1, 13-17.  Consequently, M. Lujan fails

to state a due-process claim for which relief can be granted.

> **B.   EVEN IF M. LUJAN HAD INCLUDED HIS DUE-PROCESS CHALLENGE IN HIS COMPLAINT OR HIS PETITION FOR WRIT OF CERTIORARI, HE WOULD NOT HAVE A VALID DUE-PROCESS CLAIM.**

Even if M. Lujan had included his due-process challenge in his Complaint or in his Petition

for Writ of Certiorari, he would not have a valid due-process claim.  M. Lujan argues that, in City

of Albuquerque v. Chavez, the Court of Appeals of New Mexico said that a party does not need to

show actual bias to disqualify a hearing officer.  See Appeal Brief at 16 (quoting City of

Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16).  According to M. Lujan, the Court of Appeals of

New Mexico said that a hearing officer should disqualify himself or herself for bias whenever "a

reasonable person would have serious doubts about whether the hearing officer could be fair."

Appeal Brief at 16 (quoting City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16).  M. Lujan

asserts that Ms. Maynes' working relationship with Mr. Allen required her to disqualify herself

from serving as the hearing officer, or, at a minimum, disclose her prior representation of the City

of Santa Fe.  See Reply at 9.  The Court disagrees.

The Supreme Court of New Mexico has stated that administrative proceedings must be

administered by fair and impartial triers of fact who are "[a]t a minimum, . . . disinterested and free

from any form of bias or predisposition regarding the outcome of the case."  Reid v. N.M. Bd. of

Examiners in Optometry, 1979-NMSC-005, ¶ 7, 589 P.2d 198, 200.  Triers of fact must likewise

be "impartial and unconcerned in the result" of the adjudication, and the rigidity of this

requirement "applies more strictly to an administrative adjudication where many of the customary

safeguards affiliated with court proceedings have, in the interest of expedition and a supposed

administrative efficiency, been relaxed."  Reid v. N.M. Bd. of Examiners in Optometry,

1979-NMSC-005, ¶ 7.  The mere fact that a hearing officer is or was an employee of a party involved in the hearing does not, by itself, constitute a due-process violation.  See Kmart Properties, Inc. v. Taxation & Revenue Dep't of N.M., 2006-NMCA-026, ¶ 26, 131 P.3d 27, 43 ("It is well-established that due process is not violated by having hearing officers who are employed by an agency adjudicating cases in which that agency is a party."), rev'd on other grounds, 2006-NMSC-006, 131 P.3d 22.

In Las Cruces Professional Fire Fighters v. City of Las Cruces, 1997-NMCA-031, 938 P.2d 1284, for example, the plaintiff -- a firefighters union -- sought to invalidate a city ordinance which prohibited union activities on city property during business hours.  See 1997-NMCA-031, ¶¶ 2-4. The union's claim was successful before both the administrative board and the State District Court, and the City of Las Cruces appealed.  See 1997-NMCA-031, ¶ 4.  Among other things, the City of Las Cruces argued that the proceeding before the administrative board was defective, because one board member was impermissibly biased given that unions had appointed him.  See 1997-NMCA-031, ¶ 21.  The Court of Appeals of New Mexico concluded that recusal was unnecessary, because his mere appointment by unions, alone, was insufficient to disqualify him. See 1997-NMCA-031, ¶ 21.

The closest analogy to this case is Flores v. State, 1968-NMCA-017, 439 P.2d 565.  In that case, the defendant -- Narisco Flores -- was tried and convicted of armed robbery in a jury trial. See 1968-NMCA-017, ¶ 1.  Flores sought post-conviction relief, arguing that his due-process rights were violated, because his trial judge -- the Honorable Edward E. Triviz, State District Judge, Dona Ana County, New Mexico -- was impermissibly biased.  See 1968-NMCA-017, ¶ 2. Flores explained that, in July, 1963, he retained Judge Triviz -- who was then a practicing attorney -- to represent him in a criminal action.  See 1968-NMCA-017, ¶ 3.  Although the case against

Flores was dismissed, he never paid Judge Triviz his full fee.  See 1968-NMCA-017, ¶ 3.  A month

later, Flores asked Judge Triviz to represent him in another criminal case, but he refused because

Flores still had not paid him.  See 1968-NMCA-017, ¶ 4.  Judge Triviz had no further contact with

Flores until his armed-robbery trial in December, 1966.  See 1968-NMCA-017, ¶ 4.  Flores argued

that, because he was indebted to Judge Triviz for the unpaid attorney's fee, and because Judge

Triviz had "personal knowledge of the defendant," it was impossible for him to preside impartially

at his trial.  1968-NMCA-017, ¶ 6.  The Court of Appeals of New Mexico disagreed, reasoning that

the events for which Judge Triviz represented Flores in 1963 "had no connection whatsoever" with

the issues in the trial presided over which he presided in 1966.  1968-NMCA-017, ¶ 9.

　　　　Although the analogy is not perfect -- because Ms. Maynes was a hearing officer rather

than a judge -- the Court of Appeals of New Mexico's reasoning in Flores v. State applies with

equal force here.  Similar to Judge Triviz, who represented Flores once three years before his trial,

Ms. Maynes has represented parties associated with the City of Santa Fe twice over her thirty-year

career.  In 2005, Maynes represented the Grievance Review Board -- which is comprised of three

Santa Fe residents who were not municipal employees or officers -- in Archuleta v. Santa Fe Police

Department.  See Petitioners-Appellees' Joint Brief-In-Chief (cover page) at 1, filed October 15,

2013 (Doc. 40-1)("Brief").  Separate counsel represented the City of Santa Fe.  See Brief at 1.  In

2007, the City of Santa Fe's insurance carrier retained Ms. Maynes for an unrelated employment

case that was dismissed in 2008.  See Elaine Aragon v. State of New Mexico, No. CIV 07-01234

RLP/LFG (D.N.M.).  Ms. Maynes' law firm -- Miller Stratvert -- is also currently representing a

plaintiff in a lawsuit against the City of Santa Fe regarding its telecommunications ordinance.  See

Qwest Corp. v. City of Santa Fe, No. CIV 10-617 RB/KBM (D.N.M.).  There is no evidence that

the two prior cases in which Ms. Maynes represented parties associated with the City of Santa Fe

have any connection to the issues in M. Lujan's personnel hearing.  There is similarly no indication that either Maynes or her law firm expect to represent the City of Santa Fe again in any future matters.  M. Lujan has not provided -- and the Court has not found -- any remarks that Ms. Maynes made before, after, or during the hearing that would indicate any potential bias on her part.  Consequently, Ms. Maynes had even less of a reason to be biased towards the City of Santa Fe than Judge Triviz was against Flores, because, unlike Judge Triviz -- who could have still been upset that Flores never fully compensated him for his services -- there is no evidence that Ms. Maynes' connection to the City of Santa Fe lasted after her brief period of representation.

The evidence in the record also demonstrates that M. Lujan received a fair post-termination hearing.  At the hearing, M. Lujan was represented by a competent attorney who vigorously confronted and cross examined adverse witnesses, and was allowed to present his own witnesses and evidence.  The hearing spanned four days, resulting in a hearing transcript that was 1,194 pages.  When Ms. Maynes excluded M. Lujan's documentary evidence or overruled his objections, she provided him with an explanation.  Once the hearing was completed, Ms. Maynes took four months -- from December, 2012, to March, 2013 -- to issue the Decision in which she used nearly thirty pages to detail her conclusions of law and fact.  See Decision *passim*.  The evidence in the record demonstrates that Ms. Maynes carefully considered the relevant law and evidence to reach her conclusions.  Consequently, the Court does not think "a reasonable person would have serious doubts about whether the hearing officer could be fair."  City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16.  Without something more -- a financial connection, a familial relationship, or evidence of some other benefit that Maynes would accrue from deciding in favor of the City of Santa Fe -- her mere representation of the City of Santa Fe in a prior case does not, alone, establish impermissible bias.

The cases that M. Lujan cites do not dictate a different result.  M. Lujan relies primarily on City of Albuquerque v. Chavez.  In that case, the petitioner -- Joseph Chavez -- appealed his termination by the City of Albuquerque to an independent personnel hearing officer.  See 1997-NMCA-054, ¶ 4.  During the hearing, the City of Albuquerque moved to disqualify the hearing officer multiple times, because Chavez' attorney -- Paul Livingston -- had recently filed suit against the hearing officer in an unrelated matter and continued to refer to the lawsuit throughout the hearing.  See 1997-NMCA-054, ¶ 4.  The hearing officer: (i) expressed concern for the personal financial impact that the suit would have on him; (ii) asked Mr. Livingston to reconsider suing him; and (iii) said that Mr. Livingston intimidated him, because he had never been sued.  See 1997-NMCA-054, ¶ 4.

In spite of these assertions, however, the officer denied each of the City of Albuquerque's motions, each time stating that he believed he could be impartial.  See 1997-NMCA-054, ¶ 4.  After the hearing, the hearing officer recommended that the personnel board reverse the City of Albuquerque's decision to terminate Chavez and instead reinstate him with a suspension, but did not mention the motions to disqualify.  See 1997-NMCA-054, ¶ 5.  The personnel board approved the hearing officer's recommendation, and the City of Albuquerque appealed.  See 1997-NMCA-054, ¶ 6.  The New Mexico Court of Appeals concluded that "a reasonable person would have serious doubts about whether the hearing officer could be fair in this case," and the hearing officer should have disqualified himself.  1997-NMCA-054, ¶ 18.

Unlike in City of Albuquerque v. Chavez, there is no indication that the City of Santa Fe or M. Lujan filed suit against Ms. Maynes before the hearing, or that Ms. Maynes was concerned in any way about either of the parties' actions against her personally.  There is no similarly no

evidence that Ms. Maynes had a personal or financial relationship with either of the parties. Consequently, City of Albuquerque v. Chavez is inapposite.

M. Lujan also cites United States v. Brown, 539 F.2d 467, 468 (5th Cir. 1976).  There, the defendant -- H. Rap Brown -- filed a motion to vacate his conviction after receiving a letter from an attorney who overheard Brown's trial judge state -- before Brown's trial -- "that he was going to get that n-----."  539 F.2d at 468.  On appeal, in a per curiam opinion in which Judges Wisdom, Ingraham, and Grooms joined, the United States Court of Appeals for the Fifth Circuit said:

> Impartiality finds no room for bias or prejudice.  It countenances no unfairness and upholds no miscarriage of justice.  Bias and prejudice can deflect the course of justice and effect the measure of its judgments.  If the judge finds himself possessed of those sentiments, he should recuse himself; or, if he does not, confront the likelihood of proceedings under the statute to require him to do so.

539 F.2d at 469.  The Fifth Circuit concluded that, because the trial judge's statement did not comport with the appearance of justice and the record did not demonstrate that Brown received a fair trial, it had to vacate his conviction.  See 539 F.2d at 470.  Unlike in United States v. Brown, where the trial judge made his bias against Brown abundantly clear at the outset of Brown's trial, Ms. Maynes made no such statements before, during, or after M. Lujan's hearing.  In fact, aside from pointing to her prior representation of the City of Santa Fe, M. Lujan has offered no evidence demonstrating even the appearance of bias.  Consequently, United States v. Brown does not apply.

Furthermore, M. Lujan's proposed rule is unworkable.  New Mexico has a relatively small legal community.  Judges and attorneys alike have worked in a variety of positions on both sides of the aisle.  Defense attorneys regularly come before the Court who have previously worked as prosecutors and vice versa.  The Court worked primarily as a civil defense attorney for many years before primarily doing plaintiffs' work, and also served as Deputy Attorney General for the State of New Mexico.  If the Court were to adopt M. Lujan's proposed rule, it would have to recuse itself

from any case in which the State of New Mexico or any prior client is a party, leaving the Court with a significantly smaller caseload and placing a greater burden on its colleagues. In the same way, some judges in this District have previously served as Assistant United States Attorneys for United States Attorney's Office for the District of New Mexico. Under M. Lujan's proposed rule, all of those judges would have to recuse themselves from every criminal case brought by AUSAs from this District. Nearly every judge in this District has worked for the federal government, the state government, or a municipal body. To force every one of those judges to recuse themselves from every case involving a former employer would likely make the administration of justice in this District far more difficult and less efficient. There is no reason to think that the effects among hearing officers would be any less drastic.

Moreover, there is no evidence that such a costly rule would carry an equivalent benefit -- or any benefit at all. M. Lujan has not provided -- and the Court has not found -- any evidence of widespread misconduct or decisions among State Court judges, federal judges, or administrative hearing officers who were improperly motivated by their personal biases. The Court regularly interacts with attorneys and judges alike who serve at all levels of municipal, state, and federal government, and sees that those individuals are all more than capable of compartmentalizing their prior clients or cases from their current ones. The Court sees no reason to impose such a draconian rule without any evidence of an accompanying benefit. Consequently, even if M. Lujan had included a due-process claim in his Complaint or his Petition for Writ of Certiorari, it would not lead the Court to vacate or modify Ms. Maynes' decision.

M. Lujan's argument that Ms. Maynes was required to disclose her prior representation of the City of Santa Fe is similarly unpersuasive. M. Lujan does not cite -- and the Court has been unable to find -- a case in which a court has imposed a duty to disclose on a judge or an

administrative hearing officer.  Canon 3C(1) of the Code of Conduct for United States Judges provides that judges must recuse themselves for impermissible bias where their impartiality "might reasonably be questioned."  Canon 3C(1), Code of Conduct for United States Judges, United States Courts, http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConduct UnitedStatesJudges.aspx. (last visited Feb. 20, 2015)("Cannon 3C(1)").  Canon 3(D) states that, instead of recusing themselves, judges "disqualified by Canon 3C(1) may, except in [certain circumstances], disclose on the record the basis of disqualification."  Canon 3D, Code of Conduct for United States Judges, United States Courts, http://www.uscourts.gov/RulesAndPolicies/ CodesOfConduct/CodeConductUnitedStatesJudges.aspx. (last visited Feb. 20, 2015)("Canon 3D").  Canon 3(D) further states that, if, after the judge has disclosed his potential conflict, the parties and their lawyers in the case agree in writing that the judge should not be disqualified, the judge may participate in the proceeding.  The Code of Conduct thus provides an alternative to recusal where a judge's impartiality "might reasonably be questioned," but does not set forth a freestanding disclosure requirement.  See Canon 3C(1).

Moreover, Canon 3C(1)'s impermissible-bias standard is taken verbatim from 28 U.S.C. § 455(a) (stating that a judge "shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned.").   In turn, New Mexico's impermissible-bias standard is "in essence a paraphrase" of § 455(a).  City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16.  Because the Code of Judicial Conduct uses the same standard under which the Court has already concluded that Ms. Maynes was not impermissibly biased, it would not have required her to disclose her prior representation of the City of Santa Fe.  Because

the Court cannot impose a duty that does not exist, Ms. Maynes was not required to disclose her prior representation of the City of Santa Fe.[12]

---

[12]The American Bar Association's Model Rules of Professional Misconduct ("Model Rules") indicate that, even if Ms. Maynes were serving as M. Lujan's lawyer -- a position in which she would theoretically be held to a lower standard than judges -- she would not be required to disclose her prior representation of the City of Santa Fe.  Rule 1.9 of the Model Rules -- which governs lawyers' duties to former clients -- states, in pertinent part:

> (a)    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b)    A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
> > (1)    whose interests are materially adverse to that person; and
> >
> > (2)    about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;
>
> unless the former client gives informed consent, confirmed in writing.

Rule 1.9, Model Rules of Professional Conduct, American Bar Association, http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pro fessional_conduct/rule_1_9_duties_of_former_clients.html (last visited February 20, 2015) ("Rule 1.9").  Although M. Lujan's interests in this case are "materially adverse to" the City of Santa Fe's interests, she did not represent the City of Santa Fe "in the same or a substantially related matter" to the dispute before the Court.  Rule 1.9.  Consequently, even under the ABA's Model Rules, Ms. Maynes would not be required to disclose her prior representation of the City of Santa Fe.

II.    **MS. MAYNES' DECISION THAT M. LUJAN ATTEMPTED TO OBTAIN CITY OF SANTA FE FUNDS UNDER FALSE PRETENSES BY AUTHORIZING THE PAYMENT OF TWO SUBMITTED INVOICES IS NOT FRAUDULENT, ARBITRARY, OR CAPRICIOUS, AND SUBSTANTIAL EVIDENCE SUPPORTS THE DECISION.**

Ms. Maynes did not act fraudulently, arbitrarily, or capriciously in finding that M. Lujan attempted to obtain City of Santa Funds under false pretenses by authorizing the payment of two submitted invoices.  Ms. Maynes concluded that

> [t]he City of Santa Fe met its burden of proof to show by a preponderance of the evidence that Martin Lujan attempted to obtain City funds under false pretenses, specifically, by authorizing payment of two submitted invoices, the first for $6,000 and a second invoice for $750, to reimburse or pay Martin Lujan's personal expenses through the Santa Fe Junior Wrestling Association, via its Treasurer, Martin Lujan's brother Larry Lujan.

Decision ¶ 8, at 30.

M. Lujan advances two arguments on this issue.  First, he argues that the only invoice that was submitted to the City of Santa Fe for payment was the $6,000.00 Invoice from the SFJWA -- which R. Romero agreed to pay and Rodarte approved.  See Appeal Brief at 18.  M. Lujan says that, because the alleged $750.00 Invoice that he sent to Elevate Media was never submitted to the City of Santa Fe for payment, it cannot be considered a fraudulent submission on which Ms. Maynes could base her decision.  See Appeal Brief at 18-19.

Second, he argues that the City of Santa Fe never presented evidence that he submitted any of the expenses listed in his brother's electronic-mail transmission -- i.e., a $450.00 event ticket, a $450.00 airline ticket, or hotel or car expenses -- for reimbursement.  See Appeal Brief at 19-20. M. Lujan states that, in fact, R. Romero testified that the event in Florida never happened and, therefore, the expenses listed in L. Lujan's transmission "could not have been actually expensed." Appeal Brief at 20.  See Appeal Brief at 18.  M. Lujan also notes that both he and his brother testified that the electronic-mail transmissions had nothing to do with the 2012 Grand Nationals

Tournament.  See Appeal Brief at 18 (citation omitted).  Neither argument establishes that Ms. Maynes' decision was fraudulent, arbitrary, capricious, or that substantial evidence did not support the decision.

First, in asserting that the $750.00 Invoice cannot be considered a fraudulent submission, M. Lujan disregards the evidence that he forwarded that invoice to J. Romero for processing who, in turn, sent the invoice to Lovato so that she could bill the City of Santa Fe on behalf of Elevate Media.  On June 20, 2012, L. Lujan sent an electronic-mail transmission to M. Lujan with two invoices attached.  See L. Lujan's 1st June 20, 2012, E-mail at 14.  The electronic-mail transmission stated: "Attached are the two invoices on host fees for $6000 the other for Back Cover of the program for $750."  L. Lujan's 1st June 20, 2012, E-mail at 14.  The first invoice, dated May 4, 2012, was to the City of Santa Fe - Recreation Division in the amount of $6,000 for "2012 AAU Grand National Wrestling Host Fee (Includes: Host Fee, City logo on Website, City Logo on Event program)."  $6,000 Invoice at 1.  The second invoice, dated June 1, 2012, was also to the City of Santa Fe - Recreation Division in the amount of $750.00 for "2012 AAU Grand National Wrestling Host Fee (Includes: Back cover page of Event program)."  $750.00 Invoice at 1.  Although R. Romero had authorized only a $6,000.00 expenditure on the 2012 Grand Nationals Tournament, M. Lujan forwarded both invoices to J. Romero for processing and payment.  See M. Lujan's 1st June 20, 2012, E-mail at 14.

The electronic-mail transmissions between M. Lujan and his brother demonstrate that their plan was to double-bill the City of Santa Fe for the 2012 Grand Nationals Tournament program advertisements.  L. Lujan wanted to use the City of Santa Fe's sponsorship to cover a number of his and his brother's personal expenses:

Ncaa ticket-        $450
Room ½- 703-        $350
Car rental 185-     $92.50
your airline-       $450

total-              $1342.50

L. Lujan's 3rd June 19, 2012, E-mail at 8.   Consequently, he sent his brother an invoice for

$6,320.00 -- which, after reimbursing the SFJWA for the $5,000.00 tournament-hosting fee, was

just $22.50 short of covering their expenses.  See $6,320 Invoice at 1.  Remembering that Rodarte

had only authorized $6,000.00 for the sponsorship, M. Lujan responded that "[t]he PO" -- or

purchase order -- "is for 6k."  M. Lujan's 1st June 19, 2012, E-mail at 8.  M. Lujan wanted to make

sure, however that his brother's personal expenses were fully reimbursed, so he replied: "Cost is

the same in order to get u your full reimbursement."  L. Lujan's 2nd June 19, 2012, E-mail at 8.

The Lujan brothers then went back and forth about which of their personal expenses the City of

Santa Fe's sponsorship would cover, and M. Lujan clarified that they "went from the 5k to 6k" --

i.e., increased the sponsorship from $5,000.00 to $6,000.00 -- to "cover the $450. reimbursement

on ticket" -- i.e., the NCAA ticket.  M. Lujan's 1st June 20, 2012, E-mail at 8

Although the $6,000.00 sponsorship "cover[ed]" the $450 reimbursement on ticket" -- i.e.,

the NCAA ticket -- it did not cover the cost of a flight to Florida.  M. Lujan's 1st June 20, 2012,

E-mail at 8.  M. Lujan acknowledged, however, that the $6,000.00 sponsorship did not include the

back-cover advertisement for the 2012 tournament -- which could cover the cost of the flight.  M.

Lujan's 1st June 20, 2012, E-mail at 8 ("Back cover was not included but you did mention that it

we purchased it would cover air to Florida.").  M. Lujan then indicated his disappointment that the

$6,000.00 sponsorship would not cover the cost of the flight when he said: "Doesn't look like that

is happening soo I guess its not an issue."  M. Lujan's 1st June 20, 2012, E-mail at 8.

L. Lujan did not want to miss an opportunity to cover the cost of the flight, so he responded: "I think back cover is an issue, I was going to add your FL ticket to cover your expense NOT just your ticket but the cost of AD.  Lets meet and discuss this issue, we gave up this to AD space to help you out not lose money."  L. Lujan's 1st June 20, 2012, E-mail at 8.  In other words, L. Lujan does not want SFJWA to "give up" -- or donate -- the advertisements to the City of Santa Fe without his brother receiving his full reimbursement.  Accordingly, L. Lujan added a new $750.00 Invoice to the original $6,000.00 Invoice, and he and his brother routed the $750.00 Invoice through Clarissa Lovato at Elevate Media.  L. Lujan had already suggested that this arrangement might be a possibility when he said in an electronic-mail transmission to this brother: "[U]nless we make up difference with clarissa paying difference?  let me know and I will chg invoice."  L. Lujan's 3rd June 19, 2012, E-mail at 8.  That is exactly what the brothers did -- they "ma[d]e up" the remainder of their personal expenses by having Lovato bill the City of Santa Fe as if Elevate Media had placed an advertisement in the tournament program on the City of Santa Fe's behalf.  Taken together, these facts demonstrate that Ms. Maynes' conclusion that "Martin Lujan attempted to obtain City funds under false pretenses," Decision ¶ 8, at 30, is not fraudulent, arbitrary, or capricious, and that substantial evidence supports it.

M. Lujan asserts that he did not read his brother's June 20, 2012, E-mail, and could not open the file that contained the $750.00 Invoice.   See Dec. 3, 2012, Hearing Tr. at 1072:20-1073:14 (M. Lujan, Allen).  Yet he still forwarded both invoices to J. Romero for processing and payment.   See M. Lujan's 3rd June 20, 2012, E-mail at 14.  J. Romero then forwarded the $750.00 Invoice to Lovato, stating: "Invoice for ad placement sfjr. wrestling."  J. Romero's June 20, 2012, E-mail at 14.  Lovato then faxed a $750.00 invoice from Elevate Media for an advertisement in the 2012 Grand Nationals Tournament program to M. Lujan to receive

payment from the City of Santa Fe.   See Nov. 7, 2012, Hearing Tr. at 559:5-8 (Lovato, Thompkins).   Consequently, M. Lujan -- through J. Romero and Lovato -- submitted the fraudulent $750.00 invoice to the City of Santa Fe.   That Lovato rescinded the $750.00 invoice before the City of Santa Fe paid it does not change the fact that she fraudulently submitted the invoice for processing.

The electronic-mail transmissions between M. Lujan and J. Romero, and J. Romero and Lovato after Rodarte asked M. Lujan for an itemized breakdown of the expenses that the $6,000.00 purchase order covered belie M. Lujan's contention that he did not read the body of his brother's electronic-mail transmission and could not open the file containing the $750.00 Invoice.   At 4:38 p.m. on Friday, June 29, 2012, Rodarte asked M. Lujan for an itemized breakdown of the expenses that the $6,000.00 purchase order for SFJWA would cover.   See Rodarte's June 29, 2012, E-mail at 20.   The following Monday morning -- July 2, 2012 -- at 7:17 a.m., M. Lujan sent an electronic-mail transmission to J. Romero, stating: "Good Morning Jenn . . . lets hold on Clarissa june invoice until I get to office.   Hope it's not too late.   See you in a bit."   M. Lujan's July 2, 2012, E-mail at 27.   Then, one minute later, at 7:18 a.m., Lovato sent an electronic-mail transmission to J. Romero concerning Elevate Media's $750.00 invoice, in which Lovato stated: "Just realized that the invoice I faxed on Friday is not correct.   Call me with questions."   Lovato's July 2, 2012, E-mail at 29.   When R. Romero asked J. Romero and Lovato for a copy of Elevate Media's $750.00 invoice, they both, coincidentally, said that they had deleted it.   See Nov. 7, 2012, Hearing Tr. at 372:16-373:1 (R. Romero, Allen); id. at 373:13-373:15 (R. Romero, Allen); id. at 374:20-23 (R. Romero, Allen).   To this day, M. Lujan has not provided an explanation for his or Lovato's coincidentally timed electronic-mail transmissions to J. Romero on the morning of July 2, 2012. Instead, the evidence demonstrates that "Martin Lujan's communications to Jennifer Romero and

Clarissa Lovato on or around July 2, 2012 to 'hold off on' the original Elevate Media June 2012 Invoice were for the purpose of concealing his attempt to obtain additional City funds . . . ." Decision ¶ 46, at 27.

M. Lujan also argues that Rodarte's initial approval of the $6,000.00 purchase order and later revocation of it, demonstrates that "it was his fault and there was no allegation that Lujan had fraudulently submitted invoices." Appeal Brief at 19. The evidence in the record shows, however, that it was not Rodarte's job to confirm whether the City of Santa Fe received the goods or services that it purchased; that was M. Lujan's responsibility. See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); id. at 69:25-70:3 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1027:9-14 (M. Lujan, Allen). There is thus no support for M. Lujan's contention that Rodarte was responsible for M. Lujan's misconduct because he initially approved the $6,000.00 purchase order.

Second, that M. Lujan never submitted any of the expenses listed in his brother's June 20, 2012, E-mail for reimbursement also does not dictate a different result. The City of Santa Fe never alleged that M. Lujan submitted his personal expenses for reimbursement, and Ms. Maynes' did not reach such a conclusion in the Decision. Instead, both the City of Santa Fe and Ms. Maynes relied on the fact that M. Lujan submitted the $750.00 Invoice and the $6,000.00 Invoice under the pretext of the 2012 Grand Nationals Tournament sponsorship in the hopes of having his personal expenses reimbursed. See Decision ¶ 8, at 30 ("Martin Lujan attempted to obtain City funds under false pretenses, specifically, by authorizing payment of two submitted invoices . . . to reimburse or pay Martin Lujan's personal expenses through the Santa Fe Junior Wrestling Association, via its Treasurer, Martin Lujan's brother Larry Lujan."). Consequently, M. Lujan's contention that he did not submit personal expenses for reimbursement does not indicate that Ms. Maynes' conclusion that "Martin Lujan attempted to obtain City funds under false pretenses," Decision ¶ 8,

at 30, is not fraudulent, arbitrary, or capricious, and substantial evidence supports Ms. Maynes'
conclusion.

III.   **MS. MAYNES' DECISION THAT M. LUJAN CARELESSLY, NEGLIGENTLY, OR IMPROPERLY USED CITY OF SANTA FE FUNDS IS ARBITRARY AND CAPRICIOUS, AND SUBSTANTIAL EVIDENCE DOES NOT SUPPORT IT.**

The Hearing Officer's decision that M. Lujan carelessly, negligently, or improperly used
City of Santa Fe funds is arbitrary and capricious and substantial evidence does not support it.  Ms.
Maynes concluded that "[t]here was 'just cause' for Martin Lujan's dismissal in the record to
conclude that Martin Lujan's acts, statements and intent demonstrated [c]areless, negligent or
improper use of City property, equipment or funds."  Decision ¶ 9, at 28.

M. Lujan argues that Ms. Maynes' conclusion that he negligently used City of Santa Fe
funds "is inconsistent with the fact that the City never paid SFJWA or the AAU Grand National
Tournament any funds for the 2012 event."  Appeal Brief at 19.  He also reiterates his argument
that the City of Santa Fe never presented any evidence that showed he had submitted the expenses
listed in L. Lujan's June 20, 2012, E-mail for reimbursement.  See Appeal Brief at 19.  M. Lujan
concludes: "Given that **NO** City funds were ever paid to the SFJWA or to Lujan coupled with the
City's agreement to pay SFJWA $6,000, the decision is arbitrary and capricious in finding that
Lujan 'negligently used City funds.'"  Appeal Brief at 20 (bold in original).  The City of Santa Fe
responds with one sentence: "As the MRC Administrative Manager and Interim Recreation
Division Director, Lujan had fiscal management duties within his department which he breached
by attempt[ing] to steal City funds."  Reply at 28.  The Court agrees with M. Lujan.

Ms. Maynes concluded that "no money was actually paid by the City to the SFJWA" as a
result of M. Lujan and his brother's conduct.  Decision at 3.  The City of Santa Fe has not cited --
and the Court has been unable to find -- a case in which a court has held an employee responsible

for misusing city, county, or state funds, where there is no evidence that the employee ever obtained such funds.  The crux of Ms. Maynes' decision is that M. Lujan and his brother attempted to misuse City of Santa Fe funds, but never succeeded.  Section 7.50(E)(7) of the City of Santa Fe Personnel Rules provides that a City of Santa Fe employee can be terminated for "[c]areless, negligent, or improper use of City property, equipment, or funds."  Section 7.50(E)(7), City of Santa Fe Personnel Rules at 26, filed May 23, 2013 (Doc 8-13)("City of Santa Fe's Personnel Rules").  Section 7.50(E)(7) says nothing about attempts to carelessly, negligently, or improperly use City of Santa Fe property, equipment, or funds.  The City of Santa Fe does not cite -- and the Court has been unable to find -- any case adopting its interpretation of Section 7.50(E)(7) or a similar municipal rule.  Without such authority, the Court is stuck with the rule's plain language and cannot read words into the rule that do not exist.  Accordingly, the Court concludes that Ms. Maynes' decision that "Martin Lujan's acts, statements and intent demonstrated [c]areless, negligent or improper use of City property, equipment or funds," Decision ¶ 9, at 28, was arbitrary and capricious and that substantial evidence did not support it,  see Archuleta v. Santa Fe Police Dep't ex rel. City of Santa Fe, 2005-NMSC-006, ¶ 16 ("We should reverse the ruling if the agency unreasonably or unlawfully misinterprets or misapplies the law . . . .").

IV.   **M. LUJAN WAIVED THE ISSUE WHETHER MS. MAYNES' DECISION THAT HE INTENTIONALLY FALSIFIED OR MISHANDLED CITY OF SANTA FE RECORDS WAS FRAUDULENT, ARBITRARY, AND CAPRICIOUS, AND SUBSTANTIAL EVIDENCE DID NOT SUPPORT IT; IF M. LUJAN DID NOT WAIVE THE ISSUE, HOWEVER, MS. MAYNES' DECISION THAT M. LUJAN INTENTIONALLY FALSIFIED OR MISHANDLED CITY OF SANTA FE FUNDS WAS ARBITRARY AND CAPRICIOUS AND SUBSTANTIAL EVIDENCE DID <u>NOT SUPPORT IT</u>.**

M. Lujan waived the issue whether Ms. Maynes' decision that he intentionally falsified or mishandled City of Santa Fe records was fraudulent, arbitrary, and capricious, and substantial evidence did not support it.  The Hearing Officer's decision that M. Lujan intentionally falsified or mishandled City of Santa Fe records is arbitrary and capricious, and substantial evidence does not support it.  Ms. Maynes concluded that "[t]here was 'just cause' for Martin Lujan's dismissal in the record to conclude that Martin Lujan's acts, statements and intent violated subsections of Section 7.50(E) . . . .  Intentional falsification or mishandling of City records."  Decision ¶ 9, at 29.  M. Lujan's entire argument on this conclusion consists of one heading: "The Decision That Lujan Intentionally Falsified or Mishandled City Records Is Arbitrary and Capricious and Not Supported By Substantial Evidence."  Appeal Brief at 17.  He does not address the issue in the remainder of the Appeal Brief or in his Reply.  <u>See</u> Appeal Brief *passim*; Reply *passim*.  Accordingly, M. Lujan has waived this argument.  <u>See</u> N.M.R.A Rule 1-075(K)(3)("A contention that a decision or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence.").

If M. Lujan had not waived the argument, the Court would not uphold Ms. Maynes' decision on this issue.  Section 7.50(E)(10) states that a City of Santa Fe employee can be terminated for "[i]ntentional falsification or mishandling of City records."  Section 7.50(E)(10).  The City of Santa Fe did not provide any City of Santa Fe records that M. Lujan falsified to Ms.

Maynes during M. Lujan's post-determination hearing.  Although M. Lujan submitted the $6,000.00 Invoice and the $750.00 Invoice to the City of Santa Fe and his brother falsified those invoices, there is no indication that the SFJWA's invoices constitute municipal records.  They may have become municipal records once M. Lujan submitted them, but when L. Lujan falsified them they were merely SFJWA's records.  In the Court's view, § 7.50(E)(10) is reserved for cases in which an employee has falsified actual City of Santa Fe property -- for instance, if an employee changes the dates or times on his or her time sheet or modifies the figures or conclusions of an audit which the City Manager conducted.  The plain language of § 7.50(E)(10), however, does not cover records that were falsified while they were still the property of a private entity, because those are not "City records."  Section 7.50(E)(10).  Because M. Lujan waived this issue by failing to raise it in his Appeal Brief, however, the Court cannot consider it.  If M. Lujan did not waive the issue, however, Ms. Maynes' conclusion that he "[i]ntentional[ly] falsif[ied] or mishandle[ed] . . . City records," Decision ¶ 9, at 29, is arbitrary, or capricious, and not supported by substantial evidence.

## V.   THE HEARING OFFICER'S DECISION THAT M. LUJAN STOLE CITY OF SANTA FE FUNDS IS ARBITRARY AND CAPRICIOUS AND SUBSTANTIAL EVIDENCE DOES NOT SUPPORT IT.

The Hearing Officer's decision that M. Lujan stole City of Santa Fe funds is arbitrary and capricious and substantial evidence does not support it.  Ms. Maynes concluded that "[t]here was 'just cause' for Martin Lujan's dismissal in the record to conclude that Martin Lujan's acts, statements and intent violated subsections of Section 7.50(E): . . . Stealing from the City or from other employees."  Decision ¶ 9, at 29.  Ms. Maynes was well aware that "[n]o money was actually paid by the City to the SFJWA," Decision at 3, but reasoned that the City of Santa Fe's prohibition against employee theft "fairly encompasses intent to steal as well," Decision ¶ 9 n.2, at 28.

The City of Santa Fe asserts that "attempted theft is sufficient grounds for termination under an employer's policy against employee theft." Response at 29 (citing Kurincic v. Stein, F. App'x 420, 426 (6th Cir. 2002)("Attempted theft is sufficient grounds for termination under [employer's] policy against employee theft.")). The Court disagrees. The language of rule 7.50(E)(7) of the City of Santa Fe's Personnel Rules prohibits only "[s]tealing from the City." Rule 7.50(E)(7), City of Santa Fe's Personnel Rules. It does not say anything about "attempting to steal." Moreover, the City of Santa Fe has not provided -- and the Court has been unable to find -- a case in which a court has interpreted a municipal prohibition on employee theft to include attempted theft. The only case which the City of Santa Fe cites in support of this argument is Kurincic v. Stein Inc., 30 F. App'x 420 (6th Cir. 2002).

In that case, the defendant -- Alojz Kurincic -- brought a variety of claims against his employer -- Stein, Inc., which is a private company -- for unlawful termination. See 30 F. App'x at 422. Among other things, Kurincic alleged that he should not have been fired for employee theft, because, although he intentionally submitted a false time sheet, he never received payment for that time sheet. See 30 F. App'x at 426. The United States Court of Appeals for the Sixth Circuit disagreed, stating that "[a]ttempted theft is sufficient grounds for termination under Stein's policy against employee theft." 30 F. App'x at 426 (citing Ohio Rev. Code § 2913.01(K) (defining a "theft offense" for purposes of Ohio law as including both the commission and the attempt to commit various criminal offenses)). Kurincic v. Stein Inc. is inapposite, because, unlike the Ohio Revised Code, which defines a "theft offense" as including both the commission and the attempt to commit various criminal offenses, see Ohio Rev. Code § 2913.01(K), New Mexico law does not contain such a provision.

Under New Mexico law, theft comes under the crime of "larceny," which consists of "the stealing of anything of value that belongs to another." N.M. Stat. Ann. § 30-16-1. The larceny statute says nothing about attempted larceny or attempted theft. See N.M. Stat. Ann. § 30-16-1. Instead, N.M. Stat. Ann. § 30-28-1 covers attempted crimes; it states that attempt "consists of an overt act in furtherance of and with intent to commit a felony and tending to but failing to effect its commission." N.M. Stat. Ann. § 30-28-1. Consequently, the Legislature of the State of New Mexico has made clear that the crime of theft or "larceny" does not include attempted theft. Without any authority indicating that the City of Santa Fe's prohibition on employee theft includes attempt or should be interpreted differently than the New Mexico state law against theft, the Court sees no sound reason why it should avoid the plain language of the City of Santa Fe's rule -- which prohibits only "[s]tealing from the City or from other employees." Rule 7.50(E)(7) City of Santa Fe's Personnel Rules. As the City of Santa Fe concedes that M. Lujan did not actually steal City of Santa Fe funds, see Response at 29-31, and there is no evidence of actual theft, Ms. Maynes' conclusion that M. Lujan stole City of Santa Fe funds is arbitrary and capricious, and substantial evidence does not support it.

If the City of Santa Fe's prohibition on employee theft includes attempted theft, however, M. Lujan's conduct satisfies the elements of attempted theft. M. Lujan seems to suggest that, because he did not submit his personal expenses for reimbursement, he did not commit attempted theft. The electronic-mail transmissions between M. Lujan and his brother establish that they intended to steal City of Santa Fe funds. M. Lujan committed the necessary overt act under N.M. Stat. Ann. § 30-28-1, when he submitted the unauthorized $750.00 Invoice and the $6,000.00 Invoice -- which included the reimbursement for his $450.00 NCAA ticket -- to the City of Santa Fe for payment. That M. Lujan was caught in the act does not mean he did not intend to steal City

of Santa Fe funds.  Consequently, if the City of Santa Fe's prohibition on employee theft includes

attempted theft, then M. Lujan violated that provision as well.

## VI.   JUST CAUSE EXISTED FOR THE CITY OF SANTA FE TO TERMINATE M. LUJAN'S EMPLOYMENT.[13]

Ms. Maynes concluded that there was just cause for M. Lujan's termination under four

different provisions of the City of Santa Fe's personnel rules:

There was "just cause" for Martin Lujan's dismissal in the record to conclude that
Martin Lujan's acts, statements and intent violated subsections of Section 7.50(E):

(2)    Careless, negligent or improper use of City property,
equipment or funds;

(7)    Stealing from the City or from other employees;

(10)    Intentional falsification or mishandling of City records; . . .
and

(13)    action which reflects poorly upon the integrity of the City
Santa Fe [sic].

Decision ¶ 9, at 29.  Moreover, Ms. Maynes said that, even if

it is determined in any subsequent review of this decision that § (7) of Section
7.50(E), "Stealing from the City", does not include statements showing an intent to
steal, then there was sufficient evidence to support Martin Lujan's termination for

---

[13]M. Lujan's appeal brief identifies this issue as: "Whether just cause existed for Lujan's dismissal from employment under the City of Santa Fe Personnel Rules/Regulations and Policies," thus indicating that the Court should review Ms. Maynes' decision on this issue de novo.  Appeal Brief at 2.  New Mexico courts have reviewed personnel boards' and administrative hearing officers' "just cause" findings to determine whether they are arbitrary and capricious or an abuse of authority, and in accord with the law.  Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 21 ("In sum, we find no clear abuse of authority, no contravention of our law, and no capriciousness in the Personnel Board's determination that just cause existed to discipline Worker and to terminate him without imposing progressive discipline.").  See Martinez v. N.M. State Eng'r Office, 2000-NMCA-074, 9 P.3d 657 ("[W]e consider whether the Board's determination that Martinez was terminated with just cause was arbitrary and capricious, not supported by substantial evidence, or otherwise contrary to law.").  The Court has determined, de novo, that just cause existed for the City of Santa Fe to terminate M. Lujan.  Accordingly, the Court also concludes that Ms. Maynes' decision that the City of Santa Fe had just cause to terminate M. Lujan was not arbitrary and capricious, or an abuse of authority, and was in accord with the law.

just cause based on §§ (2) "Careless, negligent or improper use of City funds", (10) "Intentional falsification or mishandling of City records" and (13) action which reflects poorly upon the integrity of the City of Santa Fe.

Decision ¶ 10, at 29.   Accordingly, it is not fatal to her "just cause" determination that her conclusions that M. Lujan stole City of Santa Fe funds, and that M. Lujan carelessly, negligently, or improperly misused City of Santa Fe funds, were arbitrary, capricious, and substantial evidence did not support them.   Instead, it is sufficient that M. Lujan's actions "reflect poorly upon the integrity of the City of Santa Fe." § 7.50(E)(13), City of Santa Fe's Personnel Rules.[14]

The sixth issue that M. Lujan raises in the Appeal Brief is "[w]hether just cause existed for Lujan's dismissal from employment under the City of Santa Fe Personnel Rules/Regulations and Policies," but M. Lujan does not address this issue in the corresponding section of his brief. Appeal Brief at 2, 22-23.   Instead, he makes the following conclusory statements about the sufficiency of the evidence on which Ms. Maynes relied: (i) "there is no evidence of conspiracy, theft or negligence," Appeal Brief at 22; (ii) "the evidence submitted by the City is insufficient to prove fraud," Appeal Brief at 22; and (iii) "the evidence and testimony is insufficient to show that Lujan stole funds from the City because the City never paid the PO or paid any money to either the SFJWA or the AAU Grand National," Appeal Brief at 23.

"The question of whether an employee's action constituted misconduct so as to provide 'just cause' for the discipline of a state employee is a question of fact to be determined from all the attendant circumstances in each case." Romero v. Employment Sec. Dep't, 1984-NMCA-111, 691 P.2d 72, 75.   Just cause to terminate exists "when an employee engages in behavior inconsistent with the employee's position and can include, among other things, incompetency,

---

[14]Consequently, even if the Court had found that M. Lujan had not waived his objection to Ms. Maynes' decision that he falsified City of Santa Fe records, it would still find just cause for M. Lujan's termination, because his actions "reflect poorly upon the integrity of the City of Santa Fe." § 7.50(E)(13), City of Santa Fe's Personnel Rules.

misconduct, negligence, insubordination, or continuous unsatisfactory performance." Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 15 (citation omitted)(internal quotation marks omitted).

M. Lujan was the Municipal Recreation Complex Administrative Manager from approximately January, 2010, until the City of Santa Fe terminated his employment on August 14, 2012. See Nov. 6, 2012, Hearing Tr. at 49:16-20 (Pino, Allen); Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins). M. Lujan also held the position of Interim Division Director for the City's Recreation Division from October 9, 2010, through August 14, 2012. See Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins). In those capacities, M. Lujan was responsible for helping create and manage a multimillion-dollar budget. See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1029:4-10 (M. Lujan, Allen). M. Lujan was also responsible for reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those purchases. See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); id. at 69:25-70:3 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1027:9-14 (M. Lujan, Allen). M. Lujan authorized the payments for most of the City of Santa Fe's purchases by signing them. See Nov. 6, 2012, Hearing Tr. at 50:21-24 (Pino, Allen). Given these duties, M. Lujan had a responsibility to manage the City of Santa Fe's funds with honesty and integrity, set an example to his subordinates, and maintain the public's trust in the City of Santa Fe. Because of his misconduct, he failed on all counts.

As the City of Santa Fe points out, M. Lujan's misconduct "involved grave violations of public trust." Response at 33. Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 19 ("Our cases have also expressly noted that supervisory staff clearly affect the efficiency of the agency and serve as examples for subordinates." (citation omitted)(internal quotation marks omitted)).

The intentional falsification or mishandling municipal records for the purpose of stealing municipal funds is the kind of serious intentional misconduct that justifies termination.  See, e.g., Montoya v. City of Albuquerque, 1982-NMSC-056, ¶ 4, 644 P.2d 1035, 1036 (agreeing with the City of Santa Fe's personnel board's conclusion that "proof of theft and dishonesty by an employee is justifiable cause for termination of employment." (internal quotation marks omitted)); Munnelly v. U.S.P.S., 805 F.2d 295, 301 (8th Cir. 1986)("[C]alculated misuse of public funds in any amount raises doubts about the fitness of a [public employee] to serve."); Flowers v. State Personnel Bd., 174 Cal. App. 3d 753 (1985)(upholding hearing officer's and personnel board's decision to terminate employee who attempted to steal amplifier); Sanders v. Dep't of Health and Human Servs., 394 So. 2d 629, 632 (La. 1981)(concluding that just cause existed to terminate employee who held classified position as a cook for attempted theft of two loaves of bread and eight dozen eggs from hospital kitchen).

In Montoya v. City of Albuquerque, for example, the petitioner -- Rudy Montoya -- was fired from his job as a foreman with the City of Albuquerque after he stole two pick-up mirrors and twenty-five pounds of nails for his personal use.  See 1982-NMSC-056, ¶ 2.  Without further explanation, the Supreme Court of New Mexico stated: "[W]e agree with the majority of the CAPB that "proof of theft and dishonesty by an employee is justifiable cause for termination of employment."  1982-NMSC-056, ¶ 2.

At first blush, M. Lujan's actions seem less egregious than Montoya's because, unlike Montoya -- who succeeded in stealing from the City of Albuquerque -- M. Lujan did not successfully steal from the City of Santa Fe.  Upon closer examination, however, M. Lujan's actions were more egregious than Montoya's for two reasons.

First, unlike Montoya -- who served in a relatively low-level position with the City of Albuquerque as a foreman on a construction site -- M. Lujan was in the upper echelon of the City of Santa Fe's municipal government.  He was charged with overseeing the entire Recreation Division and was responsible for helping create a manage a multimillion-dollar municipal budget. See Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins); id. at 49:13-50:24 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1029:4-10 (M. Lujan, Allen).  Second, unlike Montoya -- who stole two pick-up mirrors and twenty-five pounds of nails -- M. Lujan intended to steal at least $750.00 from the City of Santa Fe.  Because M. Lujan was in a more significant position of public trust than Montoya in which M. Lujan managed a larger amount of municipal funds, and the crime he attempted to commit was more serious than Montoya's, his termination was at least as justified. It is worth underscoring here that M. Lujan did not succeed in stealing City of Santa Fe funds only because he was caught in the act -- neither he nor his brother decided on their own not to go through with their plan.  The evidence in the record indicates that, had Rodarte not intervened, the brothers had every intention of following through with their scheme.

Section 7.50(E)(13) of the City of Santa Fe's Personnel Rules states that "Permanent employees may be dismissed, demoted, or suspended only for just cause.  Just cause includes, but is not limited to . . . Action which reflects poorly on the integrity of the City of Santa Fe." § 7.50(E)(13), City of Santa Fe's Personnel Rules.  Although attempting to steal municipal funds generally "reflects poorly on the integrity of the City of Santa Fe," and therefore satisfies this section, M. Lujan's conduct, when combined with his position, certainly does.  Having a high-level municipal official like M. Lujan who is charged with helping create and manage a multimillion-dollar budget; reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those

purchases; and authorizing the payments for most of the City of Santa Fe's purchases by signing them attempt to steal the municipal funds that he is entrusted with distributing is a grave violation of the public trust that "reflects poorly on the integrity of the City of Santa Fe." § 7.50E(13), City of Santa Fe's Personnel Rules. Accordingly, there was just cause for the City of Santa Fe to terminate M. Lujan's employment.

**VII.   <u>MS. MAYNES' DECISION IS IN ACCORDANCE WITH THE LAW.</u>**

This section of M. Lujan's Appeal Brief merely restates two arguments made in earlier sections -- namely, that Ms. Maynes should have recused herself because she was impermissibly biased and that substantial evidence does not support Ms. Maynes' conclusions. Because the Court has already addressed those issues in the remainder of this Memorandum Opinion, it will not repeat its analysis here. Consequently, the Court concludes that Ms. Maynes' decision is in accordance with the law

**IT IS ORDERED** that: (i) the requests in Petitioner Martin Lujan's Appeal Brief, filed September 18, 2013 (Doc. 29), are denied; and (ii) the petition for writ of certiorari in the Second Amended Petition for Writ of Certiorari and Complaint for Violation of First Amendment Rights, Retaliatory Discharge and the Whistle Blower Act, filed October 11, 2013 (Doc. 39) is granted, but the relief requested in the petition is denied. Consequently, the Court will grant M. Lujan's request in the Appeal Brief regarding Ms. Maynes' conclusions that M. Lujan stole City of Santa Fe funds and carelessly, negligently, or improperly used City of Santa Fe funds, but deny the requests in the Appeal Brief on the remainder of the issues, and leave intact Ms. Maynes' determination that just cause existed for M. Lujan's termination.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nathaniel V. Thompkins
New Mexico Firm, LLC
Santa Fe, New Mexico

      *Attorneys for the Petitioner/Plaintiff*

Luis E. Robles
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendant/Respondent*