# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARTIN LUJAN,

        Plaintiff/Petitioner,

vs.                                         No. CIV 13-0438 JB/SMV

CITY OF SANTA FE,

        Defendant/Respondent.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Petitioner Martin Lujan's Motion for Reconsideration, filed March 24, 2015 (Doc. 63)("Motion"). The Court held a hearing on June 18, 2015. The primary issues are: (i) whether the Court should reconsider its ruling that Plaintiff/Petitioner Martin Lujan waived his argument that Hearing Officer Paula Maynes was impermissibly biased when he failed to raise the issue in his complaint or petition for writ of certiorari; (ii) whether the Court should reconsider its rulings that Ms. Maynes' decision that M. Lujan attempted to obtain the Defendant/Respondent City of Santa Fe's funds by false pretenses was not fraudulent, arbitrary, or capricious, and that substantial evidence supported it; and (iii) whether the Court should reconsider its ruling that the City of Santa Fe had just cause to terminate M. Lujan's employment. Although M. Lujan has presented some new law and arguments regarding whether he waived his argument that Ms. Maynes was impermissibly biased, the Court remains persuaded that its ruling on the issue is appropriate. Accordingly, the Court will not alter its prior ruling on that issue. Similarly, although M. Lujan has presented some new argument and law whether Ms. Maynes' decision that he attempted to obtain City of Santa Fe funds by false pretenses was fraudulent, arbitrary, or capricious, or substantial evidence

supported it, the Court remains persuaded that its ruling on that issue is correct.  As for Court's

ruling that the City of Santa Fe had just cause to terminate M. Lujan's employment, although M.

Lujan presents some new authority and argument on the Court's authority to remand a case, he

has not presented any new authority, evidence, or arguments regarding whether the City of Santa

Fe had just cause to terminate his employment.  The Court will therefore leave that ruling intact.

Consequently, the Court will deny the Motion.

## FACTUAL BACKGROUND

This case arises out of the City of Santa Fe's termination of M. Lujan's employment after

he allegedly attempted to embezzle City of Santa Fe funds.  The Court set forth detailed findings

of fact in the Memorandum Opinion and Order, filed February 24, 2015 (Doc. 62)("MOO"), and

neither party has expressly challenged those findings or offered additional evidence to contradict

them.[1]  Accordingly, the Court will not set forth new findings of fact or reproduce the MOO's

findings of fact here.

---

[1]The Motion contains one argument that the Court could construe as challenging the
MOO's finding of facts.  M. Lujan asserts that the MOO "incorrectly refers to the $750 invoice
as being Elevate Media's invoice.  The Court made a finding that 'Elevate Media's $750 invoice'
and 'she rescinded Elevate Media's $750 invoice, because of a spelling error.'"  Motion at 20
(emphases omitted)(citation omitted)(quoting MOO at 18).  M. Lujan says that the Court's
finding "mistakenly combines Elevate Media's invoice with the [Santa Fe Junior Wrestling
Association]'s $750 invoice," and that "[t]here never was a $750 invoice from Elevate Media
and therefore it could not be a proper basis for the Court to find that Petitioner . . . attempted to
obtain City funds under false pretenses."  Motion at 20-21.  M. Lujan adds:

> Ms. Lovato testified that the same day that she received the SFJWA's
> $750 invoice from Jennifer, she called Jennifer.  That same day and before the
> City Manager ever questioned either Jennifer or Ms. Lovato, Jennifer advised Ms.
> Lovato that the SFJWA's invoice was submitted in error and that it had nothing to
> do with Elevate Media.  Elevate Media never submitted its own invoice with a
> copy of the SFJWA's $750 invoice because, after questioning the invoice[,]
> Elevate Media was told that it was an error.

Motion at 21.

## PROCEDURAL BACKGROUND

On April 18, 2013, M. Lujan filed an amended Petition for Writ of Certiorari and a Complaint in the First Judicial District Court for the State of New Mexico, County of Santa Fe. See First Amended Petition for Writ of Certiorari and Complaint for Violation of First Amendment Rights, Retaliatory Discharge and the Whistle Blower Act, filed in state court on

---

The City of Santa Fe responds:

> This argument is clearly belied by the Court's meticulous tracing of the initial $750 invoice sent to Petitioner by his brother on June 20, 2012, forwarded to Petitioner's assistant on June 20, 2012, forwarded by her to Clarissa Lovato at Elevate Media that same day, and ultimately sent from Elevate Media to Petitioner for approval. As noted by the Court, the fact that the invoice from Elevate Media was ultimately rescinded prior to the time the City paid it does not change the fact that it was fraudulently submitted for processing, given the questionable circumstances surrounding its creation and rescis[s]ion.

Respondent City of Santa Fe's Response to Petitioner's Motion for Reconsideration at 13, filed April 17, 2015 (Doc. 65)("Response").

To the extent that M. Lujan's argument that "Elevate Media never submitted its own invoice with a copy of the SFJWA's $750 invoice," means that Elevate Media did not submit a separate invoice on its own letterhead in addition to the $750.00 invoice from the SFJWA that Lovato submitted to M. Lujan for approval, the Court agrees. This argument does not, however, alter the Court's analysis.

M. Lujan does not dispute the Court's finding in the MOO that, "[a]t some point on Friday, June 29, 2012, Lovato [-- the owner of Elevate Media --] sent to M. Lujan for approval by facsimile transmission a $750.00 invoice from Elevate Media for an advertisement in the 2012 Grand Nationals Tournament program." MOO at 15-16. The Court used the phrase "Elevate Media's $750 Invoice" as a shorthand in the findings of fact to refer to the invoice that Elevate Media submitted to M. Lujan purportedly for an advertisement in the 2012 Grand Nationals Tournament program. Whether the Court titles the document which Lovato submitted "Elevate Media's $750 Invoice," "SFJWA's $750 invoice," or "the $750 invoice," the fact remains that M. Lujan -- through J. Romero and Lovato -- submitted a fraudulent $750 invoice to the City of Santa Fe. MOO at 68-69. The document's shorthand title, and the fact that Lovato later rescinded the document before the City of Santa Fe paid it, "does not change the fact that she fraudulently submitted the invoice for processing." MOO at 69. Accordingly, the Court will not alter the MOO's findings of fact.

April 18, 2015, filed in federal court on May 9, 2013 (Doc. 1-2).[2]   On May 9, 2013, the Defendants removed the case to the United States District Court for the District of New Mexico, asserting that the District of New Mexico has federal-question jurisdiction over the case.   See Civil Cover Sheet, filed May 9, 2013 (Doc. 1-1).   On October 11, 2013, M. Lujan filed an amended Petition for Writ of Certiorari and an amended Complaint.   See Second Amended Petition for Writ of Certiorari and Complaint for Violation of First Amendment Rights, Retaliatory Discharge and the Whistle Blower Act, filed October 11, 2013 (Doc. 39)("Complaint & Petition").

M. Lujan asks the Court to issue a Writ of Certiorari, pursuant to Constitution of the State of New Mexico, and reverse Ms. Maynes' decision, for three reasons.   See Complaint & Petition at 8-9.   First, M. Lujan contends that there is not substantial evidence that he committed theft, attempted theft, or carelessly or negligently used City of Santa Fe funds under the City of Santa Fe's Personnel Rules and Regulations.   See Complaint & Petition at 8.   M. Lujan points out that Ms. Maynes questioned her own finding on the issue of theft and stated that the evidence demonstrated only "statements showing an intent to steal."   Complaint & Petition at 8 (citation omitted)(internal quotation marks omitted).   M. Lujan notes that City Manager Robert Romero testified at M. Lujan's post-termination hearing that the City of Santa Fe never paid the Santa Fe Junior Wrestling Association ("SFJWA") or any other entity that it agreed to pay under the purchase order that it issued to the SFJWA.   Complaint & Petition at 8.

Second, M. Lujan asserts that Ms. Maynes "misinterpreted and/or misapplied the law or rules which govern[ed]" his alleged conduct.   Complaint & Petition at 8.   M. Lujan points out that the City has not presented any evidence that it paid money either to the SFJWA or to the

_____

[2]Although this document is an amended petition for writ of certiorari and complaint, it is the earliest document in the case that the parties have presented to the Court.

Amateur Athletic Union ("AAU") because of M. Lujan's actions.  Complaint & Petition at 8-9. M. Lujan says: "Therefore it is inconsistent as a matter of law for Martin to have been careless, negligent or improper with City funds."  Complaint & Petition at 8.  M. Lujan also argues that the electronic mail transmissions between him and his brother -- Larry Lujan -- on which Ms. Maynes relied "do not demonstrate that Martin handled any City funds."  Complaint & Petition at 9.  M. Lujan states that there is no evidence that he incurred any personal expenses, purchased an airline ticket, or received reimbursement for any expenses.  See Complaint & Petition at 9.

Third, M. Lujan asserts that the City of Santa Fe acted fraudulently, arbitrarily, and capriciously.  See Complaint & Petition at 9.  M. Lujan argues that R. Romero was his friend until M. Lujan began investigating concerns about R. Romero's girlfriend violating "time clock" policies.  Complaint & Petition at 9.  M. Lujan explains that he "instituted measures to control the abuses that were being carried out regarding employees clocking in for other employees," and that R. Romero's "subordinates and cronies" granted R. Romero's girlfriend an exemption from those measures.  Complaint & Petition at 9.  M. Lujan concludes:

> When Robert Romero became aware that Martin was investigating the legal requirements concerning the exemption of Robert Romero's girlfriend from the time clock policy and the nepotism of Robert Romero to a relative of his girlfriend, Robert Romero retaliated against Martin and violated his First Amendment Rights to Free Speech and Liberty, Violated the City's Anti-Fraud Policy, and retaliated against Martin for being a Whistle Blower.

Complaint & Petition at 9.

M. Lujan also alleges that the Defendants: (i) violated his rights under the First Amendment to the Constitution of the United States of America when they retaliated against him for exercising his right to free speech, see Complaint & Petition ¶¶ 1-14, at 11-12 ("Count I"); (ii) unlawfully discharged him for raising issues of public concern, see Complaint & Petition ¶¶ 15-24, at 12-13 ("Count II"); and (iii) violated the New Mexico Whistleblower Protection

Act, N.M. Stat. Ann. §§ 10-16C-2(1) and 10-16C-2(4)("WPA"), when they terminated him after he raised concerns that City of Santa Fe officials had violated the City of Santa Fe's Personnel Rules, Regulations, and Policies, Complaint & Petition ¶¶ 25-45, at 14-17 ("Count III").

      **1.**      **The Appeal Brief.**

M. Lujan filed a brief on the Petition for Writ of Certiorari on September 18, 2013.  See Petitioner Martin Lujan's Appeal Brief at 1,[3] filed September 18, 2013 (Doc. 29)("Appeal Brief").  In the Appeal Brief, M. Lujan asked the Court to overturn Ms. Maynes' decision for five reasons.  First, M. Lujan argued that Ms. Maynes was an impermissibly biased hearing officer and violated his due process rights by presiding over his post-termination hearing.  See Appeal Brief at 13-27.  Second, M. Lujan addressed together three of Ms. Maynes' conclusions of law -- that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses; that M. Lujan carelessly, negligently, or improperly used City of Santa Fe funds; and that M. Lujan intentionally falsified or mishandled City of Santa Fe records -- arguing that all three conclusions were arbitrary and capricious, and that substantial evidence did not support them.  See Appeal Brief at 17-20.  Third, M. Lujan asserted that Ms. Maynes' finding that he stole City of Santa Fe funds is arbitrary and capricious, and that substantial evidence does not support the finding.  See Appeal Brief at 20-22.  Fourth, M. Lujan contended that there was no just cause for his termination under the City of Santa Fe's Personnel Rules.  See Appeal Brief at 22-23.  Fifth, and finally, M. Lujan urged that Ms. Maynes' decision was not in accordance with the law.  See Appeal Brief at 23-24.

---

[3]The Court will use M. Lujan's pagination -- i.e., those found at the bottom of each page of the Appeal Brief -- rather than CM/ECF's.

2.     **The MOO.**

On February 24, 2015, the Court issued the MOO, which granted in part and denied in part M. Lujan's requests in the Appeal Brief.[4]  First, the Court held that M. Lujan waived his due process claim when he failed to raise it in his Complaint or in his Petition for Writ of Certiorari. See AMOO at 54-56.  The Court added that, even if M. Lujan had properly asserted his due process claim, the claim would not go forward, because "the Court does not think 'a reasonable person would have serious doubts about whether the hearing officer could be fair.'"  AMOO at 59 (quoting City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16, 941 P.2d 509).  Second, the Court held that Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds by authorizing the payment of two submitted invoices is not fraudulent, arbitrary, or capricious, and that substantial evidence supports it.  See AMOO at 65-71.  Third, the Court concluded that M. Lujan waived the issue whether Ms. Maynes' decision that he intentionally falsified or mishandled City of Santa Fe records was fraudulent, arbitrary, and capricious, and that substantial evidence did not support it.  See AMOO at 73-74 (citing N.M.R.A Rule 1-075(K)(3) ("A contention that a decision or finding of fact is not supported by substantial evidence shall be

---

[4]The Court issued an Amended Memorandum Opinion and Order, filed August 4, 2015 (Doc. 79)("AMOO"), explaining:

> The Memorandum Opinion and Order, filed February 24, 2015 (Doc. 62)("MOO"), denied in part and granted in part the requests in Petitioner Martin Lujan's Appeal Brief, filed September 18, 2013 (Doc. 29), had words missing on multiple pages.  Although the Court meticulously reviewed the MOO before filing it, a technical glitch occurred when the MOO was converted from a Word file to a PDF file.  This Amended Memorandum Opinion and Order fixes those errors while leaving the substance of the MOO -- i.e., the MOO's factual findings, legal conclusions, analysis, and holdings -- intact and unchanged.

AMOO at 1 n.1.  Because the Court filed the AMOO after the parties submitted briefing on the Motion, the parties' briefing cites and quotes only the MOO.  Accordingly, where the Court cites or quotes the parties' briefing and the briefing cites or quotes the MOO, the Court will provide the same citation or quotation that the parties used.  Otherwise, the Court will cite or quote the AMOO to explain its previous holdings.

deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence.")).  Fourth, the Court agreed with M. Lujan that Ms. Maynes' decision that he stole City of Santa Fe funds was arbitrary and capricious and that substantial evidence did not support it.  See AMOO at 74-77.  Fifth, the Court held that the City of Santa Fe had just cause to terminate M. Lujan's employment, because his actions "'reflect poorly upon the integrity of the City of Santa Fe.'"  AMOO at 78 (quoting City of Santa Fe's Personnel Rules § 7.50(E)(13))).  Sixth, and finally, the Court concluded that Ms. Maynes' decision was in accordance with the law.  See AMOO at 82.

> **3.**     **The Motion.**

M. Lujan filed the Motion on March 24, 2015.  M. Lujan asks the Court to reconsider five of its rulings in the MOO under the Court's inherent "equitable power to process litigation to a just and equitable conclusion," or under the Court's authority to alter or amend a judgment under rule 59(e) of the Federal Rules of Civil Procedure.  Motion at 2.  See id. at 5.  First, M. Lujan asserts that he did not waive his due process claim by failing to raise it in the Complaint or in the Petition for Writ of Certiorari, because whether Ms. Maynes was impermissibly biased is a jurisdictional question that "may be raised at any point in the proceedings."  Motion at 6-7.  M. Lujan contends that,

> in the administrative hearing setting, the hearing officer and the City of Santa Fe owed Petitioner a duty not to appoint Ms. Maynes as the hearing officer.  This duty is similar to the obligations placed upon the federal courts on the issue of jurisdiction.  All Federal Courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."

Motion at 7-8 (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)).

Second, M. Lujan says that the Court applied the incorrect standard in the MOO to determine whether "there was an impermissible conflict in Ms. Maynes['] authority to hear

Petitioner's appeal."  Motion at 8-9.  M. Lujan points out that the Court improperly relied on

Flores v. State, 1986-NMCA-017, 439 P.2d 565, as the closest analogy to this case, and

inaccurately held that M. Lujan "must demonstrate a direct connection between actual bias and

the matter submitted to Ms. Maynes for her consideration."  Motion at 9.  M. Lujan contends:

> In the United States Supreme Court decision, Caperton v. [A.T. ]Massey
> Coal Co., 129 S. Ct. 2252 (2009), the Court held that the failure of a state
> supreme court justice to recuse himself when a party had made extraordinary and
> disproportionate contributions in support of the justice's candidacy in the previous
> election violated the opposing party's due process rights.  The Court applied an
> objective standard and stated "that there is a serious risk of actual bias -- based on
> objective and reasonable perceptions -- when a person with a personal stake in a
> particular case had a significant and disproportionate influence in placing the
> judge on the case by raising or directing the judge's election campaign when the
> case was pending or imminent."  Id. at 2263-64.  In the instant case the City had a
> significant and disproportionate influence in placing Ms. Maynes on the case as
> the hearing officer.
>
> In Caperton there was no . . . direct evidence either cited or found by the
> Court upon which it disqualified the judge.  Using the objective standard the
> Supreme Court held that the objective standard's reasonable perceptions were
> sufficient enough to create a "serious risk of actual bias" given the campaign
> contributions.  This was the holding even where the political contributions had
> been made in a previous year's election.  The ruling is more analogous to the facts
> found in the instant case than the facts found in the Flores case.

Motion at 9-10.

M. Lujan asserts that the Court of Appeals of New Mexico adopted Caperton v. A.T.

Massey Coal Co.'s objective bias standard in City of Albuquerque v. Chavez.  See Motion at 10.

According to M. Lujan, in City of Albuquerque v. Chavez, the Court of Appeals of New Mexico

said that the bias inquiry does not focus on "'whether the Board members are actually biased or

prejudiced,'" but on whether, "'in the natural course of events, there is an indication of a possible

temptation to an average man [or woman] sitting as a judge to try the case with bias for or

against any issue presented to him [or her].'"  Motion at 10 (quoting City of Albuquerque v.

Chavez, 1997-NMCA-054, ¶ 16)(emphases omitted)(alterations in Motion but not in quoted

case).  M. Lujan argues that the MOO "requires that Petitioner not only prove actual bias but also the bias or conflict must be connected to the specific matter pending before Ms. Maynes." Motion at 12.  In M. Lujan's view, "this is inconsistent with the standard announced by the United States Supreme Court, the New Mexico Supreme Court and the New Mexico Court of Appeals subsequent to the <u>Flores</u> opinion."  Motion at 12.  M. Lujan adds that <u>City of Albuquerque v. Chavez</u> "is more on point and correctly applied the 'objective standard test' to the facts of that case."  Motion at 13.  M. Lujan says that "the authority of the Board members [in <u>City of Albuquerque v. Chavez</u>] was identical to Ms. Maynes' authority to act as the hearing officer having been appointed by the City of Santa Fe."  Motion at 13 (internal quotation marks omitted).  M. Lujan says that, under the objective bias standard, the City of Santa Fe "should not have appointed Ms. Maynes and Ms. Maynes should have refused to hear Petitioner's appeal." Motion at 13.

Third, M. Lujan challenges the MOO's conclusion that M. Lujan's proposed impermissible-bias standard "'is unworkable.'"  Motion at 14 (quoting MOO at 61).  M. Lujan says that the Court's holding "does [not] reflect the reality of the legal community in Santa Fe and the availability of un-biased attorneys that could have heard Petitioner's administrative appeal and the voluntary disclosures of potential conflicts before agreeing to hear any case." Motion at 14.  M. Lujan then lists a number of retired judges who could have served as his hearing officer, asserting that "[t]hese are only a few of a number of legal professionals who were available to act as the hearing officer regarding Petitioner's appeal and who would not have presented a possible bias -- based on objective and reasonable perceptions."  Motion at 15.

Fourth, M. Lujan contends that the MOO wrongly held that he attempted to obtain City of Santa Fe funds under false pretenses.  <u>See</u> Motion at 16 (citing MOO at 81-82).  M. Lujan

says that "the evidence does not support a finding of the prerequisite intent required for there to have been intent to obtain funds under false pretenses" and that "there was . . . no overt act with respect to the $750 SFJWA invoice." Motion at 16. M. Lujan says that he "refuted every e-mail from Larry Lujan and does not, in any instance, confirm the existence of a scheme to fraudulently obtain funds from the City of Santa Fe." Motion at 20.

Fifth, and finally, M. Lujan asks the Court to remand his case to the City of Santa Fe "for a determination of whether a less severe discipline, other than dismissal, is warranted in this case." Motion at 21 (capitalization removed for readability). M. Lujan points out that the MOO reversed Ms. Maynes' findings that M. Lujan: (i) stole from the City of Santa Fe; (ii) carelessly, negligently, or improperly used City of Santa Fe funds; and (iii) intentionally falsified or mishandled City of Santa Fe records. See Motion at 23. M. Lujan argues that, because Ms. Maynes' decision "expressly relies upon all of her findings and conclusions of law, it is proper for this Court to remand the matter back to the City for further consideration." Motion at 23. M. Lujan then provides the following colorful collection of authority to support his argument:

> "When the United States Supreme Court grants certiorari and reverses a decision of a state supreme court or a Federal appeals court, it may remand the case. Likewise, an appeals court may remand a case to a trial court. A remand may be a full remand, essentially ordering an entirely new trial; when an appellate court grants a full remand, the lower court's decision is 'reversed and remanded.'" See http://en.wikipedia.org/wiki/Remand court procedure 29#United States.

> "Alternatively, it may be 'with instructions' specifying, for example, that the lower court must use a different legal standard when considering facts already adduced at trial. It may also be a partial remand as when an appellate court affirms a conviction while directing the lower court to revisit the sentencing phase. Finally, it may remand a case upon concluding that the lower court not only made a mistake but also did not adjudicate issues that must be considered." Id.

> In Bender v. Clark, 744 F.2d 1424 (10th Cir. 1984) the Federal District Court for the District of New Mexico, remanded an action back to an administrative law judge (ALJ) for a determination of whether the

plaintiff/appellee adequately showed by a preponderance of the evidence that the United States Geological Survey (USGS) erred in finding that a particular tract of federal land contained a known geologic structure (KGS)." Id. at 1425. The 10th Circuit affirmed the decision of the District remanding the case back to the ALJ for consideration of the issues directed on remand. Id. at 1430.

Pursuant to 28 U.S. Code § 2106, "[t]he Supreme Court or any other court of appellate jurisdiction may . . . remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." Id. Circuit Appeal Courts, based upon the need to avoid the operation of bias or mindset which seems likely to have developed from consideration of decisions will remand the case to another judge or administrative law judge. The Seventh Circuit Court of Appeals uses its' Rule 36 which provides, in relevant part that:

> Whenever a case tried in a district court is remanded by this court for a new trial, it shall be reassigned by the district court for trial before a judge other than the judge who heard the prior trial unless the remand order directs or all parties request that the same judge retry the case.

Id. In the Ninth Circuit, like the Tenth Circuit, there is no specific rule regarding reassignment and therefore the Federal Circuit looked to the standard established under Ninth Circuit case law.

The court held that "[i]n the Ninth Circuit, reassignment is appropriate if personal bias or unusual circumstances are shown." Smith v. Mulvaney, 827 F.2d 558, 562 (9th Cir. 1987). When determining whether unusual circumstances exist, the Ninth Circuit considers the following factors:

> **(1)** whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, **(2)** whether reassignment is advisable to preserve the appearance of justice, and **(3)** whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

Id. at 563. Petitioner based upon the sound reasoning of the above-referenced Appellate Courts, request that the matter, if remanded, be remanded to a different Hearing Officer.

Motion at 23-25 (bold in original).

4.      **The Response.**

The City of Santa Fe responded to the Motion on April 17, 2015, attacking the Motion on five grounds.   See Respondent City of Santa Fe's Response to Petitioner's Motion for Reconsideration, filed April 17, 2015 (Doc. 65)("Response").   First, the City of Santa Fe argues that rule 54(b) of the Federal Rules of Civil Procedure provides the Court discretion to revise interlocutory orders at any time before the entry of final judgment.   See Response at 3.   The City of Santa Fe says that, when evaluating whether to reconsider an interlocutory order under rule 54(b), courts apply the same legal standard used for a motion to alter or amend a judgment under rule 59(e).   See Response at 3.   Second, the City of Santa Fe contends that M. Lujan has failed to demonstrate that the Court should reconsider its decision that M. Lujan waived his due process claim by failing to raise it in his Complaint or Petition for Writ of Certiorari.   See Response at 4. The City of Santa Fe points out that M. Lujan does not dispute that he raised his due process claim for the first time in the Appeal Brief; he similarly does not challenge "the well-established rule that courts should not consider issues that were not presented in a complaint or petition for writ of certiorari."   Response at 5 (citing Rule 12-505(D)(3) N.M.R.A.; San Pedro Neighborhood Ass'n v. Santa Fe Cnty. Bd. of Cnty. Comm'rs, 2009 NMCA-045, ¶ 29, 206 P.3d 1011, 1019). The City of Santa Fe contends that M. Lujan attempts to avoid waiver by arguing that having an impartial hearing officer is a jurisdictional issue that cannot be waived.   See Motion at 5.   The City of Santa Fe says that, although it agrees with M. Lujan that jurisdictional issues are not subject to waiver, M. Lujan fails to cite any support for his contention that "a conflict-free hearing officer . . . is a jurisdictional prerequisite."   Response at 5.   The City of Santa Fe also points out that one of the Court's prior opinions appears to implicitly foreclose M. Lujan's argument, because, in that case, the Court treated the questions of impermissible conflict and

- 13 -

jurisdiction as two separate and unrelated issues.  See Response at 6 (citing Kassabji v. Baca, No. CIV 07-0710 JB/ACT, 2007 WL 505345, at *6 (D.N.M. Jan. 8, 2007)(Browning, J.)("[E]ven if Judge Campbell had a conflict of interest, he had jurisdiction over the case.")).

Second, the City of Santa Fe asserts that the MOO applied the proper impermissible-bias standard.  See Response at 6.  The City of Santa Fe contends that, although the Court "clearly applied the objective standard advocated by Petitioner," it "simply did not reach the conclusion that Petitioner had hoped for."  Response at 7.  The City of Santa Fe says that, "[i]n reviewing the conflict issue, the Court indicated that it had not found any evidence of 'potential' bias on the part of the hearing officer, and stated that Petitioner had not offered any 'evidence demonstrating even the appearance of bias.'"  Response at 7 (quoting MOO at 59, 61).  The City of Santa Fe also highlighted the Court's holding that it "'does not think a reasonable person would have serious doubts about whether the hearing officer could be fair.'"  Response at 8 (quoting MOO at 59).  The City of Santa Fe asserts that "[t]his is unmistakably employing the objective standard advocated by Petitioner, and taking the standard from the same case cited by Petitioner":  City of Albuquerque v. Chavez.  Response at 8.  The City of Santa Fe says that the Court rejected M. Lujan's reliance on that case, "because it was factually inapposite, not because it was applying an objective standard."  Response at 8.  The City of Santa Fe added that the MOO properly relied upon Flores v. State in rejecting M. Lujan's impermissible-bias argument, because that case used an objective standard and did not require proof of actual bias.  See Response at 8.

The City of Santa Fe also attacks M. Lujan's reliance on Caperton v. A.T. Massey Coal Co.  Response at 9.  The City of Santa Fe asserts:

> Nor are the facts of Caperton remotely similar to those of this case. Caperton involved a situation in which the head of a company facing a $50 million jury verdict, knowing that the verdict would be appealed to the state Supreme Court, donated $3 million to support the election of a candidate that he

believed would be more supportive of the appeal than the incumbent.  This $3 million donation was more than the total amount spent by all other supporters of this candidate put together, and three times the amount spent by the candidate's own committee.  Despite the "extraordinary situation" of this "extreme case[]," fueled by this remarkable attempt to get his preferred candidate on the bench prior to the court's hearing of the appeal, four of the Justices on the <u>Caperton</u> Court still did not find that recusal should have been required.

Response at 9.  The City of Santa Fe asserts that <u>Caperton v. A.T. Massey Coal Co.</u> would only be analogous if Ms. Maynes "had received a large percentage of her revenues from representing the City in the past, with an expectation of receipt of a similar percentage of work in the future." Response at 10.  The City of Santa Fe argues that, "if anything, the contrast with <u>Caperton</u> demonstrates how extreme the appearance of a conflict must be before disqualification is required, and just how far from this extreme conflict the circumstances of this case presented." Response at 10.

Third, the City of Santa Fe contends that, in the MOO, the Court considered all of the evidence in the record and all of the parties' legal arguments in upholding Ms. Maynes' determination that M. Lujan attempted to obtain City of Santa Fe funds under false pretenses. <u>See</u> Response at 11.  The City of Santa Fe maintains that, although M. Lujan contends that the evidence in the record does not support the Court's ruling, "his argument is based on the same spin and implausible explanations for his emails and actions that were already made and rejected" in the MOO.  Response at 12.  Fourth, the City of Santa Fe urges that, because M. Lujan's attempt to obtain City of Santa Fe funds under false pretenses provided just cause to terminate his employment, remand to consider other potential discipline is unwarranted.  <u>See</u> Response at 14.  The City of Santa Fe asserts that, as the Court recognized in the MOO, M. Lujan "'had a responsibility to manage the City of Santa Fe's funds with honesty and integrity,

set an example to his subordinates, and maintain the public's trust in the City of Santa Fe. Because of his misconduct, he failed on all counts.'"  Response at 15 (quoting MOO at 79).

### 5.     The Reply.

M. Lujan replied to the Response on May 18, 2015.  See Petitioner Martin Lujan's Reply Brief, filed May 18, 2015 (Doc. 68)("Reply").  Aside from reiterating the arguments from the Motion, M. Lujan asserts that his impermissible-bias argument "is not ma[d]e of whole cloth," because Flores v. State requires a finding of "actual conflict of interest."  Reply at 6.  M. Lujan adds that the Supreme Court of the United States' decision in Caperton v. A.T. Massey Coal Co. did not use the impermissible-bias standard from the Court of Appeals of New Mexico's decision in Flores v. State.  See Reply at 6.  M. Lujan says that, although the City of Santa Fe argues that the cumulative evidence in the case supports the Court's holding that M. Lujan attempted to obtain City of Santa Fe funds by false pretenses, the Court relied only upon the two invoices which L. Lujan sent regarding the AAU's 2012 Grand National Wrestling Tournament -- one for $6,000.00 and another for $750.00.  See Reply at 7.  Finally, M. Lujan reiterates that the Court should remand the case to the City of Santa Fe for further consideration of less drastic disciplinary measures in light of the Court's reversal of Ms. Maynes' determination that M. Lujan stole City of Santa Fe funds.  See Reply at 8.

### 6.     The Hearing.

The Court held a hearing on the Motion on June 18, 2015.  See Transcript of Hearing (taken June 18, 2015)("June 18, 2015, Tr.").[5]  The Court kicked off the hearing by explaining that "rule[s] 59 and 60 are irrelevant" to the Court's resolution of the Motion, because the Court has not entered final judgment in this case.  Tr. at 2:2-14 (Court).  The Court explained that,

_____

[5]The Court's citations to the transcript refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

consequently, if M. Lujan can convince the Court that it was wrong, the Court has discretion to alter its rulings in the MOO.  See Tr. at 2:14-15 (Court).   Although the parties agreed with the Court's position, the City of Santa Fe clarified that, "generally, . . . courts would look to whether there was an intervening change in controlling law or new evidence not previously available, or the need to correct clear error or manifest injustice" to determine whether reconsideration is appropriate.  Tr. at 3:8-4:5 (Court, Thompkins, Roman).

Next, the Court said that it did not see how a hearing officer's bias is a jurisdictional issue and that it was inclined to conclude that M. Lujan waived his due process claim.  See Tr. at 4:10-24 (Court).   Without addressing the waiver issue -- or expressly conceding it -- M. Lujan proceeded to his argument that the MOO used the wrong impermissible-bias standard.  See Tr. at 5:11-18 (Thompkins).   M. Lujan and the Court then had an exchange over whether hearing officers and judges must recuse themselves in cases involving a party that they have previously represented, with the Court suggesting that M. Lujan's standard would require the Court to recuse itself in a large number of cases.   See Tr. at 6:17-8:20 (Court, Thompkins); id. at 8:7-14 (Court).  M. Lujan pushed back, noting that Ms. Maynes was impermissibly biased not only because of her prior representation of the City of Santa Fe, but also because her firm -- Miller Stratvert, P.A. -- has "an ongoing relationship with the City [of Santa Fe]."  Tr. at 8:21-24 (Thompkins); id. at 9:19-23 (Thompkins); id. at 10:5-10 (Court, Thompkins).   M. Lujan ultimately said that whether recusal is required turns on "the facts and the circumstances" of each case, Tr. at 7:1-2 (Thompkins), and suggested that courts look to the following factors to determine if recusal is warranted:

> How recent was [the prior representation]?  Is there an ongoing or a possible ongoing relationship that could be had from the hearing officer's perspective which he believed that if she took this work or rendered her decision, it would prohibit them from coming back to her and hiring her as a hearing officer again,

or even doing her work?  Would a reasonabl[y] prudent person believe that those would be factors that the hearing officer might weigh in her mind as reasons to render a decision one way or another?

Tr. at 20:4-16 (Thompkins).

When the City of Santa Fe took the lectern, it repeated its arguments from the Response: the Court correctly held that M. Lujan waived his due process claim, and, even if M. Lujan did not waive that claim, the Court applied the proper impermissible-bias standard.  See Tr. at 14:14-15:16 (Roman).  The City of Santa Fe argued that M. Lujan was "misinformed" about Miller Stratvert having an ongoing relationship with the City of Santa Fe and clarified that Miller Stratvert "is [currently] suing the City of Santa Fe rather than representing" it.  Tr. at 15:15-19 (Roman); id. at 17:4-12 (Court, Roman).  The City of Santa Fe pointed out that Ms. Maynes has represented it in only two cases -- one in 2005 and another in 2008.  See Tr. at 15:20-17:3 (Court, Roman).  The City of Santa Fe argued that such a tenuous relationship between Ms. Maynes and the City of Santa Fe would not lead a reasonable person to believe that Ms. Maynes could not be impartial in M. Lujan's post-termination hearing.  See Tr. at 17:15-20 (Roman).  Although the Court agreed with the parties that the objective appearance-of-bias standard applies, it said that it was inclined to stick with its ruling in the MOO that Ms. Maynes' sparse history with the City of Santa Fe and the lack of an ongoing relationship between her firm and the City of Santa Fe did not give rise to an impermissible bias.  See Tr. at 22:4-17 (Court). The parties then repeated their arguments from the briefing on the remaining issues, and the Court said that it was not inclined to alter any of the MOO's remaining holdings.  See Tr. at 24:15-38:7 (Court, Roman, Thompkins).

## LAW REGARDING MOTIONS TO ALTER OR AMEND THE JUDGMENT UNDER RULE 59(e)

Rule 59(e) provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Rule 60 provides in relevant part:

> **(b)**    **Grounds for Relief from a Final Judgment, Order, or Proceeding.**  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > **(1)**    mistake, inadvertence, surprise, or excusable neglect;
> >
> > **(2)**    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > **(3)**    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> >
> > **(4)**    the judgment is void;
> >
> > **(5)**    the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> >
> > **(6)**    any other reason that justifies relief.
>
> **(c)**    **Timing and Effect of the Motion.**
>
> > **(1)**    **Timing.**  A motion under Rule 60(b) must be made within a reasonable time -- and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.
> >
> > **(2)**    **Effect on Finality.**    The motion does not affect the judgment's finality or suspend its operation.

Fed. R. Civ. P. 60(b)-(c).  The Tenth Circuit has recognized:

> Generally, a "motion for reconsideration, not recognized by the Federal Rules of Civil Procedure, Clough v. Rush, 959 F.2d 182, 186 n.4 (10th Cir. 1992), may be construed in one of two ways: if filed within 10 days of the district court's entry of judgment, it is treated as a motion to alter or amend the judgment under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a

motion for relief from judgment under Rule 60(b)."   <u>Computerized Thermal</u>
<u>Imaging, Inc. v. Bloomberg, LP</u>, 312 F.3d 1292, 1296 n.3 (10th Cir. 2002).

<u>Price v. Philpot</u>, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005).  The time limit in rule 59(e) is now

twenty-eight days rather than ten days.  <u>See</u> Fed. R. Civ. P. 59(e).

A motion for reconsideration under rule 59(e) is an "inappropriate vehicle[] to reargue an

issue previously addressed by the court when the motion merely advances new arguments, or

supporting facts which were available at the time of the original motion."   <u>Servants of Paraclete</u>

<u>v. Does</u>, 204 F.3d 1005, 1012 (10th Cir. 2000).   "Grounds warranting a motion to reconsider

include (1) an intervening change in the controlling law, (2) new evidence previously

unavailable, and (3) the need to correct clear error or prevent manifest injustice."   <u>Servants of</u>

<u>Paraclete v. Does</u>, 204 F.3d at 1012.   "Thus, a motion for reconsideration is appropriate where

the court has misapprehended the facts, a party's position, or the controlling law."   <u>Servants of</u>

<u>Paraclete v. Does</u>, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a

motion to reconsider under rule 59(e).  <u>See</u> <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1324 (10th Cir.

1997).

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or

its legal representative from a final judgment, order, or proceeding for the following reasons,"

including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge

the time for filing a rule 59(e) motion.  <u>See</u> <u>Brock v. Citizens Bank of Clovis</u>, 841 F.2d 344, 347

(10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions);

<u>Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.</u>, No. CIV 11-0103, 2012 WL

869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period

for timely filing motions under Rule 59(e) . . . .").   "A motion under rule 59 that is filed more

than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from

- 20 -

judgment." 12 James Wm. Moore, et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted). Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, a party can rely on rule 60(b)(1) to rectify a mistake by his or her attorney, or when their attorney acted without the party's authority. See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . ."). Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or comply with deadlines. See Yapp v. Excel Corp., 186 F.3d at 1231. If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault. See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993)("This leaves, of course, the Rule's requirement that the party's neglect be 'excusable.'"); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.

> Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted). The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002). The Court has previously stated:

> There is a tension between how the law treats attorney actions that are without authority, thus permitting relief under rule 60(b), and how the law treats those attorney actions which are inexcusable litigations decisions, thus failing to qualify for relief; although the distinction between those actions may not always be logical, it is well established.

Wilson v. Jara, No. 10-0797, 2012 WL 1684595, at *7 (D.N.M. May 10, 2012)(Browning, J.).[6]

---

[6]The Supreme Court has recognized that individuals must be "held accountable for the acts and omissions of their chosen counsel," and that the "proper focus is upon whether the neglect of respondents *and their counsel* was excusable." Pioneer Inv. Servs. Co. v. Brunswick Assoc. LP, 507 U.S. at 397 (emphasis in original). At the same time, the Tenth Circuit has held that, when counsel acts without authority, rule 60(b)(1) provides relief from judgment. See Cashner v. Freedom Stores, Inc., 98 F.3d at 576 ("[A]s a general proposition, the 'mistake' provision in Rule 60(b)(1) provides for the reconsideration of judgment only where . . . an attorney in the litigation has acted without authority from a party . . . ."). "There is a tension between these decisions, because, ordinarily, a client will not authorize his or her attorney to act in a negligent manner or to make a mistake." Wilson v. Jara, 2012 WL 1684595, at *7 n.7.

The Court concludes that, when the client acknowledges that he or she has hired the attorney, there is a difference between decisions which terminate the litigation, such as settlement or a stipulation of dismissal, and other litigation decisions, because decisions to terminate the litigation are ordinarily left to the client. See Chavez v. Primus Auto. Fin. Servs., 125 F.3d 861, 1997 WL 634090, at *4-5 (10th Cir. 1997)(unpublished)(citing Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc., 749 P.2d 90, 92 (1988); Bolles v. Smith, 591 P.2d 278, 280 (1979)). "Otherwise the Court has difficulty explaining attorney decisions which are made without authority and attorney decisions for which it is acceptable that the client suffer the

consequences." <u>Wilson v. Jara</u>, 2012 WL 1684595, at *7 n.7. In <u>Chavez v. Primus Automotive Financial Services</u>, the Tenth Circuit recognized that "the mere employment of an attorney does not give him the actual, implied or apparent authority to compromise his client's case." 1997 WL 634090, at *4. Few Tenth Circuit cases analyze whether an attorney has acted without authority. The cases in which the Tenth Circuit has found a lack of authority appear to fall into two categories: (i) cases in which the attorney entered an appearance without the client's knowledge, <u>see, e.g.</u>, <u>FDIC v. Oaklawn Apts.</u>, 959 F.2d at 175-76 (finding that there were factual issues which the district court needed to resolve where "[t]here is nothing in the record indicating when Appellants became aware of the lawsuit and of Newcombe's purported representation"); and (ii) cases in which the attorney's actions terminate the litigation, <u>see, e.g.</u>, <u>Thomas v. Colo. Trust Deed Funds, Inc.</u>, 366 F.2d 136, 139-40 (10th Cir. 1966)(finding that, as to one of the plaintiffs, "the record shows that he did not participate in the transactions and negotiations with the S.E.C. and did not consent to the execution of the stipulation of the judgment"); <u>Cashner v. Freedom Stores, Inc.</u>, 98 F.3d at 577 (citing with approval <u>Surety Ins. Co. of Cal. v. Williams</u>, 729 F.2d 581, 582-83 (8th Cir. 1984), which held that a "judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry"). Because decisions that terminate the litigation are ordinarily the client's prerogative, those decisions fit more squarely within rule 60(b)(1)'s "lack of consent" prong. Decisions where the purported client is unaware of the litigation, or of the attorney's attempt to act on his or her behalf, would also fit within rule 60(b)(1)'s "lack of consent" prong, because an individual has the right to choose his or her own attorney, or whether he or she wishes to have any attorney. Other litigation decisions are made jointly or are within the attorney's control, <u>see</u> Model Code of Prof'l Conduct R. 1.2 cmt. 1 (2011)("With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client . . . and may take such action as is impliedly authorized to carry out the representation."); <u>Pittman ex rel. Sykes v. Franklin</u>, 282 F. App'x 418, 427 n.6 (6th Cir. 2008)(unpublished)("[T]he decision to allege comparative fault as an affirmative defense falls within a narrow band of circumstance in which an attorney may act without consulting his or her client."), and, thus, to give final judgments meaning and allow cases to terminate. It is logical that those decisions must fall within the "excusable litigation mistake" prong, or be based on a substantive mistake of law or fact.

Although the Tenth Circuit does not appear to have expressed its views on where the line is drawn between attorneys acting without consent and litigation mistakes, or acknowledged the tension between these two categories, the Court concludes that the appropriate division is, when the client is aware that the attorney is acting on his or her behalf, between decisions which dispose of the case and ordinarily require client consent, and other routine attorney decisions which take place over the course of the case. The Court also notes that rules of professional conduct require, "[i]n a criminal case," for a lawyer to "abide by the client's decision, after consultation with the lawyer, as to the plea to be entered, whether to waive a jury trial and whether the client will testify." Model Rules of Prof'l Conduct R. 1.2(a). While a decision on the plea to be entered in a criminal case is comparable to whether to settle a civil case, the Court has not located any decisions permitting rule 60(b) relief when a civil attorney waives his or her client's right to a jury trial. One unpublished decision from the United States Court of Appeals for the Fourth Circuit discussed briefly a scenario where, without resolving the merits of the issue, a criminal defendant raised through a rule 60(b) motion in a habeas preceding that "his

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore, supra § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863. Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the

---

trial counsel had prevented him from testifying in his defense." United States v. McMahan, 8 F. App'x 272, 274 (4th Cir. 2001)(unpublished).

judicial view of an established rule of law" does not justify relief under Rule 60(b)(6).  <u>Collins v. City of Wichita</u>, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

## <u>LAW REGARDING MOTIONS TO RECONSIDER</u>

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, <u>i.e.</u>, an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that the Federal Rules of Civil Procedure -- the normal starting point for figuring out how to use various procedural devices in the federal courts -- do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions -- "motion[s] to alter or amend a <u>judgment</u>" -- as "motions to reconsider,"[7] compounds that baseline confusion.  Fed. R. Civ. P. 59(e) (emphasis added); <u>Servants of the Paraclete v. Does</u>, 204 F.3d 1005 *passim*.

---

[7]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must be decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within 28 days of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than 28 days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies." (emphasis added)).  In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case to: (i) for the first twenty-eight days after the entry of judgment, motions under rules 50(b), 52(b), 59, and 60 -- the district court's jurisdiction, while limited, trumps that of the Court of Appeals during this time period, and, even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case, see Fed. R. App. P. 4(a)(4)(B); (ii) after twenty-eight days, if a party has filed a notice of appeal, motions under rule 60 -- the Court of Appeals' jurisdiction trumps the district court's during this period, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion;[8] and (iii) after twenty-eight days, if no party has filed a notice of appeal, motions under rule 60.

---

evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

[8]Rule 60(a), which allows the district court to correct clerical errors, provides that, "after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave."  Fed. R. Civ. P. 60(a).  Rule 60(b), which provides for the correction of substantive legal errors, has an interestingly one-sided application when the case is up on appeal: "[A] notice of appeal does not divest a district court of jurisdiction to consider a Rule 60(b) motion, although it prevents a district court from granting such a motion unless it notifies this court of its intention to grant the motion upon proper remand."  West v. Ortiz, No. CIV 06-1192, 2007 WL 706924, at *5 n.5 (10th Cir. Mar. 9, 2007) (unpublished)(Broby, J.)(citing Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002); Aldrich Enters., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991)).  In other words, "a district court does have the authority 'to consider on the merits and deny a 60(b) motion after a notice of appeal, because the district court's action is in furtherance of the appeal,'" but the district court does not have the authority to grant a rule 60(b) motion without first asking the Court of Appeals to remand the case.  United States v. Edmonson, 928 F. Supp.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home,[9] quit obsessing about the dispute, and

_____

1052, 1053 (D. Kan. 1996)(Crow, J.)(emphasis in original)(quoting Winchester v. U.S. Att'y for the S. Dist. of Tex., 68 F.3d 947, 949 (5th Cir. 1995)).

[9]When the Court says that the parties are free to "go home" after the final judgment, it is not just employing colorful language. At the beginning of a case, the plaintiff is required to serve a summons on the defendant, personally, or obtain a waiver of such service. See Fed. R. Civ. P. 4(c)-(d). Service of process is a jurisdictional prerequisite, without which the defendant is under no obligation to participate in the case and without which the plaintiff cannot seek a default judgment. See Fed. R. Civ. P. 4, 55. Once served with the initial process, however, the bar for continued service lowers substantially; papers may be served on the opposing party's attorney, rather than on the opposing party, personally, and service via CM/ECF suffices. See Macias v. N.M. Dep't of Labor, 300 F.R.D. 529, 571 (D.N.M. 2014)(Browning, J.)("While rule 5's relatively permissive standards govern service of a motion, rule 4's more rigorous provisions govern service of a summons and complaint initiating a case." (emphasis in original)).

The disparity between the one-time, heightened obligations of rule 4 service and the ongoing, easy-to-follow obligations of rule 5 service makes sense. It would be unfair for a plaintiff to win a default judgment against a defendant who has no idea he or she is being sued. On the other hand, once the defendant has been put on notice of the case, judicial efficiency dictates that the defendant should have an affirmative obligation to stay abreast of anything that pops up on CM/ECF.

That obligation, however, must end with the case. If it did not, then anyone ever named as a party in a judicial proceeding would have to spend the rest of his or her life looking out for new motions in the long-closed case, keeping his or her former adversaries updated with current contact information, and periodically checking the old docket sheet or calling the clerk's office to verify that nothing new has happened. The Court had such a case in 2014. In Macias v. New Mexico Department of Labor, 300 F.R.D. 529 (D.N.M. 2014)(Browning, J.), a group of Spanish-speaking farmworkers in the El Paso, Texas, and Sunland Park, New Mexico, area had banded together and sued the New Mexico Department of Labor ("NMDOL") in 1991. 300 F.R.D. at 533-34. The case had settled in 1992, with the NMDOL agreeing, as a part of the settlement agreement, to keep a claim office open in Sunland Park indefinitely. See 300 F.R.D. at 534. In 2013, however, NMDOL -- now named the New Mexico Department of Workforce Solutions -- filed a motion to reopen the case and exercise an escape clause in the settlement agreement purporting to allow it "'to motion the Court for appropriate relief'" in the event of "'a reduction in funding to NMDOL.'" 300 F.R.D. at 534 (quoting the settlement agreement). NMDOL was unable to locate the plaintiffs and instead served its motion on the attorney, Nancy Simmons, who had represented the plaintiff-farmworkers in 1991 and 1992 in connection with her employment with Texas Rural Legal Aid, Inc. See 300 F.R.D. at 534-37. Ms. Simmons had moved through several different public-interest legal jobs since 1992, and she had not had contact with the plaintiffs -- whom she represented to be itinerant -- in over a decade. See 300 F.R.D. at 534-37. Ms. Simmons argued that she was no longer the plaintiffs' lawyer and that

put the case behind them, and the final judgment -- especially once the twenty-eight day window

of robust district court review and the thirty-day window of appeal have both closed -- is the

disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the

need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A]

federal district court and a federal court of appeals should not attempt to assert jurisdiction over a

case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals

w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount

Co., 459 U.S. 56, 58-59 (1982).  The Court of Appeals needs a fixed record on which to base its

decisions -- especially given the collaborative nature of appellate decisionmaking -- and working

with a fixed record requires getting some elbow room from the district court's continued

interference with the case.  The "touchstone document" for this jurisdictional handoff is the

notice of appeal, and not the final judgment, see Griggs v. Provident Consumer Discount Co.,

---

service on her was inappropriate, but she nonetheless entered "'a special entry of appearance
exclusively for the purpose of challenging subject-matter jurisdiction and personal jurisdiction.'"
300 F.R.D. at 536 (citation omitted).  On the personal jurisdiction issue, Ms. Simmons argued
that NMDOL's motion was a new suit, which required new service of process on the
farmworkers; in the alternative, she argued that, even if the motion was properly styled as a
motion in the 1991 case, she was no longer a proper recipient of even non-process service under
rule 5.  See 300 F.R.D. at 536-37.  She argued that, even if it were fair -- in the context of more
recent cases -- to continue to hold parties accountable for everything posted on CM/ECF, even
years after final judgment, CM/ECF had not existed in the 1990s, and the plaintiffs, thus, most
likely neither knew about the suit nor had any reasonable way of learning about it.  The Court
ultimately denied NMDOL's motion for lack of subject-matter jurisdiction and did not decide
whether sending an electronic mail transmission to Ms. Simmons constituted sufficient service
on the plaintiffs.  See 300 F.R.D. at 571 ("The Court will reserve judgment whether it has
personal jurisdiction over UTAF."  (emphasis omitted)).

   Although the Court did not decide the question because it lacked subject-matter
jurisdiction, it would be unfair to allow former parties to ancient cases to come back, years after
the cases' resolution, and effectively receive ex parte reconsideration of rulings that the opposing
parties and the Court put behind them long ago.  From the parties' perspective, the initial service
of summons and final judgment are the jurisdictional bookends signifying the beginning and end
of their responsibility to be diligently engaged in the case.  The same due process considerations
that give rise to the service-of-process requirement also demand that the case eventually end and
that the parties eventually be set free from their obligations to stay on top of it.

459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that

inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).

> [W]e will depart from the law of the case doctrine in three exceptionally narrow circumstances: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice.

United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(citation omitted).  See Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality or jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.   Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no

bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" (citation omitted)). The Court set forth these factors in Anderson Living Trust v. WPX Energy Prod., No. CIV 12-0040 JB/KBM, 2015 WL 4040616 (D.N.M. June 24, 2015)(Browning, J.).

> First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[10] than when the

---

[10]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework;

---

**Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

(ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

Anderson Living Trust v. WPX Energy Prod., 2015 WL 4040616, at *21-22.

## ANALYSIS

The Court will deny the Motion.  Although M. Lujan has presented some new law and arguments regarding whether he waived his claim that Ms. Maynes was impermissibly biased, the Court remains persuaded that its ruling on the issue in the AMOO is correct.  Although M. Lujan has presented some new argument and new law whether Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds by false pretenses was fraudulent, arbitrary, or capricious, and that substantial evidence supported it, the Court remains convinced that its conclusion on the issue in the AMOO is correct, and will not alter its previous ruling.  As for Court's ruling that the City of Santa Fe had just cause to terminate M. Lujan's employment, although M. Lujan presents some new authority and argument on the Court's authority to remand a case, he has not presented any new authority, evidence, or arguments regarding whether the City of Santa Fe had just cause to terminate his employment.  The Court will therefore leave that ruling intact.  Consequently, the Court will deny the Motion.

## I.   THE COURT WILL NOT ALTER THE AMOO'S HOLDING THAT MS. MAYNES DID NOT ACT ARBITRARILY OR CAPRICIOUSLY WHEN SHE FAILED TO RECUSE HERSELF FROM M. LUJAN'S POST-TERMINATION HEARING.

Because M. Lujan has presented new arguments and new law regarding whether Ms. Maynes acted arbitrarily or capriciously when she failed to recuse herself from M. Lujan's post-termination hearing, the Court will reconsider that portion of its AMOO.  Despite reconsidering this issue, however, the Court will stick with the AMOO's conclusions.  First, the Court will not

alter the AMOO's holding that M. Lujan waived his due process claim by failing to raise it either

in his Complaint or in his Petition for Writ of Certiorari.  Second, the Court will not alter the

AMOO's holding that, even if M. Lujan had included his due process challenge in his Complaint

or in his Petition for Writ of Certiorari, he would not have a valid due process claim.

### A.   THE COURT WILL NOT ALTER THE AMOO'S HOLDING THAT M. LUJAN WAIVED HIS DUE PROCESS CLAIM.

In the AMOO, the Court held that M. Lujan waived his due process claim when he failed

to raise it in either his Complaint or his Petition for Writ of Certiorari.

> The Court of Appeals of New Mexico has liberally construed due-process challenges raised in appeals of administrative decisions as being brought under district courts' original jurisdiction.  See Los Chavez Cmty. Ass'n v. Valencia Cnty., 2012-NMCA-044, ¶ 11 ("The fact that Los Chavez's original appeal to the district court invoked only that court's appellate jurisdiction is not fatal to our analysis."); State v. Roybal, 2006-NMCA-043, ¶ 17, 132 P.3d 598, 605 ("It is the substance of the [pleading], and not its form or label, that controls.").  Where a party fails to mention an issue entirely in either its Complaint or Petition for Writ of Certiorari, however, New Mexico courts will not consider it.  See N.M.R.A Rule 12-505(D)(3) (stating that a petition for a writ of certiorari "shall contain a concise statement showing . . . the questions presented for review by the Court of Appeals; only the questions set forth in the petition will be considered by the Court"); San Pedro Neighborhood Ass'n v. S.F. Cnty. Bd. of Cnty. Cmm'rs, 2009-NMCA-045, ¶ 29, 206 P.3d 1011, 1019 ("The issue now raised was not set forth by either the Board or Applicant in their petitions for certiorari.  We therefore do not consider it.").
>
> Neither M. Lujan's Complaint nor his Writ of Certiorari mentions his due-process challenge to Ms. Maynes' impartiality.  Nor do they allege facts which, taken as true, would constitute a due-process challenge to Ms. Maynes' impartiality.  Instead, M. Lujan raised the issue for the first time in the Appeal Brief.  See Appeal Brief at 1, 13-17.  Consequently, M. Lujan fails to state a due-process claim for which relief can be granted.

AMOO at 55-56.

M. Lujan does not dispute that he failed to raise his due process claim in his Complaint or

in his Petition for Writ of Certiorari.  Nor does he challenge the well-established rule that New

Mexico courts do not consider issues on appeal which were not presented in a petition for a writ

of certiorari.  See N.M.R.A Rule 12-505(D)(3) (stating that a petition for a writ of certiorari "shall contain a concise statement showing . . . the questions presented for review by the Court of Appeals; only the questions set forth in the petition will be considered by the Court"); San Pedro Neighborhood Ass'n v. S.F. Cnty. Bd. of Cnty. Cmm'rs, 2009-NMCA-045, ¶ 29, 206 P.3d 1011, 1019 ("The issue now raised was not set forth by either the Board or Applicant in their petitions for certiorari.  We therefore do not consider it.").  Instead, he likens his due process claim to a jurisdictional issue that can never be waived.  See Motion at 6 ("Because the existence of a conflict divests a hearing officer of jurisdiction, 'a want of jurisdiction can be claimed at any time, even after judgment and for the first time on appeal.'"  (emphasis omitted)(quoting N.M. Livestock Bd. v. Dose, 1980-NMSC-022, 607 P.2d 606)).

While the Court agrees with M. Lujan that jurisdictional challenges can be raised at any time, the Court disagrees that having an impartial hearing officer -- or judge -- is a jurisdictional prerequisite.  Every case which M. Lujan cites supports only the proposition that jurisdictional issues are not subject to waiver.  See Motion at 6 (citing, e.g., Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694 (1982)(holding that a party does not waive subject-matter jurisdiction "by failing to challenge [it] early in the proceedings"); Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373 (9th Cir. 1997)("This is not to say that a defect in jurisdiction can be avoided by waiver or stipulation to submit to federal jurisdiction.  It cannot.")).  M. Lujan has not provided, and the Court has been unable to find, a case in which a court said that it is a jurisdictional prerequisite to have an impartial hearing officer or judge.  The only case which M. Lujan cites that even involves an appeal of an administrative law judge's decision -- Bender v. Clark -- is strictly concerned with whether the Tenth Circuit has jurisdiction to hear an appeal of a district court's remand of a case back to an administrative law judge.  See  744 F.2d at 1426

("We must decide whether a remand order by a federal district court to an administrative agency, in which the agency is directed to apply a legal standard contrary to its usual standard, is a 'final decision' within the meaning of 28 U.S.C. § 1291.").  That case provides no insight into whether a hearing officer's impartiality is a jurisdictional issue.   Moreover, the Court implicitly foreclosed M. Lujan's argument in Kassabji v. Baca by holding that, even if the judge in that case had a conflict of interest, "he had jurisdiction over the case."  2007 WL 505345, at *6. Given that the Court has -- at least implicitly -- already ruled on this issue, and that M. Lujan has presented no authority to support his argument that an impartial hearing officer is a jurisdictional prerequisite, the Court sees no sound reason to alter its holding in the AMOO that M. Lujan waived his due process claim.

> **B.**    **THE COURT WILL NOT ALTER THE AMOO'S HOLDING THAT, EVEN IF M. LUJAN HAD INCLUDED HIS DUE PROCESS CHALLENGE IN HIS COMPLAINT OR IN HIS PETITION FOR WRIT OF CERTIORARI, HE WOULD NOT HAVE A VALID DUE PROCESS CLAIM.**

M. Lujan argues that the AMOO wrongly applied an actual-bias test to his due process claim rather than the correct objective appearance-of-bias test.  See Motion at 8-9.  The Court disagrees.  After reviewing the evidence in the record, the AMOO concluded that, "aside from pointing to her prior representation of the City of Santa Fe, M. Lujan has offered no evidence demonstrating even the appearance of bias."  AMOO at 61.  Consequently, the Court held that it "does not think 'a reasonable person would have serious doubts about whether the hearing officer could be fair.'"  AMOO at 59 (quoting City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16).  The Court applied the identical standard that M. Lujan provided in the Motion and in the Appeal Brief.  See Motion at 8 ("'[W]here a reasonable person would have serious doubts about whether the hearing officer could be fair, it is inappropriate for the hearing officer to hear

- 36 -

the case.'"  (quoting City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16)); Appeal Brief at

16 ("[W]here a reasonable person would have serious doubts about whether the hearing officer

could be fair, it is inappropriate for the hearing officer to hear the case.'"  (quoting City of

Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16)).  Moreover, the Court explained why City of

Albuquerque v. Chavez is inapposite:

> M. Lujan relies primarily on City of Albuquerque v. Chavez.  In that case, the
> petitioner -- Joseph Chavez -- appealed his termination by the City of
> Albuquerque to an independent personnel hearing officer.  See 1997-NMCA-054,
> ¶ 4.  During the hearing, the City of Albuquerque moved to disqualify the hearing
> officer multiple times, because Chavez' attorney -- Paul Livingston -- had
> recently filed suit against the hearing officer in an unrelated matter and continued
> to refer to the lawsuit throughout the hearing.  See 1997-NMCA-054, ¶ 4.  The
> hearing officer: (i) expressed concern for the personal financial impact that the
> suit would have on him; (ii) asked Mr. Livingston to reconsider suing him; and
> (iii) said that Mr. Livingston intimidated him, because he had never been sued.
> See 1997-NMCA-054, ¶ 4.
>
> In spite of these assertions, however, the officer denied each of the City of
> Albuquerque's motions, each time stating that he believed he could be impartial.
> See 1997-NMCA-054, ¶ 4.  After the hearing, the hearing officer recommended
> that the personnel board reverse the City of Albuquerque's decision to terminate
> Chavez and instead reinstate him with a suspension, but did not mention the
> motions to disqualify.  See 1997-NMCA-054, ¶ 5.  The personnel board approved
> the hearing officer's recommendation, and the City of Albuquerque appealed.
> See 1997-NMCA-054, ¶ 6.  The New Mexico Court of Appeals concluded that "a
> reasonable person would have serious doubts about whether the hearing officer
> could be fair in this case," and the hearing officer should have disqualified
> himself.  1997-NMCA-054, ¶ 18.
>
> Unlike in City of Albuquerque v. Chavez, there is no indication that the
> City of Santa Fe or M. Lujan filed suit against Ms. Maynes before the hearing, or
> that Ms. Maynes was concerned in any way about either of the parties' actions
> against her personally.  There is . . . similarly no evidence that Ms. Maynes had a
> personal or financial relationship with either of the parties.  Consequently, City of
> Albuquerque v. Chavez is inapposite.

MOO at 60-61.  Accordingly, the Court rejected M. Lujan's reliance on City of Albuquerque v.

Chavez, because it was factually distinguishable, and not because it applied the wrong standard.

M. Lujan contends that the AMOO's reliance on <u>Flores v. State</u> demonstrates that the Court improperly applied an actual-bias standard rather than an objective appearance-of-bias standard.  <u>See</u> Motion at 9.  M. Lujan's argument is flawed in two respects.  First, <u>Flores v. State</u> did not apply an actual-bias test.  Under more extreme circumstances than were present in this case, <u>Flores v. State</u> held that there was no basis for disqualification, because the facts were "wholly insufficient to establish bias or prejudice, or <u>from which bias or prejudice can reasonably be inferred</u>."  1968-NMCA-017, ¶ 8 (emphasis added).  Accordingly, the Court of Appeals of New Mexico did not say that actual bias was required for recusal, but instead used an objective test by looking to whether the facts gave rise to a reasonable inference of prejudice.  Second, the AMOO did not imply or suggest that <u>Flores v. State</u> applied an actual-bias test; it analogized M. Lujan's situation to that case, because that case concerned when a judge's prior representation of a party could give rise to the appearance of bias.  The Court said:

> The closest analogy to this case is <u>Flores v. State</u>, 1968-NMCA-017, 439 P.2d 565.  In that case, the defendant -- Narisco Flores -- was tried and convicted of armed robbery in a jury trial.  <u>See</u> 1968-NMCA-017, ¶ 1.  Flores sought post-conviction relief, arguing that his due-process rights were violated, because his trial judge -- the Honorable Edward E. Triviz, State District Judge, Dona Ana County, New Mexico -- was impermissibly biased.  <u>See</u> 1968-NMCA-017, ¶ 2.  Flores explained that, in July, 1963, he retained Judge Triviz -- who was then a practicing attorney -- to represent him in a criminal action.  <u>See</u> 1968-NMCA-017, ¶ 3.  Although the case against Flores was dismissed, he never paid Judge Triviz his full fee.  <u>See</u> 1968-NMCA-017, ¶ 3.  A month later, Flores asked Judge Triviz to represent him in another criminal case, but he refused because Flores still had not paid him.  <u>See</u> 1968-NMCA-017, ¶ 4.  Judge Triviz had no further contact with Flores until his armed-robbery trial in December, 1966.  <u>See</u> 1968-NMCA-017, ¶ 4.  Flores argued that, because he was indebted to Judge Triviz for the unpaid attorney's fee, and because Judge Triviz had "personal knowledge of the defendant," it was impossible for him to preside impartially at his trial.  1968-NMCA-017, ¶ 6.  The Court of Appeals of New Mexico disagreed, reasoning that the events for which Judge Triviz represented Flores in 1963 "had no connection whatsoever" with the issues in the trial presided over which he presided in 1966.  1968-NMCA-017, ¶ 9.

Although the analogy is not perfect -- because Ms. Maynes was a hearing officer rather than a judge -- the Court of Appeals of New Mexico's reasoning in Flores v. State applies with equal force here. Similar to Judge Triviz, who represented Flores once three years before his trial, Ms. Maynes has represented parties associated with the City of Santa Fe twice over her thirty-year career. In 2005, Maynes represented the Grievance Review Board -- which is comprised of three Santa Fe residents who were not municipal employees or officers -- in Archuleta v. Santa Fe Police Department. See Petitioners-Appellees' Joint Brief-In-Chief (cover page) at 1, filed October 15, 2013 (Doc. 40-1)("Brief"). Separate counsel represented the City of Santa Fe. See Brief at 1. In 2007, the City of Santa Fe's insurance carrier retained Ms. Maynes for an unrelated employment case that was dismissed in 2008. See Elaine Aragon v. State of New Mexico, No. CIV 07-01234 RLP/LFG (D.N.M.). Ms. Maynes' law firm -- Miller Stratvert -- is also currently representing a plaintiff in a lawsuit against the City of Santa Fe regarding its telecommunications ordinance. See Qwest Corp. v. City of Santa Fe, No. CIV 10-617 RB/KBM (D.N.M.). There is no evidence that the two prior cases in which Ms. Maynes represented parties associated with the City of Santa Fe have any connection to the issues in M. Lujan's personnel hearing. There is similarly no indication that either Maynes or her law firm expect to represent the City of Santa Fe again in any future matters. M. Lujan has not provided -- and the Court has not found -- any remarks that Ms. Maynes made before, after, or during the hearing that would indicate any potential bias on her part. Consequently, Ms. Maynes had even less of a reason to be biased towards the City of Santa Fe than Judge Triviz was against Flores, because, unlike Judge Triviz -- who could have still been upset that Flores never fully compensated him for his services -- there is no evidence that Ms. Maynes' connection to the City of Santa Fe lasted after her brief period of representation.

AMOO at 57-59. The Court never said that actual bias was required or that Flores v. State set forth an actual-bias standard; instead, it looked to whether there was any evidence indicating even a reasonable inference that Ms. Maynes was biased and found that no such evidence existed. M. Lujan's argument that the AMOO improperly relied on Flores v. State is therefore unpersuasive.

M. Lujan asserts that Caperton v. A.T. Massey Coal Co. is more analogous to this case than Flores v. State. See Motion at 9-10. In that case, Don Blankenship -- the head of a coal company which had just lost a fifty-million-dollar jury verdict that it planned to appeal -- donated three million dollars to support the election of a candidate for the Supreme Court of

West Virginia.  <u>See</u> 556 U.S. at 872-73.  Blankenship's three-million-dollar donation was more than all of the candidates' other donations combined, and three times the amount that the candidate's own election committee spent.  <u>See</u> 556 U.S. at 873.  In opinion which the Honorable Anthony M. Kennedy, Associate Justice of the Supreme Court, authored, and Justices Stevens, Souter, Ginsburg, and Breyer, joined, the Supreme Court of the United States  held that the state supreme court justice's failure to recuse himself from hearing the coal company's appeal violated the opposing party's due process rights.  <u>See</u> 556 U.S. at 884.  Justice Kennedy said that there is "a serious risk of actual bias . . . when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising or directing the judge's election campaign when the case was pending or imminent."  556 U.S. at 884.  Accordingly, Justice Kennedy held that due process requires that "a judge must recuse himself when he has a direct, personal, substantial, pecuniary interest in a case."  556 U.S. at 874.  Justice Kennedy went to great pains, however, to stress that it was an "extreme," 556 U.S. at 887, "exceptional," 556 U.S. at 884, and "extraordinary" case, 556 U.S. at 887, and noted that the "[a]pplication of the constitutional standard implicated in this case will . . . be confined to rare instances,"  556 U.S. at 884.

Although M. Lujan says that "[i]n the instant case the City had a significant and disproportionate influence in placing Ms. Maynes on the case as the hearing officer," Motion at 9, he does not cite any authority or evidence in the record to support this assertion.  Presumably, M. Lujan is referring to rule 7.51(A) of the City of Santa Fe's Personnel Rules, which states that "[t]he Human Resources Director shall appoint a hearing officer" to preside over post-termination hearings.  City of Santa Fe Personnel Rules at 28, filed May 23, 2013 (Doc. 8-13)("Personnel Rules").  In other words, M. Lujan argues that anyone whom the City of

Santa Fe appoints will be impermissibly biased in a case involving the City of Santa Fe, because of the city's "significant and disproportionate influence" in deciding who serves as the hearing officer.  Motion at 9.  It is unclear if M. Lujan is relying on Caperton v. A.T. Massey Coal Co. to advance a due process claim under the New Mexico Constitution or under the federal constitution.  Either way, his argument is unpersuasive.

To the extent that M. Lujan relies on Caperton v. A.T. Massey Coal Co. to advance a due process claim under the New Mexico Constitution, the Court of Appeals of New Mexico has already foreclosed his argument.  In Las Cruces Professional Fire Fighters v. City of Las Cruces, 1997-NMCA-031, 938 P.2d 1284, the plaintiff was a firefighters union which sought to invalidate a city ordinance that prohibited union activities on city property during business hours.  See 1997-NMCA-031, ¶¶ 2-4.  After the union's claim was successful before both the administrative board and the State District Court, the City of Las Cruces appealed the decision to the Court of Appeals of New Mexico.  See 1997-NMCA-031, ¶ 4.  The City of Las Cruces argued -- as M. Lujan argues here -- that the proceeding before the administrative board was defective, because one board member was impermissibly biased, given that he was a union appointee.  See 1997-NMCA-031, ¶ 21.  The Court of Appeals of New Mexico rejected that argument, noting that the solitary fact that union interests appointed the board member was insufficient to disqualify him.  See 1997-NMCA-031, ¶ 29.  The Honorable Harris L. Hartz, then-Chief Judge of the Court of Appeals of New Mexico, now-United States Circuit Judge for the Tenth Circuit, said that, "[e]ven if he had previously expressed support for aggressive unionization of the public sector, he would not be disqualified.  Members of tribunals are entitled to hold views on policy, even strong views, and even views that are pertinent to the case before [them]."  1997-NMCA-031, ¶ 29.  Echoing the Court's concerns in the AMOO, Judge Hartz said

that a panel member is not required to recuse himself just because his "prior conduct . . . indicates a view that would favor one party or the other.  If that were the law, no judge could sit on a case after rendering a decision in a similar case."  1997-NMCA-031, ¶ 23.  The Court of Appeals of New Mexico reached a similar conclusion in Kmart Properties, Inc. v. Taxation & Revenue Department of New Mexico, 2006-NMCA-026, ¶ 2, 131 P.3d 27 ("It is well-established that due process is not violated by having hearing officers who are employed by an agency adjudicating cases in which that agency is a party."), rev'd on other grounds, 2006-NMSC-006, 131 P.3d 22.

M.  Lujan's reliance on Caperton v. A.T. Massey Coal Co. to advance a federal due process claim is similarly unavailing.  The cases that the Supreme Court in Caperton v. A.T. Massey Coal Co. cited as examples of impermissible bias involved two sets of situations.  The first category consisted of cases where a judge had a financial interest in the case's outcome.  See 556 U.S. at 877-79.  For example, in one case, the mayor of a village had authority to sit as a judge and received a salary supplement based on the fines he assessed.  See Caperton v. A.T. Massey Coal Co., 556 U.S. at 878 (citing Ward v. Monroeville, 409 U.S. 57 (1972)).  In another case, a justice casting the deciding vote to uphold a punitive damages award against an insurance company for bad faith was, at the time he cast his vote, the lead plaintiff in a "nearly identical suit" pending in his state's lower courts.  Caperton v. A.T. Massey Coal Co., 556 U.S. at 879 (citing Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986)).  The Supreme Court also pointed to Gibson v. Berryhill, 411 U.S. 564 (1973), in which a licensing board composed of optometrists had a pecuniary interest of "'sufficient substance'" so that it could not preside over a hearing against competing optometrists.  Caperton v. A.T. Massey Coal Co., 556 U.S. at 878-79 (quoting Gibson v. Berryhill, 411 U.S. at 567).

The second category consisted of cases arising in the criminal contempt context, where a judge had no pecuniary interest in the case, but was challenged because of a conflict arising from his participation in an earlier proceeding.  See Caperton v. A.T. Massey Coal Co., 556 U.S. at 880-81.  In one case -- In re Murchison, 349 U.S. 133 (1955) -- the Supreme Court described the challenged judge's participation in the earlier proceeding as a "'one-man grand jury.'"  349 U.S. at 133.  In the earlier proceeding, a judge examined witnesses to determine whether charges should be brought.  See 349 U.S. at 134.  The judge became convinced that one of the witnesses had committed perjury, charged him with perjury, and ordered him to appear and show cause why he should not be punished for criminal contempt.  See 349 U.S. at 134.  The second witness refused to answer questions based on his entitlement, under state law, to have counsel present.  As a result of the witness' refusal to answer questions, the judge also charged him with criminal contempt and ordered him to appear and show cause.  See 349 U.S. at 134.

At the subsequent proceeding, the same judge who had charged the two witnesses with criminal contempt presided over their trial for criminal contempt.  See 349 U.S. at 134.  The judge declined to recuse himself, despite the two defendants' objections to him presiding over the trial.  See 349 U.S. at 136.  Under those circumstances, the Supreme Court found that the judge's decision to preside over the criminal contempt trial violated due process, because "[i]t would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations."  349 U.S. at 137.

Thus, as the Supreme Court has admonished, only in "extreme" and "exceptional" cases will a risk of bias render a proceeding in front of that judge unconstitutional on due process grounds.  Caperton v. A.T. Massey Coal Co., 556 U.S. at 887 ("This Court's recusal cases are illustrative.  In each case the Court dealt with extreme facts that created an unconstitutional

probability of bias."). This case is neither extreme nor exceptional. Unlike the mayor in Ward v. Monroeville, who was impermissibly biased because he received a salary supplement based on the fines he assessed, or the optometrists in Gibson v. Berryhill, who were impermissibly biased because they were deciding whether to grant licenses to competing optometrists, M. Lujan has not established that Ms. Maynes had a financial stake in his case's outcome. M. Lujan has presented no evidence suggesting that Ms. Maynes would profit or benefit in any way from upholding the City of Santa Fe's decisions in M. Lujan's case. As the Court observed in the AMOO, "[t]here is similarly no indication that either [Ms.] Maynes or her law firm expect to represent the City of Santa Fe again in any future matters." AMOO at 59. Further, unlike the state supreme court justice in Caperton v. A.T. Massey Coal Co., whose campaign received a sizeable donation from a party whose case would soon be before the court, there is no indication that Ms. Maynes has ever run for any elected position or plans to run for any elected position. For these reasons, Caperton v. A.T. Massey Coal Co. does not require the Court to alter its decision in the AMOO that Ms. Maynes was not impermissibly biased when she served as M. Lujan's administrative hearing officer.

M. Lujan also attacks the AMOO's observation that his proposed impermissible-bias standard -- under which an attorney who represented the City of Santa Fe twice over her thirty-year career cannot serve as an administrative hearing officer -- is unworkable. See Motion at 14. The AMOO noted that

> New Mexico has a relatively small legal community. Judges and attorneys alike have worked in a variety of positions on both sides of the aisle. Defense attorneys regularly come before the Court who have previously worked as prosecutors and vice versa. The Court worked primarily as a civil defense attorney for many years before primarily doing plaintiffs' work, and also served as Deputy Attorney General for the State of New Mexico. If the Court were to adopt M. Lujan's proposed rule, it would have to recuse itself from any case in which the State of New Mexico or any prior client is a party, leaving the Court with a significantly

smaller caseload and placing a greater burden on its colleagues.  In the same way, some judges in this District have previously served as Assistant United States Attorneys for United States Attorney's Office for the District of New Mexico. Under M. Lujan's proposed rule, all of those judges would have to recuse themselves from every criminal case brought by AUSAs from this District. Nearly every judge in this District has worked for the federal government, the state government, or a municipal body.  To force every one of those judges to recuse themselves from every case involving a former employer would likely make the administration of justice in this District far more difficult and less efficient.  There is no reason to think that the effects among hearing officers would be any less drastic.

Moreover, there is no evidence that such a costly rule would carry an equivalent benefit -- or any benefit at all.  M. Lujan has not provided -- and the Court has not found -- any evidence of widespread misconduct or decisions among State Court judges, federal judges, or administrative hearing officers who were improperly motivated by their personal biases.  The Court regularly interacts with attorneys and judges alike who serve at all levels of municipal, state, and federal government, and sees that those individuals are all more than capable of compartmentalizing their prior clients or cases from their current ones.  The Court sees no reason to impose such a draconian rule without any evidence of an accompanying benefit.

AMOO at 61-62.  M. Lujan does not challenge the Court's characterization of his proposed rule.

Nor does he offer a limiting principle that would allow the Court to avoid recusal in cases involving its former clients, like the State of New Mexico.  Instead, M. Lujan provides only a list of three retired judges who would pass his impermissible-bias test in his case without explaining why.  See Motion at 14.  Accordingly, after re-reading the AMOO, the Court remains convinced that M. Lujan's proposed rule is unworkable.

When pressed at the hearing about the limits of his proposed impermissible-bias rule, M. Lujan finally said that whether recusal is required turns on "the facts and the circumstances" of each case, Tr. at 7:1-2 (Thompkins), and suggested that courts look to the following factors to determine if recusal is warranted:

How recent was [the prior representation]?  Is there an ongoing or a possible ongoing relationship that could be had from the hearing officer's perspective which he believed that if she took this work or rendered her decision, it would

- 45 -

> prohibit them from coming back to her and hiring her as a hearing officer again,
> or even doing her work?  Would a reasonabl[y] prudent person believe that those
> would be factors that the hearing officer might weigh in her mind as reasons to
> render a decision one way or another?

Tr. at 20:4-16 (Thompkins).  Even if the Court credits these factors -- for which M. Lujan has provided no authority -- they do not dictate a different result in this case.  Aside from noting that Ms. Maynes' representation of the City of Santa Fe -- which occurred four years before she served as M. Lujan's hearing officer -- was too recent to avoid impermissible bias, M. Lujan does not provide a specific timeframe for his first factor or explain why four years was too short of a gap for her to avoid the appearance of bias.  The Court sees no reason why a four-year gap between Ms. Maynes' prior representation of the City of Santa Fe and her serving as M. Lujan's hearing officer would lead her to be impermissibly biased.  If anything, that so much time elapsed with Ms. Maynes not representing the City of Santa Fe underscores how tenuous their relationship was.  As to M. Lujan's second factor -- the existence of "an ongoing or a possible ongoing relationship" between the hearing officer and the party -- there is no evidence that either Ms. Maynes or her firm has an ongoing relationship with the City of Santa Fe or that either of them expects to establish a relationship in the future.  The City of Santa Fe said at the hearing that, not only does it not have an ongoing relationship with Miller Stratvert, the firm is presently litigating a lawsuit against the City of Santa Fe.  See Tr. at 15:15-19 (Roman); id. at 17:4-12 (Court, Roman).  M. Lujan's final factor -- "[w]ould a reasonabl[y] prudent person believe that those would be factors that the hearing officer might weigh in her mind as reasons to render a decision one way or another" -- is similarly unhelpful to his cause.  For one, M. Lujan misstates the Court of Appeals of New Mexico's impermissible-bias standard, which is whether "a reasonable person would have serious doubts about whether the hearing officer could be fair." City of Albuquerque v. Chavez, 1997-NMCA-054, ¶ 16 (emphasis added).  Moreover, a

reasonable person would not believe that representing a client twice in thirty years -- especially

absent an ongoing attorney-client relationship -- would lead an attorney to decide in that client's

favor.  Consequently, even applying M. Lujan's proposed impermissible-bias standard does not

lead the Court to alter the AMOO's holding that Ms. Maynes was not impermissibly biased.

## II.     THE COURT WILL NOT ALTER THE AMOO'S HOLDINGS THAT MS. MAYNES' DECISION THAT M. LUJAN ATTEMPTED TO OBTAIN CITY OF SANTA FE FUNDS WAS NOT FRAUDULENT, ARBITRARY, OR CAPRICIOUS AND THAT SUBSTANTIAL EVIDENCE SUPPORTED IT.

M. Lujan argues that the evidence in the record does not show that he attempted to steal

City of Santa Fe funds.  See Motion at 17-21.  M. Lujan contends that he never "actually

attempted to submit expenses to the City for reimbursement," and that the City of Santa Fe, Ms.

Maynes, and the Court have all misinterpreted the electronic-mail transmissions between him

and his brother.  Motion at 17-21.  In M. Lujan's view, he "refuted every e-mail from Larry

Lujan and does not, in any instance, confirm the existence of a scheme to fraudulently obtain

funds from the City of Santa Fe."  Motion at 20.  M. Lujan made a similar argument in the

Appeal Brief, see Appeal Brief at 17-20, 23, and the Court addressed his argument in detail in

the AMOO, see AMOO at 65-71.  The Court explained:

> The electronic-mail transmissions between M. Lujan and his brother demonstrate that their plan was to double-bill the City of Santa Fe for the 2012 Grand Nationals Tournament program advertisements.  L. Lujan wanted to use the City of Santa Fe's sponsorship to cover a number of his and his brother's personal expenses:
>
> | Ncaa ticket- | $450 |
> | Room ½- 703- | $350 |
> | Car rental 185- | $92.50 |
> | your airline- | $450 |
> | | |
> | total- | $1342.50 |
>
> L. Lujan's 3rd June 19, 2012, E-mail at 8.  Consequently, he sent his brother an invoice for $6,320.00 -- which, after reimbursing the SFJWA for the $5,000.00

tournament-hosting fee, was just $22.50 short of covering their expenses.  See $6,320 Invoice at 1.  Remembering that Rodarte had only authorized $6,000.00 for the sponsorship, M. Lujan responded that "[t]he PO" -- or purchase order -- "is for 6k."  M. Lujan's 1st June 19, 2012, E-mail at 8.  M. Lujan wanted to make sure, however that his brother's personal expenses were fully reimbursed, so he replied: "Cost is the same in order to get u your full reimbursement."  L. Lujan's 2nd June 19, 2012, E-mail at 8.  The Lujan brothers then went back and forth about which of their personal expenses the City of Santa Fe's sponsorship would cover, and M. Lujan clarified that they "went from the 5k to 6k" -- i.e., increased the sponsorship from $5,000.00 to $6,000.00 -- to "cover the $450. reimbursement on ticket" -- i.e., the NCAA ticket.  M. Lujan's 1st June 20, 2012, E-mail at 8.

Although the $6,000.00 sponsorship "cover[ed] the $450 reimbursement on ticket" -- i.e., the NCAA ticket -- it did not cover the cost of a flight to Florida. M. Lujan's 1st June 20, 2012, E-mail at 8.  M. Lujan acknowledged, however, that the $6,000.00 sponsorship did not include the back-cover advertisement for the 2012 tournament -- which could cover the cost of the flight.  M. Lujan's 1st June 20, 2012, E-mail at 8 ("Back cover was not included but you did mention that it we purchased it would cover air to Florida.").  M. Lujan then indicated his disappointment that the $6,000.00 sponsorship would not cover the cost of the flight when he said: "Doesn't look like that is happening soo I guess its not an issue."  M. Lujan's 1st June 20, 2012, E-mail at 8.

L. Lujan did not want to miss an opportunity to cover the cost of the flight, so he responded: "I think back cover is an issue, I was going to add your FL ticket to cover your expense NOT just your ticket but the cost of AD.  Lets meet and discuss this issue, we gave up this to AD space to help you out not lose money." L. Lujan's 1st June 20, 2012, E-mail at 8.  In other words, L. Lujan does not want SFJWA to "give up" -- or donate -- the advertisements to the City of Santa Fe without his brother receiving his full reimbursement.  Accordingly, L. Lujan added a new $750.00 Invoice to the original $6,000.00 Invoice, and he and his brother routed the $750.00 Invoice through Clarissa Lovato at Elevate Media.  L. Lujan had already suggested that this arrangement might be a possibility when he said in an electronic-mail transmission to this brother: "[U]nless we make up difference with clarissa paying difference?  let me know and I will chg invoice." L. Lujan's 3rd June 19, 2012, E-mail at 8.  That is exactly what the brothers did -- they "ma[d]e up" the remainder of their personal expenses by having Lovato bill the City of Santa Fe as if Elevate Media had placed an advertisement in the tournament program on the City of Santa Fe's behalf.  Taken together, these facts demonstrate that Ms. Maynes' conclusion that "Martin Lujan attempted to obtain City funds under false pretenses," Decision ¶ 8, at 30, is not fraudulent, arbitrary, or capricious, and that substantial evidence supports it.

M. Lujan asserts that he did not read his brother's June 20, 2012, E-mail, and could not open the file that contained the $750.00 Invoice.  See Dec. 3, 2012,

Hearing Tr. at 1072:20-1073:14 (M. Lujan, Allen). Yet he still forwarded both invoices to J. Romero for processing and payment. See M. Lujan's 3rd June 20, 2012, E-mail at 14. J. Romero then forwarded the $750.00 Invoice to Lovato, stating: "Invoice for ad placement sfjr. wrestling." J. Romero's June 20, 2012, E-mail at 14. Lovato then faxed a $750.00 invoice from Elevate Media for an advertisement in the 2012 Grand Nationals Tournament program to M. Lujan to receive payment from the City of Santa Fe. See Nov. 7, 2012, Hearing Tr. at 559:5-8 (Lovato, Thompkins). Consequently, M. Lujan -- through J. Romero and Lovato -- submitted the fraudulent $750.00 invoice to the City of Santa Fe. That Lovato rescinded the $750.00 invoice before the City of Santa Fe paid it does not change the fact that she fraudulently submitted the invoice for processing.

The electronic-mail transmissions between M. Lujan and J. Romero, and J. Romero and Lovato after Rodarte asked M. Lujan for an itemized breakdown of the expenses that the $6,000.00 purchase order covered belie M. Lujan's contention that he did not read the body of his brother's electronic-mail transmission and could not open the file containing the $750.00 Invoice. At 4:38 p.m. on Friday, June 29, 2012, Rodarte asked M. Lujan for an itemized breakdown of the expenses that the $6,000.00 purchase order for SFJWA would cover. See Rodarte's June 29, 2012, E-mail at 20. The following Monday morning -- July 2, 2012 -- at 7:17 a.m., M. Lujan sent an electronic-mail transmission to J. Romero, stating: "Good Morning Jenn . . . lets hold on Clarissa june invoice until I get to office. Hope it's not too late. See you in a bit." M. Lujan's July 2, 2012, E-mail at 27. Then, one minute later, at 7:18 a.m., Lovato sent an electronic-mail transmission to J. Romero concerning Elevate Media's $750.00 invoice, in which Lovato stated: "Just realized that the invoice I faxed on Friday is not correct. Call me with questions." Lovato's July 2, 2012, E-mail at 29. When R. Romero asked J. Romero and Lovato for a copy of Elevate Media's $750.00 invoice, they both, coincidentally, said that they had deleted it. See Nov. 7, 2012, Hearing Tr. at 372:16-373:1 (R. Romero, Allen); id. at 373:13-373:15 (R. Romero, Allen); id. at 374:20-23 (R. Romero, Allen). To this day, M. Lujan has not provided an explanation for his or Lovato's coincidentally timed electronic-mail transmissions to J. Romero on the morning of July 2, 2012. Instead, the evidence demonstrates that "Martin Lujan's communications to Jennifer Romero and Clarissa Lovato on or around July 2, 2012 to 'hold off on' the original Elevate Media June 2012 Invoice were for the purpose of concealing his attempt to obtain additional City funds . . . ." Decision ¶ 46, at 27.

M. Lujan also argues that Rodarte's initial approval of the $6,000.00 purchase order and later revocation of it, demonstrates that "it was his fault and there was no allegation that Lujan had fraudulently submitted invoices." Appeal Brief at 19. The evidence in the record shows, however, that it was not Rodarte's job to confirm whether the City of Santa Fe received the goods or services that it purchased; that was M. Lujan's responsibility. See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); id. at 69:25-70:3 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1027:9-14 (M. Lujan, Allen). There is thus no support for M. Lujan's

contention that Rodarte was responsible for M. Lujan's misconduct because he initially approved the $6,000.00 purchase order.

Second, that M. Lujan never submitted any of the expenses listed in his brother's June 20, 2012, E-mail for reimbursement also does not dictate a different result. The City of Santa Fe never alleged that M. Lujan submitted his personal expenses for reimbursement, and Ms. Maynes' did not reach such a conclusion in the Decision. Instead, both the City of Santa Fe and Ms. Maynes relied on the fact that M. Lujan submitted the $750.00 Invoice and the $6,000.00 Invoice under the pretext of the 2012 Grand Nationals Tournament sponsorship in the hopes of having his personal expenses reimbursed. See Decision ¶ 8, at 30 ("Martin Lujan attempted to obtain City funds under false pretenses, specifically, by authorizing payment of two submitted invoices . . . to reimburse or pay Martin Lujan's personal expenses through the Santa Fe Junior Wrestling Association, via its Treasurer, Martin Lujan's brother Larry Lujan."). Consequently, M. Lujan's contention that he did not submit personal expenses for reimbursement does not indicate that Ms. Maynes' conclusion that "Martin Lujan attempted to obtain City funds under false pretenses," Decision ¶ 8, at 30, is not fraudulent, arbitrary, or capricious, and substantial evidence supports Ms. Maynes' conclusion.

AMOO at 66-71.

In a recent opinion, the Court listed three factors that it should use in considering the standard to use in addressing a motion to reconsider:

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d [1217,] 1225 [(10th Cir. 2007)]("[T]he [law of the case] doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" (citation omitted)). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction, than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the

Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does[, 204 F.3d 1005 (10th Cir. 2000),] grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

Anderson Living Trust v. WPX Energy Prod., LLC, 2015 WL 4040616, at *21-22. Under this framework, the Court will decline M. Lujan's invitation to give a full, in-depth new look into its ruling on this issue.

The first factor -- how thoroughly the Court considered the challenged issue -- weighs heavily against granting M. Lujan's request. The Court thoroughly considered whether Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds by false pretenses is fraudulent, arbitrary, or capricious, and whether substantial evidence supports the decision. After a comprehensive review of the evidence in the administrative hearing record and M.

Lujan's arguments, the Court upheld Ms. Maynes' decision.  Accordingly, this factor weighs in favor of giving a less comprehensive review of its prior decision.

The second factor -- the case's overall progress and posture -- is neutral.  The Court has not litigated any of M. Lujan's remaining claims and the AMOO does not seem to have dramatically changed the parties' litigation strategy, given that M. Lujan's remaining claims do not turn on the Court's resolution of the issues in the AMOO.  It does not appear that granting any of M. Lujan's request would have a significant prejudicial effect on the City of Santa Fe, because trial is still a long way down the road.  Accordingly, this factor is neutral.

The third factor -- whether there is new law or evidence, and whether there is a clear indication that the Court erred -- also weighs in favor of the Court giving a less comprehensive review of its prior decision.  M. Lujan does not direct the Court to a case or statute that was decided or passed in between the time the Court ruled on the Appeal Brief and the time M. Lujan filed the Motion.  Finally, M. Lujan does not present any evidence on this ruling to show that the Court clearly erred in its decision.  To be sure, M. Lujan presents a few new cases which set forth the proposition that attempt requires both "an intent to commit the substantive offense," and "the commission of an act which constitutes a substantial step towards the commission of the substantive offense" -- a proposition with which the Court has no qualms.  Motion at 16 (quoting United States v. Washington, 653 F.3d 1251, 1264 (10th Cir. 2011))(internal quotation marks omitted)(citing United States v. Irving, 665 F.3d 1184, 1195 (10th Cir. 2011); United States v. Gordon, 710 F.3d 1124 (10th Cir. 2013)).  Aside from offering some new authority, however, the Motion reiterates the same position that M. Lujan advances in the Appeal Brief -- that Ms. Maynes misinterpreted the electronic mail transmissions between him and his brother as setting forth a plan to steal City of Santa Fe funds when, in M. Lujan's view, "there was nothing in the

e-mail exchanged that established an agreement . . . to get [M.] Lujan reimbursed through the PO or SFJWA's contract with the City for the 2012 Tournament."  Appeal Brief at 26.  Although the AMOO did not address M. Lujan's new authority, it rejected his interpretation of the electronic mail transmissions between him and his brother, and agreed with Ms. Maynes' interpretation that those electronic mail transmissions -- combined with M. Lujan's submission of the fraudulent $750.00 invoice to J. Romero for processing and payment -- exhibited the Lujan brothers' scheme to cover "the remainder of their personal expenses by having Lovato bill the City of Santa Fe as if Elevate Media had placed an advertisement in the tournament program on the City of Santa Fe's behalf."  AMOO at 68.  Accordingly, the Court is inclined to give the Motion a less comprehensive review than the Court gave the Appeal Brief.

Addressing the crux of M. Lujan's argument -- that he did not attempt to obtain City of Santa Fe funds under false pretenses -- the same facts on which the Court relied in the AMOO satisfy attempt under the cases which M. Lujan cites.   "The electronic-mail transmissions between M. Lujan and his brother demonstrate that their plan was to double-bill the City of Santa Fe for the 2012 Grand Nationals Tournament program advertisements," AMOO at 66 -- thus demonstrating M. Lujan's "intent to commit the substantive offense," United States v. Washington, 653 F.3d at 1264.  M. Lujan also forwarded the fraudulent $750.00 invoice to J. Romero for processing and payment, see AMOO at 68 -- which was "an act which constitutes a substantial step towards the commission of the substantive offense," United States v. Washington, 653 F.3d at 1264.  Accordingly, the Court will not revise the AMOO's holding that Ms. Maynes' interpretation of M. Lujan's electronic mail transmissions and actions as setting forth and attempting to execute a scheme to cover "the remainder of their personal expenses by having Lovato bill the City of Santa Fe as if Elevate Media had placed an advertisement in the

- 53 -

tournament program on the City of Santa Fe's behalf," was not fraudulent, arbitrary, or capricious, and that substantial evidence supported her decision.  AMOO at 68.  The Court has re-read its findings of fact in full, and its analysis of the issue, and remains convinced that Ms. Maynes' and the Court's decisions are sound.  Both Ms. Maynes and the Court reached the same conclusions, and M. Lujan has not presented any arguments, evidence, or authority to persuade the Court that it should alter those conclusions.  Accordingly, the Court will not alter its ruling that Ms. Maynes' decision that M. Lujan attempted to obtain City of Santa Fe funds by false pretenses was not fraudulent, arbitrary, or capricious, and that substantial evidence supports it.

## III.    THE COURT WILL NOT ALTER THE AMOO'S DECISION THAT JUST CAUSE EXISTED FOR THE CITY OF SANTA FE TO TERMINATE M. LUJAN'S EMPLOYMENT.

M. Lujan argues that the Court should remand this case to the City of Santa Fe for further consideration of a less drastic punishment, because the Court reversed three of Ms. Maynes' decisions in the AMOO.  See Motion at 23.  Aside from providing a collection of authority on appellate courts' authority to remand cases to lower courts -- a proposition with which the Court has no qualms -- M. Lujan does not provide any new arguments, evidence, or authority why the Court should alter the MOO's holding that the City of Santa Fe had just cause to terminate his employment.  The Court thoroughly addressed this issue in the AMOO:

> Ms. Maynes concluded that there was just cause for M. Lujan's termination under four different provisions of the City of Santa Fe's personnel rules:
>
>> There was "just cause" for Martin Lujan's dismissal in the record to conclude that Martin Lujan's acts, statements and intent violated subsections of Section 7.50(E):
>>
>>> (2)    Careless, negligent or improper use of City property,   equipment or funds;
>>>
>>> (7)    Stealing from the City or from other employees;

> (10)    Intentional falsification or mishandling of
>           City records; . . . and
>
> (13)    action which reflects poorly upon the
>           integrity of the City Santa Fe [sic].

Decision ¶ 9, at 29.  Moreover, Ms. Maynes said that, even if

> it is determined in any subsequent review of this decision that § (7)
> of Section 7.50(E), "Stealing from the City", does not include
> statements showing an intent to steal, then there was sufficient
> evidence to support Martin Lujan's termination for just cause
> based on §§ (2) "Careless, negligent or improper use of City
> funds", (10) "Intentional falsification or mishandling of City
> records" and (13) action which reflects poorly upon the integrity of
> the City of Santa Fe.

Decision ¶ 10, at 29.  Accordingly, it is not fatal to her "just cause" determination
that her conclusions that M. Lujan stole City of Santa Fe funds, and that M. Lujan
carelessly, negligently, or improperly misused City of Santa Fe funds, were
arbitrary, capricious, and substantial evidence did not support them.  Instead, it is
sufficient that M. Lujan's actions "reflect poorly upon the integrity of the City of
Santa Fe."  § 7.50(E)(13), City of Santa Fe's Personnel Rules.

     The sixth issue that M. Lujan raises in the Appeal Brief is "[w]hether just
cause existed for Lujan's dismissal from employment under the City of Santa Fe
Personnel Rules/Regulations and Policies," but M. Lujan does not address this
issue in the corresponding section of his brief.  Appeal Brief at 2, 22-23.  Instead,
he makes the following conclusory statements about the sufficiency of the
evidence on which Ms. Maynes relied: (i) "there is no evidence of conspiracy,
theft or negligence," Appeal Brief at 22; (ii) "the evidence submitted by the City
is insufficient to prove fraud," Appeal Brief at 22; and (iii) "the evidence and
testimony is insufficient to show that Lujan stole funds from the City because the
City never paid the PO or paid any money to either the SFJWA or the AAU
Grand National," Appeal Brief at 23.

     "The question of whether an employee's action constituted misconduct so
as to provide 'just cause' for the discipline of a state employee is a question of
fact to be determined from all the attendant circumstances in each case."  Romero
v. Employment Sec. Dep't, 1984-NMCA-111, 691 P.2d 72, 75.  Just cause to
terminate exists "when an employee engages in behavior inconsistent with the
employee's position and can include, among other things, incompetency,
misconduct, negligence, insubordination, or continuous unsatisfactory
performance."  Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 15
(citation omitted)(internal quotation marks omitted).

M. Lujan was the Municipal Recreation Complex Administrative Manager from approximately January, 2010, until the City of Santa Fe terminated his employment on August 14, 2012.  See Nov. 6, 2012, Hearing Tr. at 49:16-20 (Pino, Allen); Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins).  M. Lujan also held the position of Interim Division Director for the City's Recreation Division from October 9, 2010, through August 14, 2012.  See Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins).  In those capacities, M. Lujan was responsible for helping create and manage a multimillion-dollar budget.  See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1029:4-10 (M. Lujan, Allen).  M. Lujan was also responsible for reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those purchases.  See Nov. 6, 2012, Hearing Tr. at 49:13-50:24 (Pino, Allen); id. at 69:25-70:3 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1027:9-14 (M. Lujan, Allen).  M. Lujan authorized the payments for most of the City of Santa Fe's purchases by signing them.  See Nov. 6, 2012, Hearing Tr. at 50:21-24 (Pino, Allen).  Given these duties, M. Lujan had a responsibility to manage the City of Santa Fe's funds with honesty and integrity, set an example to his subordinates, and maintain the public's trust in the City of Santa Fe.  Because of his misconduct, he failed on all counts.

As the City of Santa Fe points out, M. Lujan's misconduct "involved grave violations of public trust."  Response at 33.  Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 19 ("Our cases have also expressly noted that supervisory staff clearly affect the efficiency of the agency and serve as examples for subordinates."  (citation omitted)(internal quotation marks omitted)).  The intentional falsification or mishandling municipal records for the purpose of stealing municipal funds is the kind of serious intentional misconduct that justifies termination.  See, e.g., Montoya v. City of Albuquerque, 1982-NMSC-056, ¶ 4, 644 P.2d 1035, 1036 (agreeing with the City of Santa Fe's personnel board's conclusion that "proof of theft and dishonesty by an employee is justifiable cause for termination of employment."  (internal quotation marks omitted)); Munnelly v. U.S.P.S., 805 F.2d 295, 301 (8th Cir. 1986)("[C]alculated misuse of public funds in any amount raises doubts about the fitness of a [public employee] to serve."); Flowers v. State Personnel Bd., 174 Cal. App. 3d 753 (1985)(upholding hearing officer's and personnel board's decision to terminate employee who attempted to steal amplifier); Sanders v. Dep't of Health and Human Servs., 394 So. 2d 629, 632 (La. 1981)(concluding that just cause existed to terminate employee who held classified position as a cook for attempted theft of two loaves of bread and eight dozen eggs from hospital kitchen).

In Montoya v. City of Albuquerque, for example, the petitioner -- Rudy Montoya -- was fired from his job as a foreman with the City of Albuquerque after he stole two pick-up mirrors and twenty-five pounds of nails for his personal use.  See 1982-NMSC-056, ¶ 2.  Without further explanation, the Supreme Court

of New Mexico stated: "[W]e agree with the majority of the CAPB that "proof of theft and dishonesty by an employee is justifiable cause for termination of employment." 1982-NMSC-056, ¶ 2.

At first blush, M. Lujan's actions seem less egregious than Montoya's because, unlike Montoya -- who succeeded in stealing from the City of Albuquerque -- M. Lujan did not successfully steal from the City of Santa Fe. Upon closer examination, however, M. Lujan's actions were more egregious than Montoya's for two reasons.

First, unlike Montoya -- who served in a relatively low-level position with the City of Albuquerque as a foreman on a construction site -- M. Lujan was in the upper echelon of the City of Santa Fe's municipal government.  He was charged with overseeing the entire Recreation Division and was responsible for helping create a manage a multimillion-dollar municipal budget.  See Nov. 8, 2012, Hearing Tr. at 908:20-909:1 (M. Lujan, Thompkins); id. at 49:13-50:24 (Pino, Allen); Dec. 3, 2012, Hearing Tr. at 1029:4-10 (M. Lujan, Allen).  Second, unlike Montoya -- who stole two pick-up mirrors and twenty-five pounds of nails -- M. Lujan intended to steal at least $750.00 from the City of Santa Fe.  Because M. Lujan was in a more significant position of public trust than Montoya in which M. Lujan managed a larger amount of municipal funds, and the crime he attempted to commit was more serious than Montoya's, his termination was at least as justified. It is worth underscoring here that M. Lujan did not succeed in stealing City of Santa Fe funds only because he was caught in the act -- neither he nor his brother decided on their own not to go through with their plan.  The evidence in the record indicates that, had Rodarte not intervened, the brothers had every intention of following through with their scheme.

Section 7.50(E)(13) of the City of Santa Fe's Personnel Rules states that "Permanent employees may be dismissed, demoted, or suspended only for just cause.  Just cause includes, but is not limited to . . . Action which reflects poorly on the integrity of the City of Santa Fe."  § 7.50(E)(13), City of Santa Fe's Personnel Rules.  Although attempting to steal municipal funds generally "reflects poorly on the integrity of the City of Santa Fe," and therefore satisfies this section, M. Lujan's conduct, when combined with his position, certainly does. Having a high-level municipal official like M. Lujan who is charged with helping create and manage a multimillion-dollar budget; reviewing the goods and services that the City of Santa Fe purchased, the quoted prices for those purchases, and the amount that the City of Santa Fe paid for those purchases; and authorizing the payments for most of the City of Santa Fe's purchases by signing them attempt to steal the municipal funds that he is entrusted with distributing is a grave violation of the public trust that "reflects poorly on the integrity of the City of Santa Fe." § 7.50E(13), City of Santa Fe's Personnel Rules.  Accordingly, there was just cause for the City of Santa Fe to terminate M. Lujan's employment.

AMOO at 77-82.

Because the Court's ruling in the AMOO thoroughly explained why the Court was upholding Ms. Maynes' just-cause determination -- despite reversing two of her other decisions -- and because M. Lujan has not offered any additional evidence, argument, or authority challenging that conclusion, the Court sees no reason to alter it.  M. Lujan did not, in his Appeal Brief, ask for a remand to consider lesser sanctions, see Appeal Brief at 24 ("For all the forgoing reasons, Lujan request[s] that this Court reverse the Decision of the Hearing Officer and reinstate his employment with the City."), so this part of his request is new.  Although M. Lujan's request is creative, it lacks a sound basis in the law or facts.  Although M. Lujan now asks the Court for remand to impose less severe disciplinary measures, the Court's only task on appeal is determining whether just cause existed for M. Lujan's termination under the City of Santa Fe's Personnel Rules.  Once that decision was made, the Court's task is done.  Cf. Martinez v. N.M. State Eng'r Office, 2000-NMCA-074, ¶ 36, 9 P.3d 657 ("[O]nce it is determined that just cause exists to terminate, termination is appropriate under the Board Rules").  For the Court to go further and give M. Lujan a second bite at the apple by remanding the case would needlessly undermine Ms. Maynes' and the Court's decision that the City of Santa Fe had just cause to terminate his employment.  To further prolong these proceedings so that M. Lujan can have one more chance to overturn Ms. Maynes' decision, without a clear reason to do so, would be a raw exercise of judicial power and would be the Court putting its thumb on the scales when the Court's work is complete.  Given the lack of evidence or case law indicating that remand is necessary, the comprehensive four-day evidentiary hearing that Ms. Maynes held on M. Lujan's claims -- which produced a 1,194-page transcript -- and the Court's exhaustive review of the entire record to determine whether Ms. Maynes' just-cause determination was correct, the Court concludes that remand is unwarranted.  Accordingly, the

Court will leave the AMOO's holding that the City of Santa Fe had just cause to terminate M. Lujan's employment intact and will deny M. Lujan's request for remand.

**IT IS ORDERED** that Petitioner Martin Lujan's Motion for Reconsideration, filed March 24, 2015 (Doc. 63), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nathaniel V. Thompkins
New Mexico Firm, LLC
Santa Fe, New Mexico

    *Attorneys for the Petitioner/Plaintiff*

Luis E. Robles
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

    *Attorneys for the Respondent/Defendant*